E-FILED
Wednesday, 30 November, 2011  04:27:15 PM
Clerk, U.S. District Court, ILCD
Condensed Transcript

IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION


JAMES MYLES,

        Plaintiff(s),

    vs.

SYLVIA MAHONE, DENNIS LARSON,           No. 10-CV-1250-JBM-JAG
STEVEN TALLER, SCOTT BAKER,
WEXFORD HEALTH SOURCE, INC.,
SHARON SIMPSON, GUY D. PIERCE,
JACKIE MILLER, MICHAEL P.
RANDLE, and LOUIS SCHIKER,

        Defendant(s).
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

JAMES MYLES


May 5, 2011
10:03 a.m.


Pontiac Correctional Center
700 West Lincoln Street
Pontiac, Illinois


Alison L. Strubberg, CSR No. 084.004655, RPR, CRR,
a Court Reporter in and for the State of Illinois





DEFENDANT'S
EXHIBIT

A

Toll Free: 888.486.4044
Telephone:

2700 Centennial Tower
101 Marietta Street
Atlanta GA 30303
www.esquiresolutions.com

**1**

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

--oOo--

JAMES MYLES,

    Plaintiff,

  -vs-      No. 10-CV-1250-JBM-JAG

SYLVIA MAHONE, DENNIS LARSON, STEVEN
TALLER, SCOTT BAKER, WEXFORD HEALTH
SOURCE, INC., SHARON SIMPSON, GUY D.
PIERCE, JACKIE MILLER, MICHAEL P.
RANDLE, and LOUIS SCHIKER,

    Defendants.

_____/

THE DEPOSITION of JAMES MYLES, the

Plaintiff herein, taken before me, Alison L.

Strubberg, CSR No. 084.004655, RPR, CRR, a Court

Reporter in and for the State of Illinois, at

Pontiac Correctional Center, 700 West Lincoln

Street, in the City of Pontiac, County of

Livingston, and State of Illinois, on Thursday,

May 5, 2011, commencing at 10:03 a.m.

**2**

1  APPEARANCES OF COUNSEL:
2
3    FOR THE PLAINTIFF:
4      JAMES MYLES
      In Pro Se
5      Inmate #A15155
      700 West Lincoln Street
6      Pontiac, Illinois 61764
7
    FOR THE DEFENDANTS SYLVIA MAHONE, DENNIS
8  LARSON, STEVEN TALLER, and WEXFORD HEALTH
    SOURCE, INC.:
9
      HEYL, ROYSTER, VOELKER & ALLEN, PC
10     BY:  MICHAEL KOKAL
      Attorney at Law
11     Suite 575, National City Bank Building
      1 North Old State Capitol Plaza
12     Springfield, Illinois 62701
      (217) 522-8822
13
    FOR THE DEFENDANTS SHARON SIMPSON, GUY D.
14  PIERCE, JACKIE MILLER, MICHAEL P. RANDLE
    and LOUIS SCHIKER:
15     OFFICE OF THE ATTORNEY GENERAL
      STATE OF ILLINOIS
16
17     BY:  JOSEPH N. RUPCICH
      Assistant Attorney General
18     500 South Second Street
      Springfield, Illinois 62706
19     (217) 557-0261
20
21
22
23

**3**

1          I N D E X
2
3  DEPOSITION OF JAMES MYLES
4  THURSDAY, MAY 5, 2011
5

| 6 | EXAMINATION BY | PAGE |
|---|---|---|
| 7 | MR. RUPCICH | 4 |
| 8 | MR. KOKAL | 37 |

9
10     E X H I B I T S

| 11 | EXHIBIT NUMBER | PAGE |
|---|---|---|
| 12 | 1 Grievance dated 9-7-09 | 13 |
| 13 | 2 Letter to Warden Pierce dated | 17 |
| 14 | 12-3-09 | |
| 15 | 3 Letter to Warden Pierce dated | 21 |
| 16 | 3-21-10 | |
| 17 | 4 Grievance dated 12-3-09 | 27 |
| 18 | 5 Federal Bureau of Prison Guidelines | 42 |

19  (Exhibits 1 through 4 attached.  Exhibit 5
20  retained by Mr. Kokal.)
21
22
23

**4**

1     PONTIAC, ILLINOIS; THURSDAY, MAY 5, 2011
2       10:03 a.m.
3       --oOo--
4
5       JAMES MYLES,
6    having been sworn as a witness by
7    the Certified Shorthand Reporter,
8    testified as follows:
9
10     EXAMINATION BY MR. RUPCICH
11    MR. RUPCICH:  Q.  Good morning,
12  Mr. Myles.  My name is Joe Rupcich, and I'm with
13  the Attorney General's office in Springfield.  I
14  represent several of the defendants in this case.
15     Could you state and spell your name for
16  our court reporter, please.
17    A.  James Myles, J-A-M-E-S, M-Y-L-E-S.
18    Q.  Okay.  Mr. Myles, have you ever given a
19  deposition before?
20    A.  No.
21    Q.  I'll explain a little bit about the
22  process.  Basically, as the attorney for the
23  defendants and Mr. Kokal for the co-defendants,



ESQUIRE

an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                        May 5, 2011

5

1  this is our opportunity to come and ask you about
2  the facts about your claim -- your claims against
3  our client.
4       And some simple ground rules. Basically,
5  do you understand that you're under oath today?
6  A. Yes.
7  Q. And that your testimony will have the
8  same effect as if you were seated in a courtroom
9  in front of a jury; is that clear?
10  A. Yes.
11  Q. All right. Now, something that will make
12  our court reporter's job a little easier is if you
13  answer the questions with a "yes" or a "no"
14  instead of nodding your head or saying "uh-huh" or
15  "huh-uh." Does that make sense? Is that clear?
16  A. I understand, yes.
17  Q. Very good.
18       If I ask you a question that you don't
19  understand -- sometimes I ask bad questions -- you
20  know, just tell me. Tell me you don't understand
21  or it's not clear, and I will ask it in a
22  different way. Otherwise, I'm going to assume
23  that you understood my question. Is that fair?

6

1  A. Yeah.
2  Q. All right. Mr. Myles, is there anything
3  that would impair your ability to give true and
4  accurate testimony today?
5  A. No.
6  Q. All right. Very good.
7       Now, you are currently incarcerated at
8  the Pontiac Correctional Center; is that correct?
9  A. Yes.
10  Q. How long have you been at Pontiac?
11  A. Since, I think, December of '97, I
12  believe.
13  Q. All right. So would it be fair to say
14  that your claims in this case that you filed all
15  arise out of events that occurred at Pontiac
16  Correctional Center?
17  A. Yes.
18  Q. You currently are incarcerated on a
19  felony conviction; is that right?
20  A. Yes.
21  Q. And that is for murder?
22  A. Yes.
23  Q. That would be out of Peoria County?

7

1  A. Yes.
2  Q. All right. Mr. Myles, I would like to
3  talk a little about your background. Let's start
4  with your educational background.
5       What level of schooling have you
6  achieved?
7  A. I've had a year and a half of college.
8  Q. So you've completed high school. Do you
9  have a high school diploma?
10  A. I've got a GED.
11  Q. You have a GED, and you've completed how
12  much college?
13  A. A year and a half.
14  Q. Was that when you were out, or is that
15  credits --
16  A. Incarcerated.
17  Q. Okay. What college courses have you
18  completed?
19  A. Business law, business math, economics,
20  Spanish, physics, auto mechanics, and I believe
21  that's pretty much about it.
22  Q. Are you working towards any particular
23  degree?

8

1  A. Not now.
2  Q. What jobs, if any, did you hold during
3  times you weren't incarcerated?
4  A. I was -- do you want my whole job
5  history?
6  Q. Yes. What sorts of jobs did you do? If
7  you can just give me kind of an idea.
8  A. I was a shear operator for Westinghouse,
9  for WetCo, Incorporated. I was a longshoreman. I
10  was an upholsterer for like 13 years. And that's
11  basically about it.
12  Q. Were you employed by someone else, or did
13  you run your own business?
14  A. No, I was employed by others.
15  Q. Okay. Now, have you had any jobs since
16  you've been incarcerated?
17  A. Yes.
18  Q. What kinds of things have you done?
19  A. I work in the inmates' commissary, and I
20  cook in the office -- for the employees in our
21  kitchen.
22  Q. What do you do in the commissary?
23  A. Well, I just fill the commissary orders



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                                    May 5, 2011

9

1    and carry them through the window to the
2    supervisor.
3        Q.  You collect them from the inmates; is
4    that right?
5        A.  No.  They were at that time sent through
6    the commissary and then issued to us, and we fill
7    the orders.  That was all.
8        Q.  Okay.  Very good.
9            Have you filed any other lawsuits in your
10   life?
11       A.  No.
12       Q.  This is the only lawsuit you've ever
13   filed?
14       A.  Yes.
15       Q.  Have you assisted other inmates in the
16   filing of their lawsuits?
17       A.  No.
18       Q.  Is anyone assisting you with this
19   lawsuit?
20       A.  Yes.
21       Q.  Who would that be?
22       A.  Michael Lynch.
23       Q.  Is that an inmate paralegal or just

10

1    another inmate?
2        A.  He's an inmate as far as I know.  I don't
3    know if he's a paralegal or not.
4        Q.  Okay.  Now, as far as the pleadings, the
5    complaint, your motions, are you doing that
6    research yourself?
7        A.  Some of it.
8        Q.  Okay.  So you have a general idea of how
9    to proceed in this case?
10       A.  No, not really.  I just go and look for
11   what I'm given to look for, you know, as far as
12   cases go.
13       Q.  Okay.  Do you draft your pleadings --
14       A.  No.
15       Q.  -- yourself?
16       A.  No.
17       Q.  They're drafted by Mr. Lynch?
18       A.  Yes.
19       Q.  And then you review them and sign them?
20       A.  Yes.
21       Q.  Okay.  Your lawsuit here involves your
22   medical care; is that fair?
23       A.  Yes.

11

1        Q.  It involves Hepatitis C?
2        A.  Yes.
3        Q.  And your understanding is that you are
4    positive for Hepatitis C?
5        A.  Yes.
6        Q.  When did you become aware that you were
7    Hepatitis C positive?
8        A.  In July of 2009.
9        Q.  And how did you learn that?
10       A.  Well, I was attending the hypertension
11   clinic, and the attending physician informed me
12   that when he had finished writing the medical
13   report, he was going to take time to explain the
14   lab report sheet to me.
15           And as he went down the sheet, he came
16   upon my AST and my ALT, and he commented that they
17   were elevated.  And I asked what that was, and he
18   told me that AST and ALT were liver enzymes, and
19   that the elevation of them indicated liver
20   problems or Hepatitis C, and that he was going to
21   get another lab draw to confirm that, and that
22   someone would get back with me after that.  So
23   that's what took place.

12

1            But after he had informed me of it, then
2    I required my medical records, and I searched them
3    myself and saw it.
4        Q.  All right.  So the diagnosis then, as far
5    as you know, was in 2009; is that right?
6        A.  Yes, the first time.
7        Q.  Approximately July?
8        A.  Yes.
9        Q.  All right.  Do you have any medical
10   training, sir?
11       A.  No.
12       Q.  Well, I represent several of the
13   Department of Corrections employees in this case
14   that you've named.  And I would like to just talk
15   about each of them individually, and you can tell
16   me what they did that you believe violated your
17   rights.  Does that sound good?
18       A.  I hear what you're saying.
19       Q.  Okay.  Very good.
20           Do you know someone named Sandra Simpson?
21       A.  Sandra Simpson?
22       Q.  Yes.  Is that not her name?
23       A.  Sharon Simpson?



Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                                    May 5, 2011

13

1    Q. Sharon Simpson.
2    A. I don't know her personally, no.
3    Q. Have you ever spoken with her?
4    A. No.
5    Q. Okay. You understand her to be the
6    grievance officer at Pontiac Correctional
7    Center?
8    A. Yes.
9    Q. And she has, I assume, responded to some
10   of your grievances; is that right?
11   A. Yes.
12       MR. RUPCICH: Why don't we mark this as
13   Exhibit 1.
14       (Exhibit 1 marked for identification.)
15       MR. RUPCICH: Q. Take a look at that for
16   me, Mr. Myles, and after you've finished looking
17   at it, tell me if you recognize that document.
18   A. Yes, I know what it is.
19   Q. What is it?
20   A. This is my first grievance.
21   Q. All right. So Exhibit 1 would be the
22   first grievance you filed regarding the issues
23   that are the claims in this case; is that right?

14

1    A. Right.
2    Q. Okay. And you filed that on or about
3    September 7th of 2009?
4    A. Yes.
5    Q. Now, if you look at what you have labeled
6    as page 6 of 7 of Exhibit 1, the grievance
7    officer's response is signed by C.O. S. Simpson;
8    is that right?
9    A. Yes.
10   Q. And your understanding is that would be
11   defendant Sandra Simpson -- or, I'm sorry, Sharon
12   Simpson?
13   A. Uh-huh.
14   Q. Is this the first interaction that you
15   had with Ms. Simpson about the claims in this
16   case?
17   A. Yes.
18   Q. Okay. And the fact that she's a
19   defendant in this case, the fact that you have
20   sued her, that's based on her recommendation that
21   your grievance be denied; is that right?
22   A. Well, yes. Yes.
23   Q. Okay. Her grievance response indicates

15

1    that she consulted with medical staff regarding
2    your Hepatitis C treatment, and, basically, they
3    told her that the grievance should be denied; is
4    that right?
5    A. Well, I don't know who told her that, but
6    this is what -- the way that she responded.
7    Q. Right.
8    A. Okay. I don't know who told her.
9    Q. Okay. So you have sued her because of
10   her recommendation for the denial?
11   A. Yes.
12   Q. And is there any other reason that she's
13   a defendant in this case, other than her
14   recommendation that this grievance that is
15   Exhibit 1 was denied?
16   A. Well, I don't feel that she acted on the
17   grievance and the evidence of the grievance and my
18   medical records. She just solely went along.
19   That's what she did.
20   Q. She went along with what the medical
21   staff said?
22   A. Right. Exactly.
23   Q. Okay. So you don't feel that her

16

1    response was adequate?
2    A. No, I don't.
3    Q. Okay. Is there any other reason that
4    she's a defendant in this case, other than this
5    particular response to the grievance?
6    A. No.
7    Q. All right. Let's talk about Guy Pierce.
8    Who is Guy Pierce?
9    A. He's the warden.
10   Q. He's the warden at Pontiac?
11   A. Right.
12   Q. Has he been the warden at Pontiac during
13   all the times that you consider relevant to your
14   case?
15   A. I believe that he has.
16   Q. Okay. And why is -- why have you named
17   Warden Pierce as a defendant in this case?
18   A. Because I wrote to Warden Pierce asking
19   for assistance to obtain medical treatment, and I
20   didn't get that.
21   Q. How many times have you written to Warden
22   Pierce?
23   A. I don't recall at this time. That is in



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                                      May 5, 2011

17

1   my records.
2       MR. RUPCICH:  Why don't we mark this as
3   Exhibit 2, please.
4       (Exhibit 2 marked for identification.)
5       MR. RUPCICH:  Q.  Take a look at that for
6   me please, Mr. Myles.
7   A.  Yes.
8   Q.  Do you recognize this document?
9   A.  Yes.
10  Q.  What is it?
11  A.  It's a letter to the warden concerning my
12  medical needs.
13  Q.  And you wrote and sent this on or about
14  December 3rd, 2009?
15  A.  Yes.
16  Q.  How did you send it?
17  A.  Through institutional mail.
18  Q.  Okay.  Did you receive a response?
19  A.  No.
20  Q.  All right.  Now, in this letter, you
21  indicated to Warden Pierce that you had a
22  grievance pending on this issue currently, at the
23  time you were sending the letter, right?

18

1   A.  Yes.
2   Q.  Okay.  So the grievance process was
3   ongoing at the time you sent this letter?
4   A.  Yes.
5   Q.  It wasn't moving at the pace that you --
6   A.  Well, let me see.  I don't know.  Let me
7   look at the dates.
8       Okay.  Yeah, because I'm stating that
9   I've also sent a second grievance in this letter.
10  There should be another letter, more than just
11  this one.
12  Q.  Right.  How did you -- did you make a
13  copy of this before you sent it to the warden?
14  A.  Yes, I did.
15  Q.  Okay.
16  A.  It's not a xeroxed copy.  It's a
17  facsimile.  I handwrote it.
18  Q.  Okay.  So you wrote the letter to Warden
19  Pierce and hand copied it a second time?
20  A.  Yes.  Then I got xeroxed copies of it.
21  Q.  All right.  So this isn't a photocopy of
22  the one that actually went --
23  A.  Yes, it is.

19

1       Q.  All right.  Explain to me.  I don't
2   understand.
3   A.  I wrote the letter and immediately wrote
4   a facsimile of it.  Then I got the letter
5   xeroxed.
6   Q.  Which letter did you xerox?
7   A.  The one that I wrote to him.
8   Q.  All right.  Maybe I'm not understanding
9   you.
10  A.  I hand copied the letter, and I also got
11  a xerox.
12  Q.  Is this a copy of the one you hand
13  copied --
14  A.  Yes.
15  Q.  -- or is this a copy of the original?
16  A.  No, this is a hand copy, one of the
17  originals.
18  Q.  Okay.  So this is not a photocopy of the
19  one that went in the mail, this is a photocopy of
20  the one that -- let me --
21  A.  I heard you.
22  Q.  If you don't let me finish, she can't
23  take us both down, and she's going to yell at me.

20

1   A.  I'm not yelling at you, sir.
2   Q.  No, she's going to get upset.  Okay?  So
3   let me just make sure I understand you.
4       You tell me if I'm wrong.  And if I'm
5   wrong, that's fine.
6       Exhibit 2 is a photocopy of the
7   handwritten second copy of the letter that you
8   made; is that correct?
9   A.  No.
10  Q.  Okay.  Tell me what's wrong.
11  A.  It's a hand copy -- it's a copy of the
12  original letter, but I had also hand copied the
13  letter.
14  Q.  I'm not understanding.
15  A.  I was writing the letter in my cell.
16  Okay?  Then I copied it by hand, but I got the
17  letter xeroxed.
18  Q.  All right.  So as you're sitting in your
19  cell, you have two copies of this because you've
20  hand copied the second one, right?
21  A.  Right.
22  Q.  Which one of those two is this a copy
23  of?



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                                    May 5, 2011

21

1    A. I just told you a couple of times that's
2    a copy of the original letter.
3        Q. That's fine. I'm just trying to make
4    sure I understand. All right. Very good.
5        All right. Now, Warden Pierce is a
6    defendant in this case based on his failure to
7    respond to this letter?
8        A. It's not just this letter. This is the
9    only letter that you're showing me. I told you I
10   wrote him more than one letter.
11       Q. All right. So part of the reason he's a
12   defendant is his failure to respond to Exhibit 2,
13   correct?
14       A. To my request for his assistance in
15   obtaining medical treatment. That's why he's a
16   defendant.
17       Q. Okay. That would have been communicated
18   to him through this letter?
19       A. Through letters. Not just this letter.
20       Q. Right.
21       Let's mark this as Exhibit 3, please.
22       (Exhibit 3 marked for identification.)
23       MR. RUPCICH: Q. Take a look at this

22

1    please, Mr. Myles. Let me know when you're done
2    looking at it.
3        A. Okay.
4        Q. Have you had a chance to review
5    Exhibit 3?
6        A. Yes.
7        Q. What is Exhibit 3?
8        A. It's another letter to the warden
9    requesting his assistance in obtaining medical
10   treatment for Hepatitis C.
11       Q. All right. Now, this letter is dated
12   March 21st of 2010?
13       A. Yes.
14       Q. And did you put it in the institutional
15   mail on or about March 21st of 2010?
16       A. Yes.
17       Q. How did you copy this document?
18       A. How did I copy it? Okay. This was
19   mailed on 3-21-10. It was copied from the
20   facsimile.
21       Q. So is this a copy of the letter you sent
22   to the warden?
23       A. Yes.

23

1        Q. This isn't a copy of your rewriting the
2    letter, right?
3        A. They are exact.
4        Q. Right.
5        A. It's exact, line for line, word for word,
6    same places.
7        Q. Okay. So did you photocopy the one you
8    sent to the warden or the one you recopied?
9        A. The one that I recopied on this one.
10       Q. Okay. So this one is different from the
11   first one?
12       A. Yes.
13       Q. Okay. So Exhibit 3 is a copy of your
14   handwritten copy of your original?
15       A. Right.
16       Q. Okay. Very good.
17       Now, this letter, you're requesting the
18   warden intervene in your medical care, right?
19       A. Yes.
20       Q. And in the letter, you informed the
21   warden that you -- actually, that you have a
22   grievance pending in Springfield at this time,
23   right?

24

1        A. Yeah.
2        Q. You actually would have had two
3    grievances on this issue pending at this time,
4    right? Is that right?
5        A. Well, I don't know -- you have the second
6    grievance. I don't know the date on it.
7        Q. Okay. We'll go over that in a second.
8        Now, at the time you wrote to the warden,
9    you were being seen by the medical staff at
10   Pontiac; is that right?
11       A. Well, what do you call being seen? I
12   wasn't being treated.
13       Q. Right. You were going down there and
14   talking to the medical staff, they just weren't
15   giving you the treatment that you felt you --
16       A. I was going to the hospital and being
17   bull crapped. That's what I was doing.
18       Q. Okay. It's not as though you weren't
19   getting to see the medical professionals, they
20   just weren't treating you the way that you felt
21   you should be treated?
22       A. No, not that they weren't treating me the
23   way that I felt. They weren't treating me the way



ESQUIRE
an Alexander Gallo Company

James Myles                                                    May 5, 2011

25

1  the Federal Bureau of Prison Medical Guidelines
2  specified that I should be treated. They called
3  me to the hospital and bull crapped me. They
4  weren't treating me.
5      Q. All right. But you did get down there to
6  the healthcare unit?
7      A. Yes, I got there approximately every two
8  or three months.
9      Q. Right. Okay. Very good.
10     Other than Exhibit 2 and Exhibit 3, which
11 are your letters to Warden Pierce, is there any
12 other way that he should have been aware of your
13 medical issues?
14     A. Who? The warden?
15     Q. The warden, yes.
16     A. Other than my grievance and the letters,
17 no.
18     Q. Okay. And your grievance that was
19 Exhibit 1 dated September 7th of '09, the warden
20 recommended a denial of that grievance, right?
21     A. The warden didn't recommend it. Now, I
22 don't know. You've got all the records there.
23     Q. It's right here.

26

1      A. The recommendation of denial was through
2  the grievance officer. The warden simply
3  concurred that that was a fact. He just signed
4  off on it, that he concurred. He didn't recommend
5  it, the grievance officer did.
6      Q. Okay. You're right.
7      So thus far we have identified two
8  letters and the warden's denial of your grievance,
9  right, on Exhibit 1, correct?
10     A. Okay. You keep saying the warden's
11 denial. I don't see on the grievance for the
12 warden that he denied anything. It says that he
13 simply concurred with the conclusions of the
14 grievance officer.
15     Q. Okay. Now, my understanding of the
16 grievance process at the institutional level is
17 that when the warden makes his decision, the
18 grievance is final at the institutional level.
19     A. At the institution, yes, sir.
20     Q. So when he concurred with the grievance
21 officer's recommended denial, the grievance
22 process was over?
23     A. Meaning that he agreed, yes.

27

1      MR. RUPCICH: Okay. Let's mark this as
2  4, please.
3      (Exhibit 4 marked for identification.)
4      MR. RUPCICH: Q. I'm handing you
5  Exhibit 4. Why don't you take a look at that, and
6  when you're done, let me know.
7      A. Okay. This is my second grievance.
8      Q. All right. This is the second grievance
9  you filed regarding your care and treatment for
10 Hepatitis C?
11     A. Yes.
12     Q. And this is dated December 3rd of 2009,
13 right?
14     A. Right.
15     Q. All right. And this grievance was
16 recommended denied by Ms. Simpson in January of
17 2010, right?
18     A. I can't see the date here. It's muddled
19 down here.
20     Q. I was looking at the top, date of review.
21     A. Date of review, January 3rd.
22     Q. All right. So we've reviewed Exhibit 1
23 and Exhibit 4 that were your medical grievances on

28

1  Hepatitis C, right?
2      A. Yes.
3      Q. And both of those indicate that
4  Ms. Simpson was the grievance officer, correct?
5      A. Yes.
6      Q. Is there any other reason, other than her
7  action on these two grievances, that she's a
8  defendant in this lawsuit?
9      A. No. Just for her actions and inactions
10 is all.
11     Q. Based on these two grievances?
12     A. Yes.
13     Q. Okay. Now, this Exhibit 4 grievance also
14 shows a concurrence by Guy Pierce, right?
15     A. Uh-huh.
16     Q. Okay. So we have Exhibit 1 and
17 Exhibit 4, the grievances that were denied and
18 concurred with by Warden Pierce, right?
19     A. Uh-huh.
20     Q. And then we have two letters, Exhibits 2
21 and 3, that you sent to Warden Pierce, correct?
22     A. Uh-huh.
23     Q. All right. Other than those four things,



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                    May 5, 2011

---

29

1  is there any other way that Warden Pierce would
2  have been aware of your medical issues?
3      A. Other than the grievances and the letters
4  that I wrote to him, as far as I know, no.
5      Q. Okay. Let's talk about Jackie Miller.
6  How do you know Jackie Miller, or do you?
7      A. I don't know her personally. All I know
8  is that she's the administrative assistant in
9  Springfield.
10     Q. Okay.
11     A. She's the chairperson of the grievance
12  committee.
13     Q. You've never spoken with her personally?
14     A. No. No.
15     Q. All right. And if you pick up Exhibit 1
16  again and you look at the last page, which would
17  be, as you've labeled it, 7 of 7, this is the
18  Administrative Review Board in Springfield's final
19  determination on your grievance, right?
20     A. Yes.
21     Q. All right. And it indicates that Jackie
22  Miller made the decision for the Administrative
23  Review Board, right?

---

30

1      A. Correct.
2      Q. Other than her signature appearing on
3  this grievance denial, has she had any other role
4  in your medical care?
5      A. None that I know of.
6      Q. All right. So the fact that you've named
7  her as a defendant in this case is based solely on
8  her response to your grievance?
9      A. Well, it would come out to be her
10  response, yeah. But just the same thing, her
11  actions and inactions is basically what -- but,
12  yeah. Yes.
13     Q. All right. Which would have been
14  conveyed to her through the grievance process?
15     A. Right. Right.
16     Q. And this -- has she ruled on any other
17  grievances on this issue besides this one?
18     A. No.
19     Q. Okay. So this is the only way that she
20  would have been involved in this process?
21     A. Yes.
22     Q. All right. Very good.
23        You've also named Michael Randle as a

---

31

1  defendant?
2      A. Yes.
3      Q. Who is Michael Randle?
4      A. He's the former director of the
5  Department of Corrections.
6      Q. Have you ever spoken with him personally
7  about your medical care?
8      A. No, I have not.
9      Q. Why have you named him as a defendant?
10     A. Because Michael Randle, as the director,
11  he signs off on all grievances, and I assume that
12  he has a responsibility of reviewing them before
13  putting his signature to them.
14     Q. All right. Now, if we continue to look
15  at Exhibit 1, on page 7 of 7 there at the end, it
16  appears that Jackie Miller's decision was
17  concurred with by Michael Randle, right?
18     A. Jackie Miller's decision was concurred
19  with by Warden Pierce. Oh, Jackie Miller, yeah.
20  Yes. I'm thinking Sharon Simpson. Yeah, you're
21  right.
22     Q. So Michael Randle concurred with Jackie
23  Miller's recommendation at the Administrative

---

32

1  Review Board in Springfield?
2      A. Correct.
3      Q. Okay. Now, have you named Michael Randle
4  as a defendant in this case based on anything
5  other than his role in answering or denying this
6  grievance?
7      A. Same answer, sir, actions and
8  inactions.
9      Q. Right. Based on this grievance that was
10  filed on September 7th of '09?
11     A. Yes.
12     Q. Do you know Louis Schiker?
13     A. I don't know any of these people
14  personally.
15     Q. Have you ever spoken with Louis
16  Schiker?
17     A. No, I haven't. I've never seen him.
18     Q. Why have you named Mr. Schiker as a
19  defendant?
20     A. Because he came into the case making --
21  in this grievance here, it says, "Per IDOC Medical
22  Director Dr. Schiker, medical staff are attempting
23  to resolve other medical issues which are

---



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                                    May 5, 2011

33

1  currently prohibiting the issuance of treatment."
2  And this was untrue, and this is Dr. Schiker's
3  statement.  And as the state medical director, he
4  should have reviewed my records, which he failed
5  to do.
6      Q.  So you've named him as a defendant based
7  on this sentence in this July 2nd, 2010 grievance
8  denial that's page 7 of 7 of Exhibit 1?
9      A.  No, based on the fact that he issued this
10 statement and failed to review my medical records.
11 Had he done so, he couldn't have said this because
12 there was no other medical problem attempting to
13 be resolved.
14     Q.  Okay.  Do you have any personal knowledge
15 of what Dr. Schiker did beyond this sentence in
16 this July 10th, 2010 letter?
17     A.  Nothing.
18     Q.  All right.  And you believe, based on
19 what's said in this letter, he didn't do what he
20 should have done?
21     A.  Correct.
22     Q.  And other than what's contained in this
23 letter, you have no other knowledge of anything

34

1  Dr. Schiker did, is that fair, or didn't do?
2      A.  Correct.
3      Q.  So the only reason he's in this
4  case -- I'll start over.
5          He's in this case and you know about him
6  only because of this sentence in this grievance?
7      A.  He's in this case because of his failure,
8  as administrative medical director, to investigate
9  my claim and administer a proper decision on it.
10     Q.  That he would have been made aware of
11 through this Exhibit 1 grievance?
12     A.  That and the medical records, had he
13 obtained them.
14     Q.  You've never written to him
15 independently?
16     A.  No.
17     Q.  The only correspondence, as far as you
18 know, would have been through this process?
19     A.  Yes.
20     Q.  The grievance process, right?
21     A.  Yes.
22     Q.  Okay.  What's the current status of your
23 Hepatitis C, if you know?

35

1      A.  It's chronic.
2      Q.  Chronic.
3          Okay.  Now, have you continued to see
4  medical staff through the present time?
5      A.  The medical staff have not even called me
6  to the hospital to tell me the results of my liver
7  biopsy.  I haven't continued to see anybody.
8      Q.  Okay.  So you've received a liver biopsy?
9      A.  Yes.
10     Q.  When did you receive a liver biopsy?
11     A.  On January 3rd.  And that's the last time
12 that I saw any medical personnel in reference to
13 the Hepatitis C or liver biopsy.
14     Q.  Now, were you sent to an outside hospital
15 for that?
16     A.  Yes.
17     Q.  And nobody has communicated to you the
18 results?
19     A.  No.
20     Q.  Have you seen any doctors here at the
21 facility since January 3rd?
22     A.  Not in reference to Hepatitis C.  I saw
23 them for pain in my right side during sick call,

36

1  and that was about it.
2      Q.  Okay.  So when you want to see medical
3  staff, you can fill out a sick call slip, right?
4      A.  Well, the procedure is supposed to be
5  that the medical -- the EMTs walk the gallery, and
6  you catch them if you see them and request sick
7  call.  You know, that's the procedure.  But if you
8  don't see anybody, which chances are you won't,
9  then you can write to the hospital and request
10 it.
11     Q.  All right.  Have you requested the
12 results of your liver biopsy?
13     A.  I wrote Dr. Tilden a letter in reference
14 to the treatment and asked when was he going to
15 call me over to give me the information on my
16 biopsy results.  I never got a response.
17     Q.  Okay.  So you're still waiting on the
18 results of your biopsy?
19     A.  I know what the results are, but I didn't
20 get them from this hospital here.  I didn't get
21 them from these medical people.
22     Q.  How did you get them?
23     A.  I got my lab report -- my biopsy reports


ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                              May 5, 2011

37

1   from the hospital myself.
2   Q.  Okay.  Which hospital?
3   A.  Decatur Memorial.
4   Q.  That's where you had your biopsy?
5   A.  Yes.
6       MR. RUPCICH:  I don't think I have any
7   other questions, Mr. Myles.  Thank you.
8       THE WITNESS:  I can go?
9       MR. KOKAL:  No.
10      MR. RUPCICH:  No, he gets to ask some.
11      EXAMINATION BY MR. KOKAL
12      MR. KOKAL:  Q.  Mr. Myles, how is your
13  health doing right now, currently?
14  A.  How is my health doing right now?  I
15  wouldn't say that it's doing too great.  I've got
16  fibrosis of the liver.
17  Q.  Any other health issues?
18  A.  Well, other than I have some pains
19  occasionally through my right lower abdominal
20  section, and my left.
21  Q.  As I understand it, your only complaint
22  against the prison doctors and the medical staff
23  is that they failed to properly treat your

38

1   hepatitis; is that correct?
2   A.  Yes.  And -- well, not necessarily only
3   to treat me, but they failed to inform me of the
4   fact that I was infected with Hepatitis C.
5   Q.  Sure.  So your only complaints against
6   the prison doctors and the medical staff here
7   concerns your care and treatment of hepatitis and
8   not any other ailment; is that correct?
9   A.  No.
10  Q.  Am I correct?
11  A.  Yes.
12  Q.  Now, you mentioned, in looking over your
13  grievances, that the problem with your medical
14  care with regard to hepatitis is that they failed
15  to do a liver biopsy, failed to do HCV genotyping,
16  and failed to do the interferon treatment; is that
17  right?
18  A.  That, plus informing me of the fact.
19  Q.  Well, right now you've had a liver
20  biopsy, right?
21  A.  Yes.
22  Q.  And you've had the HCV genotyping as
23  well; is that right?

39

1   A.  Yes.
2   Q.  And so, basically, as I understand it,
3   your only complaint now against the prison doctors
4   is that they haven't instituted interferon
5   treatment for you; is that correct?
6   A.  Correct.
7   Q.  And there are no other treatments that
8   you're claiming that you need, other than the
9   interferon treatment right now for your hepatitis;
10  is that correct?
11  A.  None that I know of, no.
12  Q.  Am I correct?
13  A.  Yes.
14  Q.  Now, you would agree with me that not
15  every case of Hepatitis C should have the
16  interferon treatment; is that correct?
17  A.  Yeah.
18  Q.  Okay.  What cases, to your understanding,
19  don't require the interferon treatment or the
20  antiviral treatment?
21  A.  People -- there were four, and I think
22  one is people who have some condication [sic], or
23  whatever, against the medication, people who

40

1   were --
2   Q.  Contraindication for the medication; is
3   that correct?
4   A.  Right.  Contraindication, correct.
5   Q.  All right.
6   A.  People who were presenting using HIV
7   drugs and drinking alcohol, people, I believe, who
8   had COPD, and there was one other.  I don't
9   recall.
10  Q.  Well, you would agree with me that in
11  addition to those contraindications, if a liver
12  biopsy came back and it was not -- didn't show
13  severe enough damage to the liver, that that might
14  also be a reason that you wouldn't need the
15  interferon treatment as well, correct?
16  A.  Well, as far as I know, according to the
17  Federal Bureau of Prison Guidelines, I should be
18  receiving the treatment.  I am a genotype 1b, and
19  I've got fibrosis of my liver.  So...
20  Q.  So your understanding -- where did you
21  get the understanding that any fibrosis
22  or -- well, strike that.
23      Would it be possible that if your



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                                    May 5, 2011

41

1  fibrosis was not severe and your liver biopsy came
2  back showing that, that you might not need the
3  interferon treatments or --
4      A.  Well, I couldn't or wouldn't say that
5  because I'm aware of the fact that people 40 to
6  50 years old, their livers deteriorate at a much
7  faster rate, and they die at the rate of an
8  80 year old.  This is all I know.  And I've got
9  it, and it should be treated.  They have known
10  prior to 2007 from my finding of the medical
11  information.  They have known this as far back as
12  2003.
13      Q.  Well, you would agree with me, though,
14  that you're not an expert in what the treatments
15  are for Hepatitis C and the liver; is that
16  correct?
17      A.  None other than what I've read in the
18  Federal Bureau of Prison Guidelines.
19      Q.  And the Federal Bureau of Prison
20  Guidelines, is this what you're referring to
21  here?
22      A.  Yes.
23      MR. KOKAL:  Okay.  So can we go ahead and

42

1  mark this as Exhibit 5?
2      (Exhibit 5 marked for identification.)
3      MR. KOKAL:  Q.  So, basically, Mr. Myles,
4  you're saying that your only knowledge about what
5  should or shouldn't be done with regard to the
6  treatment of the liver is contained in what you've
7  read in Exhibit 5; is that correct?
8      A.  That guideline is what the medical people
9  here are supposed to be following as IDOC adopted
10  that policy in 1999.  That's what they're supposed
11  to be going by.  So as far as I'm concerned,
12  that's it.
13      Q.  Now, what do you understand were the
14  results of your liver biopsy?
15      A.  What do you mean what do I understand?
16      Q.  Well, I think you mentioned that you
17  obtained the results of the liver biopsy; is that
18  right?
19      A.  Yes.
20      Q.  And what is your understanding of the
21  results of your liver biopsy?
22      A.  That my liver is diseased.
23      Q.  Do you have any other understanding other

43

1  than that?
2      A.  None other than the fact that it's
3  getting worse as I get older, as time passes and
4  not being treated.
5      Q.  Do you understand that one of the
6  functions of a liver biopsy is to stage the extent
7  of your fibrosis of the liver?
8      A.  Okay.
9      Q.  I mean, do you know that, or am I telling
10  you new information?
11      A.  I didn't know exactly what the biopsy,
12  the purpose of it was, other than to check my
13  liver for liver damage.
14      Q.  Right.  But in the -- in your background
15  research and what you've read, do you understand
16  that there are certain stages of fibrosis?
17      A.  Yes.  Yes.
18      Q.  And stage one would be the lowest stage
19  of fibrosis?
20      A.  Yes.  Yes.
21      Q.  And then stage two is more, and --
22      A.  Yes.
23      Q.  -- stage three?

44

1      And stage four would be --
2      A.  Severe.
3      Q.  Now, do you have any understanding of
4  what stage of fibrosis your liver is at
5  currently?
6      A.  I believe that the report said it was
7  stage one at this time.
8      Q.  So that's good news; am I correct?
9      A.  That's not good news to me.
10      Q.  Well, it's the lowest stage of fibrosis
11  that you could have as --
12      A.  I understand that, but it's not good
13  news.
14      Q.  Well, you would much rather have stage
15  one than stage four?
16      A.  I would like to not have any.
17      Q.  Do you agree with me that the
18  determination of what treatment you receive for
19  your Hepatitis C is based upon what stage of
20  fibrosis is present on your liver biopsy?
21      A.  I can't agree on that because I don't
22  know.
23      Q.  And is it possible that some stages



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

45

1  of -- now, I -- let me strike that.
2      I understand that you're not an expert in
3  the staging of, you know, liver disease and stuff.
4  But is it possible that there might be a doctor or
5  somebody that is an expert who would say that
6  certain stages of liver fibrosis would not
7  indicate that you need antiviral therapy if it's
8  not severe enough?  Would you agree that that's
9  possible?
10     A.  I don't know.  I can't -- I can't --
11 don't know.  Like I said, I'm not an expert.
12 So...
13     Q.  Sure.
14         Who is the doctor that told you in July
15 2009 about your elevated AST levels?
16     A.  Dr. Castravilla, the visiting physician
17 here.
18     Q.  Now, you've filed a complaint against
19 Scott Baker.  Who is Scott Baker?
20     A.  He was a nurse practitioner who used to
21 work here.
22     Q.  And what is your complaint against Scott
23 Baker?

46

1      A.  That he, too, failed to inform me of the
2  fact that I was infected with Hepatitis C.  He had
3  the information, as he conducted hypertension
4  clinics.  He read my lab reports, and he saw this,
5  failed to report it and failed to inform me of
6  it.
7      Q.  Any other complaints against Scott Baker?
8      A.  None other than what's stated in my
9  claim.
10     Q.  What evidence do you have that Scott
11 Baker was ever apprised of your lab results?
12     A.  He signed the medical report.  He was
13 there.  I mean, I saw the man.  I talked with him.
14     Q.  So is your source of information that
15 Scott Baker was aware of your liver problems only
16 based upon the medical records that he would have
17 signed?
18     A.  He read the lab reports.  The doctors who
19 conduct hypertension clinic, they have a lab
20 report there.  They read that, and they transfer
21 information from it to the medical report.
22     Q.  Well, I guess what I'm getting at is, if
23 there wasn't a document that Mr. Baker signed, you

47

1  wouldn't be -- expect him to know the results of
2  that unless he physically signed it; is that
3  correct?
4      A.  Well, if he didn't see it, he wouldn't
5  know the results of it, but he saw it.
6      Q.  And the only source of information you
7  have that he saw it is because you saw his
8  signature on some of those lab reports; is that
9  correct?
10     A.  I was there with him.  I mean, the man
11 and I was sitting across the table from each
12 other.  So he read the lab reports, not just the
13 fact that he signed the paper.
14     Q.  When did this occur, that he was sitting
15 across from you?
16     A.  I don't recall that at this time.  There
17 are various dates.
18     Q.  What does Mr. Baker look like?
19     A.  I can't recall that either.  That's just
20 another man to me.
21     Q.  Well, is he -- what's his race?
22     A.  He's Caucasian.
23     Q.  How tall is he?

48

1      A.  I don't know that.
2      Q.  Does he wear glasses?
3      A.  Not that I recall.
4      Q.  Does he have any facial hair or a beard
5  or anything?
6      A.  I -- you're asking -- I don't pay that
7  close attention to guys, you know.  So I don't
8  know.
9      Q.  Well, is he --
10     A.  None that I haven't -- I don't recall him
11 wearing a beard or anything like that.  So...
12     Q.  How tall of a man are you?
13     A.  Six feet.
14     Q.  Was Mr. Baker taller or shorter than
15 you?
16     A.  I didn't have occasion to stand up to
17 him.  So...
18     Q.  Okay.
19     A.  I would guess that we were in reasonable
20 proximity of each other.  I don't know.
21     Q.  How old is Mr. Baker, approximately?
22     A.  I don't -- I don't know that either.
23     Q.  Do you think he's more than 40 or less



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                                May 5, 2011

**49**

1    than 40?
2        A.  I don't think that he was any more than
3    40.  He left here and went to the military.  I
4    don't think he was 40 years old.
5        Q.  But as you sit here today, you don't
6    remember his age; is that right?
7        A.  No, I don't.  I never knew his age.
8        Q.  When did Mr. Baker leave Pontiac?
9        A.  I can't say for certain.
10       Q.  Now, do you have any evidence that any of
11   your liver problems have gotten worse since
12   2009?
13       A.  None other than the facts that I read in
14   the Prison Bureau Guidelines, you know, which they
15   state that you -- as time progresses, so does the
16   disease.
17       Q.  But you're not able to point to any
18   evidence, other than that -- other than that
19   statement in the Prison Guidelines, you're not
20   able to point to any other evidence that your
21   particular Hepatitis C has progressed since 2009;
22   is that correct?
23       A.  Well, I haven't seen anything.  Okay?  So

**50**

1    I can't say.  I haven't seen it.  I haven't seen
2    any -- any tests, test results and things like
3    that, revealed to us, so I don't know.
4        Q.  Well, the test results -- or some of the
5    test results have been revealed to you though.  I
6    mean, you've seen your HCV genotyping results,
7    right?
8        A.  Blood tests, that kind of stuff, yes.
9        Q.  And you know that you're a 1b genotype;
10   is that right?
11       A.  Right.  I know that from the biopsy
12   report and from Dr. Taller expressing that to
13   me.
14       Q.  Right.  And you know that -- and you've
15   seen the results of your liver biopsy, so you know
16   the results of that test and the types of stages,
17   right?
18       A.  Right.  And I was once told by Dr. Steven
19   Taller, during the medical director's clinic, that
20   I already had liver damage.  So that was before --
21   prior to the biopsy.
22       Q.  Have you ever seen Dr. Larson as a
23   patient?

**51**

1        A.  I've seen him years back, yes.
2        Q.  When did you see Dr. Larson?
3        A.  The only time that I would have ever had
4    the occasion of seeing Dr. Larson was at the
5    hospital.  And whether I -- I don't recall that I
6    went and saw him personally.  I don't know.  It's
7    been a long time ago.
8        Q.  I mean, you haven't seen Dr. Larson in
9    the last four years; is that right?
10       A.  Four years, no.
11       Q.  Am I correct?
12       A.  Yeah.
13       Q.  When did Dr. Larson leave Pontiac?
14       A.  I don't know.  I don't know.  All I
15   know -- people come and go.  All I know is he was
16   gone.  I don't know exact dates of anything as far
17   as people leaving.
18       Q.  And you couldn't tell me any specific
19   date that you've ever -- has Dr. Larson ever
20   provided any medical treatment to you directly as
21   a doctor?
22       A.  Not that I recall.  I don't know.
23       Q.  Do you know what Dr. Larson looks like?

**52**

1        A.  No, I don't.
2        Q.  Okay.  Do you know what race of a man he
3    is?
4        A.  I know he's Caucasian.
5        Q.  Do you know how old he is?
6        A.  No, that one I couldn't tell you
7    either.
8        Q.  Do you know if he wears glasses?
9        A.  I don't know that either.
10       Q.  What do you think that Dr. Larson -- why
11   did you see Dr. Larson?  Why is he in your
12   lawsuit?
13       A.  As the medical director, he has the
14   responsibility to review doctor's reports when
15   they conduct the hypertension clinic.  He has a
16   responsibility to review the lab reports.  He's
17   the medical director.  He's supposed to know this.
18   He checks whatever work the doctors do, so he
19   should have knowledge of it.  He's supposed to
20   have.
21       Q.  Do you have any evidence that he ever was
22   presented with or reviewed any of the medical
23   records in your chart?



ESQUIRE
an Alexander Gallo Company

James Myles                                      May 5, 2011

53

1    A. Okay. As I just said, he has the
2 responsibility to do it. Since 2003, this stuff
3 has shown up. He should have seen it as a medical
4 director.
5    Q. Do you have any source of information
6 that a medical director is responsible for
7 reviewing every inmate's chart at this facility?
8    A. Do I have?
9    Q. Any evidence or -- what's your source of
10 information that a medical director has to review
11 all the inmates' charts for everything going on?
12    A. According to the Wexford contract, they
13 have responsibilities to.
14    Q. Okay. So your complaint against
15 Dr. Larson is based upon, basically, you think he
16 didn't live up to the Wexford contract; is that
17 right?
18    A. And he didn't -- as far as I'm concerned,
19 he didn't live up to his hypocritical oath, you
20 know, and that is to help people.
21    Q. Are you aware that Dr. Larson ever signed
22 or initialed or put his name on any of your
23 medical records?

54

1    A. Not that I recall.
2    Q. Okay. Dr. Taller, why did you sue him?
3    A. Steven Taller?
4    Q. Yes.
5    A. He was the medical director that relieved
6 Medical Director Mahone. He took over her
7 position. It was his duty to pursue my treatment.
8 She had me sign a treatment consent form, and he
9 was supposed to follow through on it. He called
10 me to the hospital and bull crapped me every
11 couple of months about it, you know. So he was
12 very aware of it and did nothing.
13    Q. So you're saying that Dr. Taller didn't
14 treat your Hepatitis C by giving you the test,
15 right? But eventually you had a test; is that
16 right?
17    A. After him, yeah. He had told me that I
18 was going to get the test, but I never got them
19 during his tenure here.
20    Q. When did Dr. Taller leave Pontiac?
21    A. When did he leave Pontiac?
22    Q. Right.
23    A. Oh, you're asking me dates again. I

55

1 can't recall that either because I don't even
2 recall when Dr. Tilden came and took his place. I
3 can just guess. I believe it may have been
4 sometime in 2010. I don't know for sure.
5    Q. Would you agree that all the -- all the
6 tests that you would have liked Dr. Taller to have
7 rendered to you have now been provided to you; is
8 that correct?
9    A. To the best of my knowledge, yes. The
10 only one that I was waiting for was the liver
11 biopsy.
12    Q. Do you have any other complaints against
13 Dr. Taller, other than what you've already
14 discussed here today?
15    A. No.
16    Q. What about Dr. Mahone, why did you file
17 suit against her?
18    A. Mahone?
19    Q. Yes.
20    A. Dr. Mahone was very aware of the problem.
21 Like I said, in 2009 I found out about it. She
22 was the medical director then. And after I spoke
23 with Dr. Castravilla, Dr. Mahone called me to the

56

1 hospital. I believe it was July 29th of '09. And
2 during that time, she expressed to me that I had
3 been infected with Hepatitis C.
4    Dr. Mahone called me back to the
5 hospital, and told me that she had reviewed
6 the Federal Bureau of Prison Guidelines, that it
7 stated that no treatment could be provided for
8 people 60 years old or older.
9    And I asked her then, I said, "You're
10 telling me that you've got a guideline telling you
11 not to treat people?"
12    And she said, "Yes," and held up a piece
13 of paper.
14    But I wrote to the Federal Bureau of
15 Prisons and got that and reviewed it myself, and
16 that's when I saw that she was wrong. And I filed
17 that second grievance and sent her a copy of
18 page 28, which specifies people who do get
19 treatment. And there was nothing in there about
20 people 60 years old not getting it. So she just
21 outright lied to me.
22    Q. Well, the treatment that was prescribed
23 in the Federal Bureau of Prisons that we've marked



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                          May 5, 2011

57

1  as Exhibit 5, that is treatment that you've
2  already received now; is that correct?
3      A.  I have not received any treatment.
4      Q.  Right.  But you've had all the testing
5  that was anticipated under the Federal Prison
6  Guidelines?
7      A.  I've had a sonogram and I've had a liver
8  biopsy, the regular blood tests that I get every
9  four months for the hypertension clinic.  That's
10  all the testing that I've had, which, according to
11  that, is nothing.
12      Q.  So as I understand it, your only
13  complaint against Dr. Mahone is that she didn't
14  follow the guidelines that are set out in
15  Exhibit 5; is that correct?
16      A.  That she didn't treat me, that she didn't
17  give me treatment.  That's what my complaint
18  against her is.  That she withheld information of
19  the fact that I am infected with a
20  life-threatening disease, that's what my complaint
21  is.
22      Q.  Okay.  So your complaint against
23  Dr. Mahone is that she didn't -- I thought she did

58

1  tell you that you had Hepatitis C.
2      A.  She didn't tell me until I found out
3  about it.  It was 2009 when Dr. Mahone told me
4  about it.  The evidence came up in 2007, as far
5  back as 2003.  She withheld that information.
6      Q.  Are you an expert on how the diagnosis of
7  Hepatitis C is made by lab tests?
8      A.  None other than them counting the liver
9  enzymes, I believe, in your blood.  I'm not an
10  expert on anything medically.  You keep asking
11  that.  I'm not a medical expert.
12      Q.  Any other complaints against Dr. Mahone,
13  other than what you've described here today?
14      A.  Nothing other than what's been stated in
15  my claim.  That's all.  My claim speaks -- I have
16  nothing else to say about it.
17      Q.  Have you ever been told that prison
18  doctors will refer cases of Hepatitis C to a
19  specialist who will guide them on what treatment
20  needs to be performed?
21      A.  Yeah.  I was told by Dr. Taller that
22  there was a new procedure and that it would be
23  supervised -- I'm thinking that's what he said --

59

1  by some outside source, but the actual
2  administration of it would be dealt with in here,
3  and him telling me that I would be sent out for
4  testing and stuff.  And that was it.
5      Q.  So you have an understanding that, for
6  example, Dr. Mahone or Dr. Taller would send your
7  lab results out to another doctor who specializes
8  in hepatitis treating?
9      A.  He told me that an outside source would
10  look at this process, but that they here would
11  administer the treatment.
12      Q.  Right.  I understand the doctors here are
13  going to administer the treatment, but the
14  determination of what treatment you need is made
15  by an outside source; is that correct?
16      A.  Not that I -- not that I know of.  I
17  don't see why because they're doctors, they've got
18  the guidelines, and they know what it says.
19      Q.  So did you have an understanding that
20  your case was being referred to the outside source
21  in determination of whether or not there was going
22  to be treatment?
23      A.  No, I don't know, because I don't see why

60

1  it would be referred to anybody.
2      Q.  Well, what's your understanding of what
3  Dr. Taller was telling you that some outside
4  source would review your records for and -- what
5  did you have an understanding of that was going to
6  take place?
7      A.  I don't know.  I don't know.
8      Q.  Well, what specifically did he tell you?
9      A.  Just that there was a new procedure and
10  that somebody outside would be overseeing
11  something, and they would be giving the treatment.
12  Now, who or what, I have no idea.  I don't even
13  know why.
14      Q.  And Dr. Taller told you that this outside
15  source was going to be looking at your case; is
16  that correct?
17      A.  That was a new procedure is what he told
18  me.
19      MR. KOKAL:  That's all I have.
20      MR. RUPCICH:  I don't have any other
21  questions.
22      Mr. Myles, you have the option of either
23  waiving or reserving your signature on this



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles                                           May 5, 2011

**61**

1  deposition. What that means is you can trust that
2  our court reporter took down your testimony
3  accurately. They're usually very good. Or,
4  alternatively, you can reserve the right to review
5  the transcript for accuracy and then sign.
6        THE WITNESS: I believe that she did her
7  job accordingly. I don't have a problem signing.
8  What I would like to be known is that I would like
9  to have a copy of the transcript of this
10 proceeding.
11       MR. RUPCICH: Right. Okay. Well, that
12 will be up to you to purchase a copy of the
13 transcript.
14       THE WITNESS: I'm an indigent inmate, so
15 I don't have any money to purchase anything.
16       MR. RUPCICH: Okay. Well --
17       THE WITNESS: I know I'm entitled to a
18 copy of the transcript.
19       MR. RUPCICH: Well, like I said, you can
20 either waive your signature or you can review it.
21       THE WITNESS: I don't have a problem
22 signing the signature for the deposition being
23 held. That's what you're talking about?

**62**

1        MR. RUPCICH: What I'm talking about
2  right now is whether you want to review the
3  transcript before signing it or whether you want
4  to waive that right today. The choice is yours.
5        MR. KOKAL: She just needs to know today.
6        THE WITNESS: She needs to know what?
7        MR. KOKAL: You need to let her know if
8  you're going to waive signature or not.
9        THE WITNESS: Well, I don't have a reason
10 to waive it. I would just like to have a copy of
11 it, as I stated.
12       MR. RUPCICH: Right. And she can give
13 you her contact information and then -- you know,
14 that's the court reporter's property, you know.
15 We all have to purchase our copies.
16       THE WITNESS: But I'm an indigent inmate.
17 I can't purchase a copy.
18       MR. RUPCICH: Well, we can talk about
19 that off the record. But what she needs to know
20 right here and now is whether you want to review
21 the deposition or whether you want to waive that
22 right.
23       THE WITNESS: I don't need to read it

**63**

1  now. We just got done doing it.
2        MR. RUPCICH: Show the witness waived
3  signature.
4        That will conclude the deposition.
5        (The deposition concluded at 11:15 a.m.)
6                  --o0o--
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**64**

1  STATE OF ILLINOIS  )
2  COUNTY OF McLEAN  )
3        The undersigned Certified Shorthand
4  Reporter, a court reporter in and for the State of
5  Illinois, does hereby certify;
6        The witness named in the foregoing
7  proceeding was by me duly sworn to testify the
8  truth, the whole truth, and nothing but the truth
9  in the within-entitled cause; that said deposition
10 was taken at the time and place therein stated;
11 that the testimony of said witness was reported by
12 me, ALISON L. STRUBBERG, a Certified Shorthand
13 Reporter and disinterested person, and was
14 thereafter transcribed into typewriting;
15       And I further certify that I am not of
16 counsel or attorney for either or any of the
17 parties to said deposition, nor in any way
18 interested in the outcome of the cause named in
19 said caption.
20       IN WITNESS WHEREOF, I have hereunder
21 subscribed my hand on the 16th day of May, 2011.
22       _____
         ALISON L. STRUBBERG, CSR, RPR, CRR
23       CSR No. 084.004655



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

| A | | | | |
|---|---|---|---|---|
| **a.m** 63:5 | 31:23 34:8 **adopted** 42:9 | **answer** 5:13 32:7 | **assume** 5:22 13:9 31:11 | **Bank** 2:11 |
| **A15155** 2:5 | **age** 49:6,7 | **answering** 32:5 | **AST** 11:16,18 45:15 | **based** 14:20 21:6 28:11 30:7 |
| **abdominal** 37:19 | **ago** 51:7 | **anticipated** 57:5 | **attached** 3:19 | 32:4,9 33:6, 9,18 44:19 46:16 53:15 |
| **ability** 6:3 | **agree** 39:14 40:10 | **antiviral** 39:20 45:7 | **attempting** 32:22 33:12 | **Basically** 4:22 5:4 8:11 |
| **able** 49:17,20 | 41:13 44:17, 21 45:8 55:5 | **anybody** 35:7 36:8 | **attending** 11:10 | 15:2 30:11 39:2 42:3 |
| **accuracy** 61:5 | **agreed** 26:23 | 60:1 **APPEARANCES** | **attention** 48:7 | 53:15 **beard** |
| **accurate** 6:4 | **ahead** 41:23 | 2:1 **appearing** | **Attorney** 2:10,16,17 | 48:4,11 **being** |
| **accurately** 61:3 | **ailment** 38:8 | 30:2 **appears** | 4:13,22 64:16 **auto** | 24:9,11,12, 16 43:4 59:20 |
| **achieved** 7:6 | **alcohol** 40:7 | 31:16 **apprised** | 7:20 **aware** | 61:22 **believe** |
| **acted** 15:16 | **Alison** 1:0 64:12,22 | 46:11 **Approximatel** | 11:6 25:12 29:2 34:10 | 6:12 7:20 12:16 16:15 |
| **action** 28:7 | **ALLEN** 2:9 | y 12:7 25:7 | 41:5 46:15 53:21 54:12 | 33:18 40:7 44:6 55:3 |
| **actions** 28:9 30:11 | **along** 15:18,20 | 48:21 **arise** | 55:20 | 56:1 58:9 61:6 |
| 32:7 | **already** 50:20 55:13 | 6:15 **asked** | B | **besides** 30:17 |
| **actual** 59:1 | 57:2 | 11:17 36:14 56:9 | **B** 3:10 | **best** 55:9 |
| **addition** 40:11 | **also** 18:9 19:10 | **asking** 16:18 48:6 | **back** 11:22 40:12 | **beyond** 33:15 |
| **adequate** 16:1 | 20:12 28:13 30:23 40:14 | 54:23 58:10 **assistance** | 41:2,11 51:1 56:4 58:5 | **biopsy** 35:7,8,10,13 |
| **administer** 34:9 59:11,13 | **ALT** 11:16,18 | 16:19 21:14 22:9 | **background** 7:3,4 43:14 | 36:12,16,18, 23 37:4 |
| **administrati on** 59:2 | **alternativel** y 61:4 | **Assistant** 2:17 29:8 | **bad** 5:19 | 38:15,20 40:12 41:1 |
| **administrati ve** 29:8,18,22 | **another** 10:1 11:21 18:10 22:8 47:20 59:7 | **assisted** 9:15 **assisting** 9:18 | **BAKER** 1:0 45:19,23 46:7,11,15, 23 47:18 48:14,21 49:8 | 42:14,17,21 43:6,11 44:20 50:11,15,21 55:11 57:8 **bit** |



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

May 5, 2011

66

4:21
**Blood**
50:8 57:8
58:9
**Board**
29:18,23 32:1
**both**
19:23 28:3
**Building**
2:11
**bull**
24:17 25:3
54:10
**Bureau**
3:18 25:1
40:17 41:18,
19 49:14
56:6,14,23
**Business**
7:19 8:13

— C —

**C**
11:1,4,7,20
15:2 22:10
27:10 28:1
34:23 35:13,
22 38:4 39:15
41:15 44:19
46:2 49:21
54:14 56:3
58:1,7,18
**C.O**
14:7
**call**
24:11 35:23
36:3,7,15
**called**
25:2 35:5
54:9 55:23
56:4
**came**
11:15 32:20

40:12 41:1
55:2 58:4
**Capitol**
2:11
**caption**
64:19
**care**
10:22 23:18
27:9 30:4
31:7 38:7,14
**carry**
9:1
**case**
4:14 6:14
10:9 12:13
13:23 14:16,
19 15:13
16:4,14,17
21:6 30:7
32:4,20 34:4,
5,7 39:15
59:20 60:15
**cases**
10:12 39:18
58:18
**Castravilla**
45:16 55:23
**catch**
36:6
**Caucasian**
47:22 52:4
**cause**
64:9,18
**cell**
20:15,19
**Center**
1:0 6:8,16
13:7
**CENTRAL**
1:0
**certain**
43:16 45:6

49:9
**Certified**
4:7 64:3,12
**certify**
64:5,15
**chairperson**
29:11
**chance**
22:4
**chances**
36:8
**chart**
52:23 53:7
**charts**
53:11
**check**
43:12
**checks**
52:18
**choice**
62:4
**chronic**
35:1,2
**City**
1:0 2:11
**claim**
5:2 34:9 46:9
58:15
**claiming**
39:8
**claims**
5:2 6:14
13:23 14:15
**clear**
5:9,15,21
**client**
5:3
**clinic**
11:11 46:19
50:19 52:15
57:9

**clinics**
46:4
**close**
48:7
**c o -
defendants**
4:23
**collect**
9:3
**college**
7:7,12,17
**come**
5:1 30:9
51:15
**commencing**
1:0
**commented**
11:16
**commissary**
8:19,22,23
9:6
**committee**
29:12
**communicated**
21:17 35:17
**complaint**
10:5 37:21
39:3 45:18,22
53:14 57:13,
17,20,22
**complaints**
38:5 46:7
55:12 58:12
**completed**
7:8,11,18
**concerned**
42:11 53:18
**concerning**
17:11
**concerns**
38:7

**conclude**
63:4
**concluded**
63:5
**conclusions**
26:13
**concurred**
26:3,4,13,20
28:18 31:17,
18,22
**concurrence**
28:14
**condication**
39:22
**conduct**
46:19 52:15
**conducted**
46:3
**confirm**
11:21
**consent**
54:8
**consider**
16:13
**consulted**
15:1
**contact**
62:13
**contained**
33:22 42:6
**continue**
31:14
**continued**
35:3,7
**contract**
53:12,16
**Contraindica
tion**
40:2,4
**contraindica**



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

tions
40:11

conveyed
30:14

conviction
6:19

cook
8:20

COPD
40:8

copied
18:19 19:10,
13 20:12,16,
20 22:19

copies
18:20 20:19
62:15

copy
18:13,16
19:12,15,16
20:7,11,22
21:2 22:17,
18,21 23:1,
13,14 56:17
61:9,12,18
62:10,17

correct
6:8 20:8
21:13 26:9
28:4,21 30:1
32:2 33:21
34:2 38:1,8,
10 39:5,6,10,
12,16 40:3,4,
15 41:16 42:7
44:8 47:3,9
49:22 51:11
55:8 57:2,15
59:15 60:16

Correctional
1:0 6:8,16
13:6

Corrections

12:13 31:5

corresponden
ce
34:17

couldn't
33:11 41:4
51:18 52:6

COUNSEL
2:1 64:16

counting
58:8

County
1:0 6:23 64:2

couple
21:1 54:11

courses
7:17

COURT
1:0 4:16 5:12
61:2 62:14
64:4

courtroom
5:8

crapped
24:17 25:3
54:10

credits
7:15

CRR
1:0 64:22

CSR
1:0 64:22,23

current
34:22

currently
6:7,18 17:22
33:1 37:13
44:5

――――――
        D
――――――
D
1:0 2:14 3:1

damage
40:13 43:13
50:20

date
24:6 27:18,
20,21 51:19

dated
3:12,13,15,
17 22:11
25:19 27:12

dates
18:7 47:17
51:16 54:23

day
64:21

dealt
59:2

Decatur
37:3

December
6:11 17:14
27:12

decision
26:17 29:22
31:16,18 34:9

defendant
14:11,19
15:13 16:4,17
21:6,12,16
28:8 30:7
31:1,9 32:4,
19 33:6

Defendants
1:0 2:7,14
4:14,23

degree
7:23

denial
15:10 25:20
26:1,8,11,21
30:3 33:8

denied

14:21 15:3,15
26:12 27:16
28:17

DENNIS
1:0 2:7

denying
32:5

Department
12:13 31:5

DEPOSITION
1:0 3:3 4:19
61:1,22 62:21
63:4,5 64:9,
17

described
58:13

deteriorate
41:6

determinatio
n
29:19 44:18
59:14,21

diagnosis
12:4 58:6

didn't
16:20 25:21
26:4 33:19
34:1 36:19,20
40:12 43:11
47:4 48:16
53:16,18,19
54:13 57:13,
16,23 58:2

die
41:7

different
5:22 23:10

diploma
7:9

directly
51:20

director

31:4,10 32:22
33:3 34:8
52:13,17
53:4,6,10
54:5,6 55:22

director's
50:19

discussed
55:14

disease
45:3 49:16
57:20

diseased
42:22

disintereste
d
64:13

DISTRICT
1:0

DIVISION
1:0

doctor
45:4,14 51:21
59:7

doctors
35:20 37:22
38:6 39:3
46:18 52:18
58:18 59:12,
17

doctor's
52:14

document
13:17 17:8
22:17 46:23

doing
10:5 24:17
37:13,14,15
63:1

down
11:15 19:23
24:13 25:5



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

| | | | | |
|---|---|---|---|---|
| 27:19 61:2 | 7:19 | **EXAMINATION** | 22:20 | 21 41:1 43:7, |
| **Dr** | **educational** | 3:6 4:10 | **fact** | 16,19 44:4, |
| 32:22 33:2,15 | 7:4 | 37:11 | 14:18,19 26:3 | 10,20 45:6 |
| 34:1 36:13 | **effect** | **example** | 30:6 33:9 | **file** |
| 45:16 50:12, | 5:8 | 59:6 | 38:4,18 41:5 | 55:16 |
| 18,22 51:2,4, | **either** | **EXHIBIT** | 43:2 46:2 | **filed** |
| 8,13,19,23 | 47:19 48:22 | 3:11,19 | 47:13 57:19 | 6:14 9:9,13 |
| 52:10,11 | 52:7,9 55:1 | 13:13,14,21 | **facts** | 13:22 14:2 |
| 53:15,21 | 60:22 61:20 | 14:6 15:15 | 5:2 49:13 | 27:9 32:10 |
| 54:2,13,20 | 64:16 | 17:3,4 20:6 | **failed** | 45:18 56:16 |
| 55:2,6,13, | **elevated** | 21:12,21,22 | 33:4,10 37:23 | **filing** |
| 16,20,23 56:4 | 11:17 45:15 | 22:5,7 23:13 | 38:3,14,15, | 9:16 |
| 57:13,23 | **elevation** | 25:10,19 26:9, | 16 46:1,5 | **fill** |
| 58:3,12,21 | 11:19 | 27:3,5,22,23 | **failure** | 8:23 9:6 36:3 |
| 59:6 60:3,14 | **employed** | 28:13,16,17 | 21:6,12 34:7 | **final** |
| **draft** | 8:12,14 | 29:15 31:15 | **fair** | 26:18 29:18 |
| 10:13 | **employees** | 33:8 34:11 | 5:23 6:13 | **finding** |
| **drafted** | 8:20 12:13 | 42:1,2,7 | 10:22 34:1 | 41:10 |
| 10:17 | **EMTs** | 57:1,15 | **far** | **fine** |
| **draw** | 36:5 | **Exhibits** | 10:2,4,11 | 20:5 21:3 |
| 11:21 | **end** | 3:19 28:20 | 12:4 26:7 | **finish** |
| **drinking** | 31:15 | **expect** | 29:4 34:17 | 19:22 |
| 40:7 | **enough** | 47:1 | 40:16 41:11 | **finished** |
| **drugs** | 40:13 45:8 | **expert** | 42:11 51:16 | 11:12 13:16 |
| 40:7 | **entitled** | 41:14 45:2,5, | 53:18 58:4 | **first** |
| **duly** | 61:17 | 11 58:6,10,11 | **faster** | 12:6 13:20,22 |
| 64:7 | **enzymes** | **explain** | 41:7 | 14:14 23:11 |
| **during** | 11:18 58:9 | 4:21 11:13 | **Federal** | **follow** |
| 8:2 16:12 | **events** | 19:1 | 3:18 25:1 | 54:9 57:14 |
| 35:23 50:19 | 6:15 | **expressed** | 40:17 41:18, | **following** |
| 54:19 56:2 | **eventually** | 56:2 | 19 56:6,14,23 | 42:9 |
| **duty** | 54:15 | **expressing** | 57:5 | **follows** |
| 54:7 | **evidence** | 50:12 | **feel** | 4:8 |
| ___ E ___ | 15:17 46:10 | **extent** | 15:16,23 | **foregoing** |
| | 49:10,18,20 | 43:6 | **feet** | 64:6 |
| **E** | 52:21 53:9 | ___ F ___ | 48:13 | **form** |
| 3:1,10 | 58:4 | | **felony** | 54:8 |
| **each** | **exact** | **facial** | 6:19 | **former** |
| 12:15 47:11 | 23:3,5 51:16 | 48:4 | **felt** | 31:4 |
| 48:20 | **Exactly** | **facility** | 24:15,20,23 | **found** |
| **easier** | 15:22 43:11 | 35:21 53:7 | **fibrosis** | 55:21 58:2 |
| 5:12 | | **facsimile** | 37:16 40:19, | |
| **economics** | | 18:17 19:4 | | |



**ESQUIRE**
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

four
28:23 39:21
44:1,15 51:9,
10 57:9
front
5:9
functions
43:6
further
64:15

---
G
---

gallery
36:5
GED
7:10,11
GENERAL
2:16,17 10:8
General's
4:13
genotype
40:18 50:9
genotyping
38:15,22 50:6
getting
24:19 43:3
46:22 56:20
give
6:3 8:7 36:15
57:17 62:12
given
4:18 10:11
giving
24:15 54:14
60:11
glasses
48:2 52:8
go
10:10,12 24:7
37:8 41:23
51:15
going

5:22 11:13,20
19:23 20:2
24:13,16
36:14 42:11
53:11 54:18
59:13,21
60:5,15 62:8
gone
51:16
Good
4:11 5:17 6:6
9:8 12:17,19
21:4 23:16
25:9 30:22
44:8,9,12
61:3
gotten
49:11
great
37:15
Grievance
3:12,17 13:6,
20,22 14:6,
21,23 15:3,
14,17 16:5
17:22 18:2,9
23:22 24:6
25:16,18,20
26:2,5,8,11,
14,16,18,20,
21 27:7,8,15
28:4,13
29:11,19
30:3,8,14
32:6,9,21
33:7 34:6,11,
20 56:17
grievances
13:10 24:3
27:23 28:7,
11,17 29:3
30:17 31:11
38:13
ground

5:4
guess
46:22 48:19
55:3
guide
58:19
guideline
42:8 56:10
Guidelines
3:18 25:1
40:17 41:18,
20 49:14,19
56:6 57:6,14
59:18
GUY
1:0 2:14
16:7,8 28:14
guys
48:7

---
H
---

H
3:10
hair
48:4
half
7:7,13
hand
18:19 19:10,
12,16 20:11,
12,16,20
64:21
handing
27:4
handwritten
20:7 23:14
handwrote
18:17
haven't
32:17 35:7
39:4 48:10
49:23 50:1

51:8
HCV
38:15,22 50:6
head
5:14
HEALTH
1:0 2:8
37:13,14,17
healthcare
25:6
hear
12:18
heard
19:21
held
56:12 61:23
help
53:20
Hepatitis
11:1,4,7,20
15:2 22:10
27:10 28:1
34:23 35:13,
22 38:1,4,7,
14 39:9,15
41:15 44:19
46:2 49:21
54:14 56:3
58:1,7,18
59:8
her
12:22 13:2,3,
5 14:20,23
15:3,5,8,9,
10,13,23
28:6,9 29:7,
13 30:2,7,8,
9,10,14 54:6
55:17 56:9,17
57:18 61:6
62:7,13
hereby
64:5

herein
1:0
hereunder
64:20
HEYL
2:9
high
7:8,9
history
8:5
HIV
40:6
hold
8:2
hospital
24:16 25:3
35:6,14 36:9,
20 37:1,2
51:5 54:10
56:1,5
huh-uh
5:15
hypertension
11:10 46:3,19
52:15 57:9
hypocritical
53:19

---
I
---

idea
8:7 10:8
60:12
identificati
on
13:14 17:4
21:22 27:3
42:2
identified
26:7
IDOC
32:21 42:9
ILLINOIS



James Myles

May 5, 2011
70

1:0 2:6,12,
16,18 4:1
64:1,5
**immediately**
19:3
**impair**
6:3
**inactions**
28:9 30:11
32:8
**incarcerated**
6:7,18 7:16
8:3,16
**Incorporated**
8:9
**independentl
y**
34:15
**indicate**
28:3 45:7
**indicated**
11:19 17:21
**indicates**
14:23 29:21
**indigent**
61:14 62:16
**individually**
12:15
**infected**
38:4 46:2
56:3 57:19
**inform**
38:3 46:1,5
**information**
36:15 41:11
43:10 46:3,
14,21 47:6
53:5,10 57:18
58:5 62:13
**informed**
11:11 12:1

23:20
**informing**
38:18
**initialed**
53:22
**Inmate**
2:5 9:23
10:1,2 61:14
62:16
**inmates**
9:3,15
**inmate's**
53:7
**inmates'**
8:19 53:11
**instead**
5:14
**instituted**
39:4
**institution**
26:19
**institutiona
l**
17:17 22:14
26:16,18
**interaction**
14:14
**interested**
64:18
**interferon**
38:16 39:4,9,
16,19 40:15
41:3
**intervene**
23:18
**investigate**
34:8
**involved**
30:20
**involves**
10:21 11:1

**issuance**
33:1
**issue**
17:22 24:3
30:17
**issued**
9:6 33:9
**issues**
13:22 25:13
29:2 32:23
37:17

_____ J _____

**JACKIE**
1:0 2:14
29:5,6,21
31:16,18,19,
22
**JAMES**
1:0 2:4 3:3
4:5,17
**J-A-M-E-S**
4:17
**January**
27:16,21
35:11,21
**job**
5:12 8:4 61:7
**jobs**
8:2,6,15
**Joe**
4:12
**JOSEPH**
2:17
**July**
11:8 12:7
33:7,16 45:14
56:1
**jury**
5:9
**just**
5:20 8:7,23

9:23 10:10
12:14 15:18
18:10 20:3
21:1,3,8,19
24:14,20 26:3
28:9 30:10
47:12,19 53:1
55:3 56:20
60:9 62:5,10
63:1

_____ K _____

**keep**
26:10 58:10
**kind**
8:7 50:8
**kinds**
8:18
**kitchen**
8:21
**knew**
49:7
**know**
5:20 10:2,3,
11 12:5,20
13:2,18 15:5,
8 18:6 22:1
24:5,6 25:22
27:6 29:4,6,7
30:5 32:12,13
34:5,18,23
36:7,19 39:11
40:16 41:8
43:9,11 44:22
45:3,10,11
47:1,5 48:1,
7,8,20,22
49:14 50:3,9,
11,14,15
51:6,14,15,
16,22,23
52:2,4,5,8,
9,17 53:20
54:11 55:4

59:16,18,23
60:7,13 61:17
62:5,6,7,13,
14,19
**knowledge**
33:14,23 42:4
52:19 55:9
**known**
41:9,11 61:8
**KOKAL**
2:10 3:8,20
4:23 37:9,11,
12 41:23 42:3
60:19 62:5,7

_____ L _____

**L**
1:0 64:12,22
**lab**
11:14,21
36:23 46:4,
11,18,19
47:8,12 52:16
58:7 59:7
**labeled**
14:5 29:17
**LARSON**
1:0 2:8 50:22
51:2,4,8,13,
19,23 52:10,
11 53:15,21
**last**
29:16 35:11
51:9
**Law**
2:10 7:19
**lawsuit**
9:12,19 10:21
28:8 52:12
**lawsuits**
9:9,16
**learn**
11:9



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

May 5, 2011

71

leave
49:8 51:13
54:20,21

leaving
51:17

left
37:20 49:3

less
48:23

Let's
7:3 16:7
21:21 27:1
29:5

Letter
3:13,15
17:11,20,23
18:3,9,10,18
19:3,4,6,10
20:7,12,13,
15,17 21:2,7,
8,9,10,18,19
22:8,11,21
23:2,17,20
33:16,19,23
36:13

letters
21:19 25:11,
16 26:8 28:20
29:3

level
7:5 26:16,18

levels
45:15

lied
56:21

life
9:10

l i f e -
threatening
57:20

liked
55:6

Lincoln
1:0 2:5

line
23:5

little
4:21 5:12 7:3

live
53:16,19

liver
11:18,19
35:6,8,10,13
36:12 37:16
38:15,19
40:11,13,19
41:1,15 42:6,
14,17,21,22
43:6,7,13
44:4,20 45:3,
6 46:15 49:11
50:15,20
55:10 57:7
58:8

livers
41:6

Livingston
1:0

long
6:10 51:7

longshoreman
8:9

look
10:10,11
13:15 14:5
17:5 18:7
21:23 27:5
29:16 31:14
47:18 59:10

looking
13:16 22:2
27:20 38:12
60:15

looks

51:23

LOUIS
1:0 2:15
32:12,15

lower
37:19

lowest
43:18 44:10

Lynch
9:22 10:17

---
M
---

MAHONE
1:0 2:7 54:6
55:16,18,20,
23 56:4
57:13,23
58:3,12 59:6

mail
17:17 19:19
22:15

mailed
22:19

making
32:20

man
46:13 47:10,
20 48:12 52:2

March
22:12,15

mark
13:12 17:2
21:21 27:1
42:1

marked
13:14 17:4
21:22 27:3
42:2 56:23

math
7:19

McLEAN
64:2

mean
42:15 43:9
46:13 47:10
50:6 51:8

Meaning
26:23

means
61:1

mechanics
7:20

medical
10:22 11:12
12:2,9 15:1,
18,20 16:19
17:12 21:15
22:9 23:18
24:9,14,19
25:1,13 27:23
29:2 30:4
31:7 32:21,
22,23 33:3,
10,12 34:8,12
35:4,5,12
36:2,5,21
37:22 38:6,13
41:10 42:8
46:12,16,21
50:19 51:20
52:13,17,22
53:3,6,10,23
54:5,6 55:22
58:11

medically
58:10

medication
39:23 40:2

Memorial
37:3

mentioned
38:12 42:16

MICHAEL
1:0 2:10,14
9:22 30:23

31:3,10,17,
22 32:3

military
49:3

MILLER
1:0 2:14
29:5,6,22
31:19

Miller's
31:16,18,23

money
61:15

months
25:8 54:11
57:9

morning
4:11

motions
10:5

moving
18:5

muddled
27:18

murder
6:21

MYLES
1:0 2:4 3:3
4:5,12,17,18
6:2 7:2 13:16
17:6 22:1
37:7,12 42:3
60:22

M-Y-L-E-S
4:17

myself
12:3 37:1
56:15

---
N
---

N
2:17 3:1

name



an Alexander Gallo Company

James Myles

May 5, 2011

72

4:12,15 12:22
53:22

**named**
12:14,20
16:16 30:6,23
31:9 32:3,18
33:6 64:5,18

**National**
2:11

**necessarily**
38:2

**need**
39:8 40:14
41:2 45:7
59:14 62:7,23

**needs**
17:12 58:20
62:5,6,19

**never**
29:13 32:17
34:14 36:16
49:7 54:18

**new**
43:10 58:22
60:9,17

**news**
44:8,9,13

**nobody**
35:17

**nodding**
5:14

**North**
2:11

**Nothing**
33:17 54:12
56:19 57:11
58:14,16 64:8

**NUMBER**
3:11

**nurse**
45:20

**O**

**oath**
5:5 53:19

**obtain**
16:19

**obtained**
34:13 42:17

**obtaining**
21:15 22:9

**occasion**
48:16 51:4

**occasionally**
37:19

**occur**
47:14

**occurred**
6:15

**OFFICE**
2:16 4:13
8:20

**officer**
13:6 26:2,5,
14 28:4

**officer's**
14:7 26:21

**Oh**
31:19 54:23

**Okay**
4:18 7:17
8:15 9:8
10:4,8,13,21
12:19 13:5
14:2,18,23
15:8,9,23
16:3,16 17:18
18:2,8,15,18
19:18 20:2,
10,16 21:17
22:3,18 23:7,
10,13,16
24:7,18 25:9,
18 26:6,10,15

27:1,7 28:13,
16 29:5,10
30:19 32:3
33:14 34:22
35:3,8 36:2,
17 37:2 39:18
41:23 43:8
48:18 49:23
52:2 53:1,14
54:2 57:22
61:11,16

**Old**
2:11 41:6,8
48:21 49:4
52:5 56:8,20

**older**
43:3 56:8

**once**
50:18

**ongoing**
18:3

**operator**
8:8

**opportunity**
5:1

**option**
60:22

**orders**
8:23 9:7

**original**
19:15 20:12
21:2 23:14

**originals**
19:17

**outcome**
64:18

**outright**
56:21

**outside**
35:14 59:1,9,
15,20 60:3,
10,14

**over**
24:7 26:22
34:4 36:15
38:12 54:6

**overseeing**
60:10

**P**

**P**
1:0 2:14

**pace**
18:5

**PAGE**
3:6,11 14:6
29:16 31:15
33:8 56:18

**pain**
35:23

**pains**
37:18

**paper**
47:13 56:13

**paralegal**
9:23 10:3

**part**
21:11

**particular**
7:22 16:5
49:21

**parties**
64:17

**passes**
43:3

**patient**
50:23

**pay**
48:6

**PC**
2:9

**pending**
17:22 23:22
24:3

**people**
32:13 36:21
39:21,22,23
40:6,7 41:5
42:8 51:15,17
53:20 56:8,
11,18,20

**PEORIA**
1:0 6:23

**performed**
58:20

**person**
64:13

**personal**
33:14

**personally**
13:2 29:7,13
31:6 32:14
51:6

**personnel**
35:12

**photocopy**
18:21 19:18,
19 20:6 23:7

**physically**
47:2

**physician**
11:11 45:16

**physics**
7:20

**pick**
29:15

**piece**
56:12

**PIERCE**
1:0 2:14
3:13,15 16:7,
8,17,18,22
17:21 18:19
21:5 25:11
28:14,18,21
29:1 31:19



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

May 5, 2011

73

place
11:23 55:2
60:6 64:10

places
23:6

Plaintiff
1:0 2:3

Plaza
2:11

pleadings
10:4,13

please
4:16 17:3,6
21:21 22:1
27:2

plus
38:18

point
49:17,20

policy
42:10

Pontiac
1:0 2:6 4:1
6:8,10,15
13:6 16:10,12
24:10 49:8
51:13 54:20,
21

position
54:7

positive
11:4,7

possible
40:23 44:23
45:4,9

practitioner
45:20

prescribed
56:22

present
35:4 44:20

presented
52:22

presenting
40:6

pretty
7:21

prior
41:10 50:21

Prison
3:18 25:1
37:22 38:6
39:3 40:17
41:18,19
49:14,19 56:6
57:5 58:17

Prisons
56:15,23

Pro
2:4

problem
33:12 38:13
55:20 61:7,21

problems
11:20 46:15
49:11

procedure
36:4,7 58:22
60:9,17

proceed
10:9

proceeding
61:10 64:7

process
4:22 18:2
26:16,22
30:14,20
34:18,20
59:10

professionals
24:19

progressed
49:21

progresses
49:15

prohibiting
33:1

proper
34:9

properly
37:23

property
62:14

provided
51:20 55:7
56:7

proximity
48:20

purchase
61:12,15
62:15,17

purpose
43:12

pursue
54:7

put
22:14 53:22

putting
31:13

_____ Q _____

question
5:18,23

questions
5:13,19 37:7
60:21

_____ R _____

race
47:21 52:2

RANDLE
1:0 2:14
30:23 31:3,

10,17,22 32:3

rate
41:7

read
41:17 42:7
43:15 46:4,
18,20 47:12
49:13 62:23

really
10:10

reason
15:12 16:3
21:11 28:6
34:3 40:14
62:9

reasonable
48:19

recall
16:23 40:9
47:16,19
48:3,10 51:5,
22 54:1 55:1,
2

receive
17:18 35:10
44:18

received
35:8 57:2,3

receiving
40:18

recognize
13:17 17:8

recommend
25:21 26:4

recommendation
14:20 15:10,
14 26:1 31:23

recommended
25:20 26:21
27:16

recopied

23:8,9

record
62:19

records
12:2 15:18
17:1 25:22
33:4,10 34:12
46:16 52:23
53:23 60:4

refer
58:18

reference
35:12,22
36:13

referred
59:20 60:1

referring
41:20

regard
38:14 42:5

regarding
13:22 15:1
27:9

regular
57:8

relevant
16:13

relieved
54:5

remember
49:6

rendered
55:7

report
11:13,14
36:23 44:6
46:5,12,20,
21 50:12

reported
64:11

Reporter



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

1:0 4:7,16
61:2 64:4,13

reporter's
5:12 62:14

reports
36:23 46:4,18
47:8,12
52:14,16

represent
4:14 12:12

request
21:14 36:6,9

requested
36:11

requesting
22:9 23:17

require
39:19

required
12:2

research
10:6 43:15

reserve
61:4

reserving
60:23

resolve
32:23

resolved
33:13

respond
21:7,12

responded
13:9 15:6

response
14:7,23 16:1,
5 17:18 30:8,
10 36:16

responsibili
ties
53:13

responsibili
ty
31:12 52:14,
16 53:2

responsible
53:6

results
35:6,18
36:12,16,18,
19 42:14,17,
21 46:11
47:1,5 50:2,
4,5,6,15,16
59:7

retained
3:20

revealed
50:3,5

review
10:19 22:4
27:20,21
29:18,23 32:1
33:10 52:14,
16 53:10 60:4
61:4,20 62:2,
20

reviewed
27:22 33:4
52:22 56:5,15

reviewing
31:12 53:7

rewriting
23:1

right
5:11 6:2,6,
13,19 7:2 9:4
12:4,5,9
13:10,21,23
14:1,8,21
15:4,7,22
16:7,11
17:20,23
18:12,21

19:1,8 20:18,
20,21 21:4,5,
11,20 22:11
23:2,4,15,
18,23 24:4,
10,13 25:5,9,
20,23 26:6,9
27:8,13,14,
15,17,22
28:1,14,18,
23 29:15,19,
21,23 30:6,
13,15,22
31:14,17,21
32:9 33:18
34:20 35:23
36:3,11
37:13,14,19
38:17,19,20,
23 39:9 40:4,
5 42:18 43:14
49:6 50:7,10,
11,14,17,18
51:9 53:17
54:15,16,22
57:4 59:12
61:4,11 62:2,
4,12,20,22

rights
12:17

role
30:3 32:5

ROYSTER
2:9

RPR
1:0 64:22

ruled
30:16

rules
5:4

run
8:13

RUPCICH

2:17 3:7
4:10,11,12
13:12,15
17:2,5 21:23
27:1,4 37:6,
10 60:20
61:11,16,19
62:1,12,18
63:2

───── S ─────

S
3:10 14:7

Sandra
12:20,21
14:11

saw
12:3 35:12,22
46:4,13 47:5,
7 51:6 56:16

saying
5:14 12:18
26:10 42:4
54:13

says
26:12 32:21
59:18

SCHIKER
1:0 2:15
32:12,16,18,
22 33:15 34:1

Schiker's
33:2

school
7:8,9

schooling
7:5

SCOTT
1:0 45:19,22
46:7,10,15

Se
2:4

searched

12:2

seated
5:8

Second
2:18 18:9,19
20:7,20 24:5,
7 27:7,8
56:17

section
37:20

see
18:6 24:19
26:11 27:18
35:3,7 36:2,
6,8 47:4 51:2
52:11 59:17,
23

seeing
51:4

seen
24:9,11 32:17
35:20 49:23
50:1,6,15,22
51:1,8 53:3

send
17:16 59:6

sending
17:23

sense
5:15

sent
9:5 17:13
18:3,9,13
22:21 23:8
28:21 35:14
56:17 59:3

sentence
33:7,15 34:6

September
14:3 25:19
32:10

set



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

May 5, 2011

75

57:14

severe
40:13 41:1
44:2 45:8

SHARON
1:0 2:14
12:23 13:1
14:11 31:20

shear
8:8

sheet
11:14,15

shorter
48:14

Shorthand
4:7 64:3,12

show
40:12 63:2

showing
21:9 41:2

shown
53:3

shows
28:14

sic
39:22

sick
35:23 36:3,6

side
35:23

sign
10:19 54:8
61:5

signature
30:2 31:13
47:8 60:23
61:20,22 62:8
63:3

signed
14:7 26:3
46:12,17,23

47:2,13 53:21

signing
61:7,22 62:3

signs
31:11

simple
5:4

simply
26:2,13

SIMPSON
1:0 2:14
12:20,21,23
13:1 14:7,11,
12,15 27:16
28:4 31:20

sir
12:10 20:1
26:19 32:7

sit
49:5

sitting
20:18 47:11,
14

Six
48:13

slip
36:3

So..
40:19 45:12
48:11,17

solely
15:18 30:7

somebody
45:5 60:10

sonogram
57:7

sorry
14:11

sorts
8:6

sound

12:17

SOURCE
1:0 2:8 46:14
47:6 53:5,9
59:1,9,15,20
60:4,15

South
2:18

Spanish
7:20

speaks
58:15

specialist
58:19

specializes
59:7

specific
51:18

specifically
60:8

specified
25:2

specifies
56:18

spell
4:15

spoke
55:22

spoken
13:3 29:13
31:6 32:15

Springfield
2:12,18 4:13
23:22 29:9
32:1

Springfield'
s
29:18

staff
15:1,21 24:9,
14 32:22

35:4,5 36:3
37:22 38:6

stage
43:6,18,21,
23 44:1,4,7,
10,14,15,19

stages
43:16 44:23
45:6 50:16

staging
45:3

stand
48:16

start
7:3 34:4

State
1:0 2:11,16
4:15 33:3
49:15 64:1,4

stated
46:8 56:7
58:14 62:11
64:10

statement
33:3,10 49:19

STATES
1:0

stating
18:8

status
34:22

STEVEN
1:0 2:8 50:18
54:3

Street
1:0 2:5,18

strike
40:22 45:1

Strubberg
1:0 64:12,22

stuff

45:3 50:8
53:2 59:4

subscribed
64:21

sue
54:2

sued
14:20 15:9

suit
55:17

Suite
2:11

supervised
58:23

supervisor
9:2

supposed
36:4 42:9,10
52:17,19 54:9

sure
20:3 21:4
38:5 45:13
55:4

sworn
4:6 64:7

SYLVIA
1:0 2:7

T

T
3:10

table
47:11

take
11:13 13:15
17:5 19:23
21:23 27:5
60:6

taken
1:0 64:10

talk
7:3 12:14



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

May 5, 2011

76

16:7 29:5
62:18

**talked**
46:13

**talking**
24:14 61:23
62:1

**tall**
47:23 48:12

**TALLER**
1:0 2:8 48:14
50:12,19
54:2,3,13,20
55:6,13 58:21
59:6 60:3,14

**tell**
5:20 12:15
13:17 20:4,10
35:6 51:18
52:6 58:1,2
60:8

**telling**
43:9 56:10
59:3 60:3

**tenure**
54:19

**test**
50:2,4,5,16
54:14,15,18

**testified**
4:8

**testify**
64:7

**testimony**
5:7 6:4 61:2
64:11

**testing**
57:4,10 59:4

**tests**
50:2,8 55:6
57:8 58:7

**Thank**

37:7

**therapy**
45:7

**thereafter**
64:14

**thing**
30:10

**things**
8:18 28:23
50:2

**think**
6:11 37:6
39:21 42:16
48:23 49:2,4
52:10 53:15

**thinking**
31:20 58:23

**thought**
57:23

**three**
25:8 43:23

**Thursday**
1:0 3:4 4:1

**Tilden**
36:13 55:2

**time**
9:5 11:13
12:6 16:23
17:23 18:3,19
23:22 24:3,8
35:4,11 43:3
44:7 47:16
49:15 51:3,7
56:2 64:10

**times**
8:3 16:13,21
21:1

**today**
5:5 6:4 49:5
55:14 58:13
62:4,5

**told**

11:18 15:3,5,
8 21:1,9
45:14 50:18
54:17 56:5
58:3,17,21
59:9 60:14,17

**top**
27:20

**towards**
7:22

**training**
12:10

**transcribed**
64:14

**transcript**
61:5,9,13,18
62:3

**transfer**
46:20

**treat**
37:23 38:3
54:14 56:11
57:16

**treated**
24:12,21 25:2
41:9 43:4

**treating**
24:20,22,23
25:4 59:8

**treatment**
15:2 16:19
21:15 22:10
24:15 27:9
33:1 36:14
38:7,16 39:5,
9,16,19,20
40:15,18 42:6
44:18 51:20
54:7,8 56:7,
19,22 57:1,3,
17 58:19
59:11,13,14,
22 60:11

**treatments**
39:7 41:3,14

**true**
6:3

**trust**
61:1

**truth**
64:8

**trying**
21:3

**two**
20:19,22 24:2
25:7 26:7
28:7,11,20
43:21

**types**
50:16

**typewriting**
64:14

_____
U
_____

**uh-huh**
5:14 14:13
28:15,19,22

**under**
5:5 57:5

**undersigned**
64:3

**understand**
5:5,16,19,20
13:5 19:2
20:3 21:4
37:21 39:2
42:13,15
43:5,15 44:12
45:2 57:12
59:12

**understandin
g**
11:3 14:10
19:8 20:14
26:15 39:18

40:20,21
42:20,23 44:3
59:5,19 60:2,
5

**understood**
5:23

**unit**
25:6

**UNITED**
1:0

**unless**
47:2

**untrue**
33:2

**upholsterer**
8:10

**upset**
20:2

**usually**
61:3

_____
V
_____

**various**
47:17

**violated**
12:16

**visiting**
11:11 45:16

**VOELKER**
2:9

_____
W
_____

**waiting**
36:17 55:10

**waive**
61:20 62:4,8,
10,21

**waived**
63:2

**waiving**
60:23

**walk**



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

May 5, 2011

77

| | | | | |
|---|---|---|---|---|
| 36:5 | 1:0 2:5 | wouldn't | yelling | 40:18 50:9 |
| **want** | **Westinghouse** | 37:15 40:14 | 20:1 | **2** |
| 8:4 36:2 | 8:8 | 41:4 47:1,4 | **yourself** | |
| 62:2,3,20,21 | **WetCo** | **write** | 10:6,15 | **2** |
| **Warden** | 8:9 | 36:9 | **0** | 3:13 17:3,4 |
| 3:13,15 16:9, | **we've** | **writing** | | 20:6 21:12 |
| 10,12,17,18, | 27:22 56:23 | 11:12 20:15 | **084.004655** | 25:10 28:20 |
| 21 17:11,21 | **WEXFORD** | **written** | 1:0 64:23 | **2003** |
| 18:13,18 21:5 | 1:0 2:8 | 16:21 34:14 | **'** | 41:12 53:2 |
| 22:8,22 23:8, | 53:12,16 | **wrong** | | 58:5 |
| 18,21 24:8 | **whatever** | 20:4,5,10 | **'09** | **2007** |
| 25:11,14,15, | 39:23 52:18 | 56:16 | 25:19 32:10 | 41:10 58:4 |
| 19,21 26:2, | **WHEREOF** | **wrote** | 56:1 | **2009** |
| 12,17 28:18, | 64:20 | 16:18 17:13 | **1** | 11:8 12:5 |
| 21 29:1 31:19 | **whether** | 18:18 19:3,7 | **1** | 14:3 17:14 |
| **warden's** | 51:5 59:21 | 21:10 24:8 | 2:11 3:12,19 | 27:12 45:15 |
| 26:8,10 | 62:2,3,20,21 | 29:4 36:13 | 13:13,14,21 | 49:12,21 |
| **wasn't** | **whole** | 56:14 | 14:6 15:15 | 55:21 58:3 |
| 18:5 24:12 | 8:4 64:8 | **X** | 25:19 26:9 | **2010** |
| 46:23 | **window** | **X** | 27:22 28:16 | 22:12,15 |
| **way** | 9:1 | 3:1,10 | 29:15 31:15 | 27:17 33:7,16 |
| 5:22 15:6 | **withheld** | **xerox** | 33:8 34:11 | 55:4 |
| 24:20,23 | 57:18 58:5 | 19:6,11 | **1003** | **2011** |
| 25:12 29:1 | **w i t h i n -** | **xeroxed** | 1:0 4:2 | 1:0 3:4 4:1 |
| 30:19 64:17 | **e n t i t l e d** | 18:16,20 19:5 | **10-CV-1250-** | 64:21 |
| **wear** | 64:9 | 20:17 | **JBM-JAG** | **21** |
| 48:2 | **witness** | **Y** | 1:0 | 3:15 |
| **wearing** | 4:6 37:8 | **Yeah** | **10th** | **217** |
| 48:11 | 61:6,14,17, | 6:1 18:8 24:1 | 33:16 | 2:12,19 |
| **wears** | 21 62:6,9,16, | 30:10,12 | **1115** | **21st** |
| 52:8 | 23 63:2 64:6, | 31:19,20 | 63:5 | 22:12,15 |
| **We'll** | 11,20 | 39:17 51:12 | **12-3-09** | **27** |
| 24:7 | **word** | 54:17 58:21 | 3:14,17 | 3:17 |
| **went** | 23:5 | **year** | **13** | **28** |
| 11:15 15:18, | **work** | 7:7,13 41:8 | 3:12 8:10 | 56:18 |
| 20 18:22 | 8:19 45:21 | **years** | **16th** | **29th** |
| 19:19 49:3 | 52:18 | 8:10 41:6 | 64:21 | 56:1 |
| 51:6 | **working** | 49:4 51:1,9, | **17** | **2nd** |
| **weren't** | 7:22 | 10 56:8,20 | 3:13 | 33:7 |
| 8:3 24:14,18, | **worse** | **yell** | **1999** | **3** |
| 20,22,23 25:4 | 43:3 49:11 | 19:23 | 42:10 | **3** |
| **West** | | | **1b** | 3:15 21:21,22 |



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

James Myles

22:5,7 23:13
25:10 28:21
**3-21-10**
3:16 22:19
**37**
3:8
**3rd**
17:14 27:12,
21 35:11,21
_____ 4 _____
**4**
3:7,17,19
27:2,3,5,23
28:13,17
**40**
41:5 48:23
49:1,3,4
**42**
3:18
_____ 5 _____
**5**
1:0 3:4,18,19
4:1 42:1,2,7
57:1,15
**50**
41:6
**500**
2:18
**522-8822**
2:12
**557-0261**
2:19
**575**
2:11
_____ 6 _____
**6**
14:6
**60**
56:8,20
**61764**

2:6
**62701**
2:12
**62706**
2:18
_____ 7 _____
**7**
14:6 29:17
31:15 33:8
**700**
1:0 2:5
**7th**
14:3 25:19
32:10
_____ 8 _____
**80**
41:8
_____ ' _____
**'97**
6:11
_____ 9 _____
**9-7-09**
3:12

SCANNED

ILLINOIS ATTORNEY GENERAL
GENERAL LAW DIVISION
SPRINGFIELD
MAY 24 2011
RECEIVED



ESQUIRE
an Alexander Gallo Company

Toll Free: 888.486.4044

2700 Centennial Tower
101 Marietta Street
Atlanta, GA 30303
www.esquiresolutions.com

OFFENDER'S GRIEVANCE

0 1:10-cv-01250-JBM-JAG  # 22    Page 19 of 19   A15155

Page 1 of 2

| | | | |
|---|---|---|---|
| Date: 9-7-09 | Offender: (Please Print) James Myles | | A15155 |
| Present Facility: Pontiac C.C. | | Facility where grievance issue occurred: Pontiac C.C. | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [ ] Other (specify): _____

- [ ] Disciplinary Report: ____ / ____ / ____
  Date of Report _____  Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** This grievance charges medical staff at Pontiac Correctional Center, with knowingly placing the grievant at a greater risk of developing liver damage by deliberately concealing from him that he tested positive for the hepatitis C virus, and by further delaying and/or denying him appropriate medical care and treatment contrary to the current standard of care.
The facts of this grievance are as follows:
    On February 14, 2007, a blood sample was collected from me and sent to an outside lab for analysis.

**Relief Requested:** HCV genotyping, liver biopsy (to stage liver disease), and treatment with Peaylated interferon plus ribavirin.

- [x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

s/James Myles                          A15155          9/7/09
_____          _____    _____
Offender's Signature                  ID#           Date

(Continued on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: ____ / ____ / ____    [ ] Send directly to Grievance Officer    [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277.

Response: _____

_____    _____    _____
Print Counselor's Name          Counselor's Signature          Date of Response

---

**EMERGENCY REVIEW**

Date Received: 9/08/09    Is this determined to be of an emergency nature?    [ ] Yes: expedite emergency grievance
                                                                               [x] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

s/Guy Pierce                                    9/08/09
_____          _____
Chief Administrative Officer's Signature              Date

Distribution: Master File; Offender          Page 1          DOC 0046 (Rev. 3/2005)

Printed on Recycled Paper

DEFENDANT'S EXHIBIT
tabbies
B

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE (Continued)**

The results of this blood test revealed that I had an ALT level of 51, (10-50 is normal), and an AST level of 52, (10-40 is normal).

For the purpose of this grievance, the reader should know that alanine aminotransferase (ALT), and aspartate transaminase (AST) levels are sensitive indicators of liver injury.

The same blood test revealed that I had a Bun/creat Ratio of 6.2, (12-20 is normal), and my HDL was 25, (40-60 is normal).

See: Exhibit-1 (1 pg. blood test)

On June 29, 2007, another blood sample was collected from me and analyzed which revealed that my AST level was 55, and my Creatinine level was 1.7, (0.5-1.5 is normal), and Bun/Creat Ratio was 5.9, and HDL was 27.

See: Exhibit-2 (1 pg. blood test)

On February 6, 2008, my AST level was 41, my Bun/creat Ratio was 8.7, my HDL level was 31, and Triglyceride level at 164, (45-150 is normal).

See: Exhibit-3 (1 pg. blood test)

On July 17, 2008, my AST level was 83, ALT level was 56, Creatinine level was 1.6, HDL level was 31, and I had a Glucose level of 122, (65-110 is normal).

See: Exhibit-4

On July 30, 2008, a blood sample was collected from me for the purpose of testing for antibodies to hepatitis C. The results of this hepatitis C antibody test revealed that the grievant was positive for hepatitis C and that supplemental testing was not required.

See: Exhibit-5 (1 pg. blood test)

On October 29, 2008, my AST level was 52, my ALT level was 53, Glucose level at 126, Bun/creat Ratio was 5.7, and HDL at 32.

See: Exhibit-6 (1 pg. blood test)

On February 11, 2009, my AST level was 47, Glucose level was 114, Bun/creat Ratio was 4.7, and HDL at 28.

See: Exhibit-7 (1 pg. blood test)

On June 1, 2009, my AST level was 65, ALT level 63, Glucose level at 119, and HDL at 32.

See: Exhibit-8 (

On July 14, 2009, a blood sample was collected from me again for the purpose of testing for antibodies to hepatitis C. The results of this test revealed again →

OFFENDER'S GRIEVANCE (Continued)

0 5 0 4 1 6

that the grievant was positive for hepatitis C and that supplemental testing was not required.

The same test results revealed my Ast level was 59, ALt level was 53, Glucose level at 124, Bun/creat Ratio was 6.4, and HDL at 31, and Triglyceride level at 160. See: Exhibit-9 (3 pg. blood test)

The grievant asserts that the Medical Director, Dr. Sylvia Mahone, and other medical staff which are unknown to grievant at this time, ignored or otherwise disregarded his abnormal alanine aminotransferase (ALt) and aspartate transaminase (Ast) levels "which are sensitive indicators of liver injury", from February 14, 2007, until July of 2009, and that the same medical Director and Medical staff deliberately concealed from him that he had tested positive for hepatitis C on July 30, 2008. On July 29, 2008, nurse Judy Ellinger attended the grievants regularly scheduled Hypertension/ Cardiovascular clinic, and this nurse ordered that he be screened for hepatitis. Nurse Ellinger signed her name, and also initialed the "offender progress note" that accompanies this order.
See: Exhibit-10 (1 pg. offender progress note)

On July 30, 2008, the grievant submitted to a blood test and the results of that test revealed that he tested positive for antibodies to hepatitis C. Medical Director, Sylvia Mahone, reviewed this blood test result on August 1, 2008 and initialed said result.
See: Exhibit-5

The grievant asserts that he was never told by any medical staff, Doctors, or Medical Director, that he had tested positive for hepatitis C, or that he even had abnormal Ast/ALt levels. The grievant was made to believe that all the blood test he had underwent up to this point was part of the protocol for his regularly scheduled Hypertension/cardiovascular clinic he attended every three (3) months. Infact, the record also reflects that due to the Medical Director and certain medical staff disregarding grievants blood test results, the grievant had to go "another year to July 14, 2009, with abnormal ALt/Ast levels".

(3)

1 9 2009

OFFENDER'S GRIEVANCE (Continued)

Page 3 of 8

It was on or about the first week in July of 2009, that the grievant saw Dr. Castravillo in the health care unit. At that time, Dr. Castravillo noticed the grievants abnormal Alt/Ast levels and told grievant that he would be checked for hepatitis. On July 14, 2009, a hepatitis C antibodies blood test was preformed and the results of that test came back positive again for Hepatitis C virus. On July 16, 2009, Medical Director, Sylvia Mahone, reviewed this blood test and initialed her name. See: Exhibit-9.

It was on July 23, 2009, when Sylvia Mahone, had the grievant brought to the health care unit and told him that he tested positive for hepatitis C. Sylvia Mahone asked the grievant if he had ever injected drugs in his past, and grievant replied yes. Sylvia Mahone then told the grievant that he would be getting a series of 3 shots to vaccinate him against hepatitis B, and then our meeting ended and I returned to my cell. See: Exhibit-11 (1 pg. offender progress note)

The grievant asserts that the first clinical indication that he should have been screened for hepatitis was on February 14, 2007, when his blood test revealed abnormal ALT/Ast levels. The Illinois Department of Corrections has adopted the policy of the " Federal Bureau of Prisons - Clinical Practice Guidelines for the Prevention and Treatment of Viral Hepatitis ", and that policy, in which the CDC and American Liver Foundation helped generate, dictates that inmates should be screened for hepatitis C if the inmate has elevated ALT levels of unknown etiology, or as clinically indicated, e.g., inmates with signs or symptoms of acute or chronic hepatitis or percutaneous blood exposure while incarcerated.

This was not done. The grievant went 17 months having 5 separate blood test, all of which revealed abnormal liver levels, and the test were ignored. Then, when the abnormal Alt/Ast levels were noticed and the grievant finally got the hepatitis C antibody test on July 30, 2008, that test also got ignored or disregarded. As proof that the grievants July 30, 2008, hepatitis C antibody test was ignored and disregarded, the grievant offers exhibit-11. Sylvia Mahone, wrote, " NO previous Hep C ", " Hep C ⊕ 7/14/09 " New Hep C ⊕ on this exhibit when she informed grievant he was positive.

4

Page 4 of 7

All together, the grievant was allowed to go for 29 months (2½ years) with abnormal ALT/AST levels and not being told by health care personnel that he had tested positive for the hepatitis c virus.

Its also alarming that even after the grievant was told by Sylvia Mahone, that he tested positive for HCV, no-one counseled the grievant regarding the natural history of the infection, potential treatment options, or the specific measures for preventing transmission to others. A baseline clinician evaluation also should have been done which consisted of an estimation and documentation of the earliest possible date of infection, a targeted history and physical examination to evaluate for signs and symptoms of liver disease, quantify prior alcohol consumption and determine risk behaviors. Serum ALT, AST, bilirubin, alkaline phosphatase, albumin, prothrombin time, and further diagnostic evaluations as clinically warranted, for other potential causes of liver disease also should have been done. This was not done.

See: Federal Bureau of Prisons- Clinical Practice Guidelines for the Prevention and Treatment of Viral Hepatitis, at pgs. 22-26.

The grievant asserts that since February of 2007, and probably before that date, his Bun/creat Ratio has been low, Creatine level has been high, HDL low, Glucose level high and Triglyceride level high. These blood levels also dictate liver disease, and they have all gone ignored or disregarded.

A layperson, or someone not trained in the field of health care could easily determine that the grievant is undergoing some sort of liver injury at the present time.

The grievant is requesting that genotyping now be done and that he undergo a liver biopsy to stage his liver disease. Determining the degree of liver disease is important for inmates who may wish to defer treatment if they have normal liver histology, or minimal fibrosis. Furthermore, inmates with abnormal ALT/AST levels should be prioritized for liver biopsy.

See: Federal Bureau of Prisons - Clinical Practice Guidelines for the Prevention and Treatment of Viral Hepatitis.

1-9-20XX

⑤

5

Page 5 of 8

The grievant also request that he be treated for his hepatitis C. condition with Pegylated interferon (alfa 2a or alfa 2b) plus ribavirin.

As evidenced by all of the foregoing facts, the grievant has and will continue to suffer serious and irreparable liver damage as a result of the aforementioned medical personnel's conduct and lack thereof. As such, this grievance should be considered on an emergency basis provides that "if the Chief Administrative Officer determines that there is a substantial risk of *** serious or irreparable harm to the offender, the grievance shall be handled on an emergency basis." Furthermore, this grievance should not be forwarded to the medical department for review (as provided for by the express terms of the contract entered into between Pontiac C.C. and Wexford), nor should any member thereof be consulted for resolution of the matters contained herein, as both would create the appearance of bias and a conflict of interest and would otherwise deny grievant his right to a fair determination of the matters contained herein by an impartial fact-finder. If it is deemed necessary that a medical professional must be consulted for a proper resolution of this grievance, then the Chief Administrative Officer should exercise the same discretion which he possesses in other medical situations involving offenders to "obtain the advice of one or more physicians licensed to practice medicine in all of its branches in this state." (See, 730 ILCS 5/3-6-2 (c)), who are both independent of the Pontiac C.C. medical department and un-related to any of the matters described herein.

————— End of inmate grievance —————

⑥

6

ILLINOIS DEPARTMENT OF CORRECTIONS

**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

*Page 6 of 9*

| Grievance Officer's Report | | |
|---|---|---|

**Date Received:** September 22, 2009   **Date of Review:** December 21, 2009   **Grievance #** (optional): 050416

**Committed Person:** Myles, James                                    **ID#:** A15155

**Nature of Grievance:** Medical Treatment

**Facts Reviewed:** Offender grieves medical treatment by facility HCU.

The Medical Director's response, dated 12/16/09, the grievance dated 09/07/09 was read and the applicable medical record was reviewed.

After reviewing this grievance I find that there was an unintentional delay in communication with Offender Myles. Plan of care is determined by the physician. We will continue to monitor his present condition.

Medical concerns are to be directed to the cell house CMT who will evaluate the offender or refer if appropriate. Alternatively, the offender may send a yellow "Medical Request" slip to the healthcare unit administration requesting medical services.

**Recommendation:** Based upon a total review of all available information, it is the recommendation of this Grievance Officer that the offender's grievance be MOOT based on the response of facility Medical Director to the issue. Any other judgement upon this matter that when returned for cause would have no practical effect upon the existing controversy.

C/O  S  Simpson
_____
Print Grievance Officer's Name                                    Grievance Officer's Signature
(Attach a copy of Committed Person's Grievance, including counselor's response if applicable).

| Chief Administrative Officer's Response | | |
|---|---|---|

**Date Received:** _____   ☑ I concur   ☐ I do not concur   ☐ Remand

**Comments:**

s/Guy Pierce

_____                                    12/28/9
Chief Administrative Officer's Signature                              Date

| Committed Person's Appeal To The Director | | |
|---|---|---|

I am appealing the Chief Administrative Officer's decision to the Director.  I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original ... including the counselor's response, if applicable, and any pertinent documents.)

s/James Myles

_____          A-15155          1-3-10
Committed Person's Signature                  ID#                  Date

Distribution: Master File; Committed Person                 Page 1                 DOC 0047 (Eff. 10/2001)
                                                    Printed on Recycled Paper          (Replaces DC 5657)

7

7 of 7

**E-FILED**
Tuesday, 21 December, 2010 10:27:55 AM
Clerk, U.S. District Court, ILCD

**PAT QUINN**
Governor

**Illinois**
**Department of**
**Corrections**

**MICHAEL P. RANDLE**
Director

1301 Concordia Court / P.O. Box 19277 / Springfield IL 62794-9277 / Telephone: (217) 558-2200 / TDD: (800) 526-0844

July 2, 2010

James Myles
Register No. A15155
Pontiac Correctional Center

Dear Mr. Myles:

This is in response to your grievance received on January 6, 2010, regarding medical (requests Hep C treatment), which was alleged to have occurred at Pontiac Correctional Center. This office has determined the issue will be addressed without a formal hearing.

Per IDOC Medical Director Dr. Schicker, medical staff are attempting to resolve other medical issues which are currently prohibiting the issuance of treatment.

The Grievance Officer's Report (050416) and subsequent recommendation dated December 25, 2009 and approval by the Chief Administrative Officer on December 28, 2009 have been reviewed.

Based on a total review of all available information, it is the opinion of this office that the grievance be denied as the offender's medical needs are being addressed by the Pontiac Correctional Center Administration, in accordance with established policies and procedures.

s/Jackie Miller

FOR THE BOARD: _____

Jackie Miller
Administrative Review Board
Office of Inmate Issues

s/Michael Randle

CONCURRED:_____

Michael P. Randle          7/13/10
Director

cc:  Warden Pierce, Pontiac Correctional Center
James Myles, Register No. A15155

8

STATE OF ILLINOIS         )

COUNTY OF WILL         )

                  )

*Myles v. Mahone*, et al.
USDC-CD Case No. 10-1250

## AFFIDAVIT

I, GUY PIERCE, being first duly sworn upon oath, depose and state that:

1. I am currently employed as the Assistant Warden of Operations at the Stateville Northern Reception Classification Center.  I was previously Warden at Pontiac Correctional Center (Pontiac) from August 2009 to May 2011 and from October 2004 through May 2006.  I have also served as the Deputy Director for the Illinois Department of Corrections for the Northern Region from June 2006 to August 2009.  I have been employed by the Department in various capacities since May 1986.

2. As the Warden and Chief Administrative Officer at Pontiac, I was responsible for overseeing the overall administration of the operations of the institution, including fiscal management, personnel, security, and the delivery of programs and services to the offenders confined at Pontiac.  I also oversaw the planning  and formulating of policy, procedures, rules, regulations and institutional directives for employees and offenders.

3. As Warden and Chief Administrative Officer, I routinely delegated the authority to review items such as correspondence, complaints and grievances to my executive assistants or other designees.

4. Members of my executive staff were authorized as my designee to review and put my signature on responses to grievances submitted by offenders.

1



DEFENDANT'S
EXHIBIT

C

5. The Responses to the Offender's Grievances attached hereto as attachments 1 and 2 purporting to bear my signature were, in fact, reviewed and signed by one of my designees.

6. Moreover, I did not review correspondence in the form of letters from inmates that were sent to the Warden at Pontiac. They were handed similarly to grievances in that members of my executive staff would review them and forward them to the appropriate department for handling based on the nature of the complaint.

7. I have no personal knowledge of nor did I have any involvement with the medical treatment of James Myles (#A-15155), or the incidents giving rise to his allegations in *Myles v. Mahone,* et al No. 10-1250.

8. I am not a licensed physician, have no formal medical training, and did not provide medical treatment to James Myles. As Warden of Pontiac I had no personal involvement in the medical treatment of any individual inmate.

9. Medical care is provided to offenders by on-site health care staff which are supervised on clinical matters by a medical director who is a licensed physician.

10. As Warden I did not have the authority to override the treatment prescribed to an inmate by a physician.

11. As Warden of Pontiac, I relied on the facility medical professionals to adequately diagnose and treat the medical problems of the offenders.

12. I had no personal involvement in the diagnosis, treatment or medical care that the plaintiff, James Myles, received at Pontiac.

2

FURTHER AFFIANT SAYETH NOT.

s/Guy Pierce

GUY PIERCE

SUBSCRIBED and SWORN to

before me this ___ day of _____, 2011 _November_

s/Lora Haven

Notary Public

OFFICIAL SEAL
LORA L. HAVEN
Notary Public - State of Illinois
My Commission Expires Feb 25, 2013

3

Second Grievance.

ILLINOIS DEPARTMENT OF CORRECTIONS
**COMMITTED PERSON'S GRIEVANCE**

051024

| Date: 12-3-09 | Committed Person: (Please Print) James Myles | ID#: A-151555 |
|---|---|---|

Present Facility: Pontiac C.C.   Facility where grievance issue occurred: Pontiac C.C.

**NATURE OF GRIEVANCE:**

☐ Personal Property ☐ Mail Handling ☐ Restoration of Good Time ☐ Disability
☐ Staff Conduct ☐ Dietary ☒ Medical Treatment ☐ Other (specify):
☐ Transfer Denial by Facility ☐ Transfer Denial by Transfer Coordinator

☐ Disciplinary Report: _____
Date of Report          Facility where issued

Note:   Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: This grievence is based upon the Unethical, Erronious, and Indifferent decision of the Medical Direct Dr. Sylvia Mahone, of the Pontiac Medical Dept. et Pontiac Correctional Facility. On 11-10-09, I was called to the hospital for a Medical Director's Clinic, in reference to a determination by the medical director as to whether or not to treat me for a deadly medical condition to which I have been found to have tested positive for. This Condition being Hepatitis C, which is known as a "silent killer". It wasn't until after 2½ yrs. that the Med. Dept.

Relief Requested: HCV RNA Test, and a genotype test, and a liver biopsy; followed by proper Treatment.

☒ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

s/James Myles _____   A-15155   12.8.09
                                    ID#        Date
(Continue on reverse side if necessary)

| **Counselor's Response (if applicable)** | | |
|---|---|---|

Date Received: _____   ☐ Send directly to Grievance Officer   ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

_____                                      DEC 11 2009

Print Counselor's Name _____   Counselor's Signature _____   Date of Response

| **EMERGENCY REVIEW** | |
|---|---|

Date Received:  DEC 11 2009   Is this determined to be of an emergency nature?

☐ Yes: expedite emergency grievance
☒ No: an emergency is not substantiated. Committed person should submit the grievance in the normal manner.

Pontiac
Gr. ioc   s/Guy Pierce

Chief Administrative Officer's Signature _____   Date

Distribution: Master File; Committed Person                   Page 1

DOC 0046 (Eff.10/2001)
(Replaces DC 5657)

Printed on Recycled Paper

attachment 2

EXHIBIT
4
J. Myles
5-5-11

Exhibit 15

ILLINOIS DEPARTMENT OF CORRECTIONS
## RESPONSE TO COMMITTED PERSON'S GRIEVANCE

| Grievance Officer's Report | | |
|---|---|---|

Date Received: December 11, 2009          Date of Review: January 1, 2010          Grievance # (optional): 051024

Committed Person: Myles, James                                          ID#: A15155

**Nature of Grievance:**  Medical Treatment

**Facts Reviewed:** Offender grieves medical treatment by facility HCU.

The Medical Director's response, dated 12/30/09, the grievance dated 12/03/09 was read and the applicable medical record was reviewed.

Offender Myles was seen at the HCU on 12/29/09.  He will be evaluated for Hepatitis C treatment.  He has agreed to the proposed evaluation.

Medical concerns are to be directed to the cell house CMT who will evaluate the offender or refer if appropriate.  Alternatively, the offender may send a yellow "Medical Request" slip to the healthcare unit administration requesting medical services.

**Recommendation:**  Based upon a total review of all available information, it is the recommendation of this Grievance Officer that the offender's grievance be MOOT based on the response of facility Medical Director to the issue.  Any other judgement upon this matter that when returned for cause would have no practical effect upon the existing controversy.

s/S. Simpson

S. Simpson
Print Grievance Officer's Name                                          Grievance Officer's Signature
(Attach a copy of Committed Person's Grievance, including counselor's response if applicable.)

| Chief Administrative Officer's Response | | |
|---|---|---|

Date Received: _____        ☑ I concur        ☐ I do not concur        ☐ Remand

Comments:

s/Guy Pierce

Chief Administrative Officer's Signature                                          Date
1-5-10

| Committed Person's Appeal To The Director | | |
|---|---|---|

I am appealing the Chief Administrative Officer's decision to the Director.  I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

s/James Myles

Committed Person's Signature                    A-15155            1-17-10
                                                  ID#                  Date

Distribution:  Master File, Committed Person                    Page 1                    DOC 0047 (Eff. 10/2001)
                                                                                          (Replaces DC 3637)

OFFENDER'S GRIEVANCE

0590018 1:10-cv-01250-JBM-JAG # 22 Page 19 of 46 A15155

Page 1 of 7

| Date: 9-7-09 | Offender: (Please Print) James Myles | |
|---|---|---|
| Present Facility: Pontiac C.C. | Facility where grievance issue occurred: Pontiac C.C. | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [ ] Other (specify) _____

- [ ] Disciplinary Report _____/_____/_____    _____
      Date of Report    Facility where issued

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: This grievance changes medical staff at Pontiac Correctional Center, with knowingly placing the grievant at a greater risk of developing liver damage by deliberately concealing from him that he tested positive for the hepatitis C virus, and by further delaying and/or denying him appropriate medical care and treatment contrary to the current standard of care.
The facts of this grievance are as follows:
   On February 14, 2007, a blood sample was collected from me and sent to an outside lab for analysis.

Relief Requested: HCV genotyping, liver biopsy (to stage liver disease), and Treatment with Pegylated interferon plus ribavirin *.

[x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

— s/James Myles                      A15155      9,7,09
   Offender's Signature                 ID#          Date
                        (Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

| Date Received: ____/____/____ | [ ] Send directly to Grievance Officer | [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |
|---|---|---|

Response: _____

_____

_____

| Print Counselor's Name | Counselor's Signature | Date of Response |
|---|---|---|

---

**EMERGENCY REVIEW**

| Date Received: 9,22,09 | Is this determined to be of an emergency nature? | [ ] Yes: expedite emergency grievance [x] No: an emergency is not substantiated. Offender should submit this grievance in the normal manner. |
|---|---|---|

   s/Guy Pierce                                        9,22,09
   Chief Administrative Officer's Signature                Date

Page 1

Distribution: Master File; Offender                DOC 0046 (Rev. 3/2005)

Attachment 1

EXHIBIT 1
J. Myles
5-5-11

ILLINOIS DEPARTMENT OF CORRECTIONS
**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

Page 1 of 1

| Grievance Officer's Report |
|---|

Date Received: September 22, 2009    Date of Review: December 23, 2009    Grievance # (optional): 050416

Committed Person: Myles, James    ID#: A15155

Nature of Grievance: Medical Treatment

**Facts Reviewed:** Offender grieves medical treatment by facility HCU.

The Medical Director's response, dated 12/16/09, the grievance dated 09/07/09 was read and the applicable medical record was reviewed.

After reviewing this grievance I find that there was an unintentional delay in communication with Offender Myles. Plan of care is determined by the physician. We will continue to monitor his present condition.

Medical concerns are to be directed to the cell house CMT who will evaluate the offender or refer if appropriate. Alternatively, the offender may send a yellow "Medical Request" slip to the healthcare unit administration requesting medical services.

**Recommendation:** Based upon a total review of all available information, it is the recommendation of this Grievance Officer that the offender's grievance be MOOT based on the response of facility Medical Director to the issue. Any other judgement upon this matter that when returned for cause would have no practical effect upon the existing controversy.

C/O S. Simpson
    Print Grievance Officer's Name                     Grievance Officer's Signature
    (Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response |
|---|

Date Received: _____    ☑ I concur    ☐ I do not concur    ☐ Remand

Comments:

s/Guy Pierce

    Chief Administrative Officer's Signature                     12/28/        Date

| Committed Person's Appeal To The Director |
|---|

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief A                         P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original documents)

s/James Myles

    Committed Person's Signature            A-15155            1-2-10
                                            ID#                 Date

Distribution: Master File; Committed Person            Page 1
                                                        Printed on Recycled Paper            DOC 0047 (Eff. 10/2001)
                                                                                            (Replaces DC 1657)

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

JAMES MYLES (A-15155),       )
                             )
        Plaintiff,           )
                             )
    v.                       )    No. 10-1250
                             )
SYLVIA MAHONE, et al.,       )
                             )
        Defendants.          )

**DEFENDANT SIMPSON'S RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR
INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS**

NOW COMES the Defendant, SHARON SIMPSON, by and through her attorney, Lisa Madigan, and pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 33 and 34), responds as follows to Plaintiff's First Request for Interrogatories and Production of Documents Directed to Defendant Sharon Simpson.

1.    State the title associated with your duties at Pontiac Correctional Center. If those duties are set forth in any job description or other document, produce the document.

**RESPONSE**:      I am a correctional officer at Pontiac Correctional Center assigned as the primary Grievance Officer. For a description of my duties, see Exhibit A.

2.    State the names, titles, and duties of all staff members at Pontiac who have the responsibility for responding to, investigating or deciding inmate grievances. If those duties are set forth in any job description, policy, directive, or other document, produce the document.

**RESPONSE:**      Currently there are eight counselors, who are assigned to various

1

**DEFENDANT'S
EXHIBIT**

_____ D _____

housing units, and are the first step in the grievance process. Plaintiff should know who his counselor is. The grievance office is staffed by Counselor Patrick Hastings and Sharon Simpson, who respond at the second stage of the grievance process. Finally, the Warden or his designee reviews Grievance Officer recommendations on offender grievances.

3. Is it Administrative or Departmental Policy to decide a grievance against the grievant when the complained of party has conceded to the allegation.

**RESPONSE:**   No.

4. State the procedure in effect during January 2009 thru January 2011 at Pontiac for responding to, investigating and deciding inmate grievances. If the proicedure [sic] for handling inmate grievances based on medical complaints is different from the procedure for handling other kinds of inmate grievances, state both procedures. If those procedures are set forth in any directive, manual or other document, produce the document.

**RESPONSE:**   The Grievance Officer procedure for responding to offender grievances is that the Grievance Officer makes first hand contact with whatever Department or staff is required to arrive at a decision on the offender's allegations. The exception to this procedure is for medical grievances. For medical grievances, a copy of the grievance is forwarded to the healthcare unit, where a written response is generated by either the Medical Director or Healthcare Unit Administrator. The response of the medical personnel is then

2

incorporated into the grievance officer response to the offender grievance. The inmate grievance procedure is generally contained at 20 Ill. Admin. Code, Part 504, which is available to Plaintiff.

Respectfully Submitted,

SHARON SIMPSON,

Defendant,

Lisa Madigan, Attorney General
of the State of Illinois,

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
(217) 782-1841
Of Counsel.

Attorney for Defendant,

s/Joseph Rupcich

By: _____
　　　Joseph N. Rupcich
　　　Assistant Attorney General

3

## CERTIFICATE OF SERVICE

Joseph Rupcich, Assistant Attorney General, herein certifies that he has served a copy of the foregoing Defendant Simpson's Response to Plaintiff's First Request for Interrogatories and Request for Production of Documents upon:

>           Michael T. Kokal
>           Heyl, Royster, Voelker & Allen
>           Suite 575, PNC Bank Building
>           One North Old State Capitol Plaza
>           P. O. Box 1687
>           Springfield, IL 62705-1687
>
>           James Myles, A-15155
>           Pontiac Correctional Center
>           PO Box 99
>           Pontiac, IL 61764

by mailing a true copy thereof to the above addresses in an envelope duly addressed, bearing proper first class postage, and deposited in the United States mail at Springfield, Illinois on September 9, 2011.

>           s/Joseph Rupcich
>           _____
>           Joseph N. Rupcich
>           Assistant Attorney General

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-1841

4

RECEIVED  09/01/2011 11:27
Sep 01 2011 11:27    PONTIAC CORRECTIONAL        815-842-3051            p.6
09/01/2011  10:28    2175242987                              PAGE  05/05

## ATTESTATION

SHARON SIMPSON, being first duly sworn on oath, deposes and states that she is a Defendant in the above-captioned matter, that she has read the forgoing document, and the admissions made herein are true, correct and complete to the best of her knowledge and belief.

s/Sharon Simpson

_____
SHARON SIMPSON

Subscribed and sworn to before me

this _1st_ day of _Sept_, 2011.

s/Paula Rich

_____
Notary Public

OFFICIAL SEAL
PAULA G. RICH
Notary Public - State of Illinois
My Commission Expires Apr 28, 2014

RECEIVED  10/25/2011 16:13
2175221957   P.02/02

OCT-25-2011  16:38        DOC INMATE ISSUES

## Illinois
### Department of
## Corrections

**Pat Quinn**
Governor

**Michael P. Randle**
Director

Pontiac Correctional Center
700 W. Lincoln Street, P.O. Box 99
Pontiac, IL  61764

Telephone: (815) 842-2816
TDD: (800) 526-0844

## M E M O R A N D U M

DATE:        December 16, 2009

TO:          Grievance Office

FROM:        Ester Martin, RN
             HCU Administrator

SUBJECT:     James Myles A15155 (050416) - MERIT

I have read the grievance and reviewed the applicable medical record.

After reviewing this grievance I find that there was an unintentional delay in communication with Offender Myles.  Plan of care is determined by the physician. We will continue to monitor his present condition.

Medical concerns are to be directed to the cellhouse CMT who will evaluate him for treatment or refer him if appropriate.  Alternatively, he may send a yellow "Medical Request" slip to the Health Care Unit Administration requesting medical services.

EM/clb

Cc:   Medical Director
      QI File - Temp

**DEFENDANT'S EXHIBIT**

tabbies

E

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

JAMES MYLES (A-15155),     )
                        )
    Plaintiff,        )
                        )
    v.             )   No. 10-1250
                        )
SYLVIA MAHONE, et al.,    )
                        )
    Defendants.    )

## DEFENDANT SIMPSON'S RESPONSE TO
## PLAINTIFF'S REQUEST FOR INTERROGATORIES

NOW COMES the Defendant, Sharon Simpson, by and through her attorney, Lisa Madigan, and pursuant to Rule 33 of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 33), responds as follows to Plaintiff's Request for Interrogatories.

1. When considering the Plaintiff's 09/07/09 grievance alledging [sic] that an adverse diagnosis that he had Hepatitis C (HCV) had been withheld from him and that he was being denied medical treatment for that serious medical disease what consideration did you give to the fact that Dr. Mahone conceded to the Plaintiff's allegations in reaching your decision.

**RESPONSE:**   Since I have no medical training, I relied exclusively on the memo from Healthcare Unit Administrator Ester Martin. See December 16, 2009, memo attached to Ms. Miller's responses.

2. Was Dr. Mahone's admission of the facts in the Plaintiff's grievance regarding his diagnosed HCV a valid point of determination.

1



**DEFENDANT'S EXHIBIT**

F

**RESPONSE:**      Defendant objects to this interrogatory as vague as to Dr. Mahone's "admission of facts" and as to Plaintiff's meaning of "valid point of determination." Without waiving the objection, see Response to No. 1.

3.      After your interview with, Dr. Mahone did you memorialize any relevant portion of that interview with her on your findings of fact.

**RESPONSE:**      I did not interview Dr. Mahone. The information provided in the grievance response came from the memorandum from Heathcare Unit Administrator Ester Martin dated December 16, 2010. The December 25, 2009, grievance officer's report that refers to a "Medical Director's response" to Plaintiff's grievance contains a clerical error. What is being referred to is Ester Martin's December 16, 2009, memorandum.

4.      Regarding interrogatory #3 state what she told you-in detail- about the Plaintiff's HCV and the reason for delaying telling him about the diagnosis.

**RESPONSE:**      See Response to No. 3.

5.      Did the Plaintiff request an independant [sic] source of investigation in his grievance to you. By independant [sic] it is meant that he request that you not rely solely on Dr. Mahone in response to the allegations in his grievance.

**RESPONSE:**      The grievance speaks for itself as far as what Plaintiff requested. However, as grievance officer I had no authority to grant such a request and must rely

2

on those with medical expertise to answer the grievance.

6.    Following the Plaintiff's grievance did you at any point discover that the

Plaintiff was not receiving treatment for his HCV.

**RESPONSE:**    No.

7.    Following the plaintiff's grievance of 09/07/09 did you learn what facts of

his grievance was substantiated. If so, please state those facts.

**RESPONSE:**    No.

Respectfully Submitted,

SHARON SIMPSON,

Defendant,

Lisa Madigan, Attorney General
of the State of Illinois,

Attorney for Defendant,

s/Joseph Rupcich

By. _____

Joseph N. Rupcich, #6283899          Joseph N. Rupcich
Assistant Attorney General           Assistant Attorney General
500 South Second Street
Springfield, IL  62706
(217) 782-1841
Of Counsel.

3

## CERTIFICATE OF SERVICE

Joseph Rupcich, Assistant Attorney General, herein certifies that he has served a copy of the foregoing Defendant Simpson's Response to Plaintiff's Request for Interrogatories upon:

James Myles, A-15155
Pontiac Correctional Center
P. O. Box 99
Pontiac, IL 61764

Michael T. Kokal
Heyl, Royster, Voelker & Allen
Suite 575, PNC Bank Building
One North Old State Capitol Plaza
Springfield, IL 62705

by mailing a true copy thereof to the above addresses in an envelope duly addressed, bearing proper first class postage, and deposited in the United States mail at Springfield, Illinois on November 14, 2011.

s/Joseph Rupcich

Joseph N. Rupcich
Assistant Attorney General

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-1841

5

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

JAMES MYLES (A-15155),    )
                          )
   Plaintiff,           )
                          )
   v.                 )    No. 10-1250
                          )
SYLVIA MAHONE, et al.,    )
                          )
   Defendants.       )

## DEFENDANT MILLER'S RESPONSE TO
## PLAINTIFF'S REQUEST FOR INTERROGATORIES

NOW COMES the Defendant, Jackie Miller, by and through her attorney, Lisa Madigan, and pursuant to Rule 33 of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 33), responds as follows to Plaintiff's Request for Interrogatories.

1.    When investigating an inmates allegation against an Illinois Department of Corrections (IDOC) staff or agent thereof and that IDOC staff or agent has conceded the facts in the inmates grievance what is the protacol [sic] for resolving the grievance of that nature.

**RESPONSE:**    Defendant objects to this interrogatory as a vague hypothetical that calls for speculation from Defendant. Without waiving the objection, it would depend what the issue grieved was, what facts were conceded to by IDOC staff, and what relief, if any, could be provided through the grievance process on the issue raised.

2.    What medical training, if any at all, do you have.

1

**DEFENDANT'S EXHIBIT**

exhibit

G

**RESPONSE:**      I have no formal medical training.

3.      When you reviewed the Plaintiff's grievance state whether you emailed, spoke to or communicated with either the Agency Medical Director to or communicated with either the Agency Medical Director, the Facility Healthcare Unit Administrator, or the Facility Medical Director.

**RESPONSE:**      I emailed with Dr. Shicker.  I also reviewed a December 16, 2009, memorandum from Pontiac's Healthcare Unit Administrator. See email correspondence with Dr. Shicker and memorandum from Ester Martin attached hereto.

4.      In what way is a grievance stating a medical allegation regarding the Process- any different from the review of any other grievance staing [sic] non-medical allegations.

**RESPONSE:**      In reviewing a medical grievance, I may, in addition to reading the grievance, Grievance Officer's Response, and Chief Administrative Officer's Response, email the Agency Medical Director or contact the Healthcare Unit Administrator at the facility where the grievance originated.

5.      Are you, aware that the Hepatitis C virus is a serious condition.

**RESPONSE:**      I am not.  I have no formal medical training and am not familiar with hepatitis C.

6.      Are you aware that the Hepatitis C virus can lead to death if not treated.

**RESPONSE:**      Defendant objects to this interrogatory as compound and lacking

2

foundation.  The interrogatory assumes the truth of certain facts regarding hepatitis C and requires Defendant to affirm those facts to respond. The interrogatory provides no foundation for those facts. Without waiving the objection, see Response to No. 5.

7.     Are you also aware that the Hepatitis C virus, if not treated can cause organ failure.

**RESPONSE:**     Defendant objects to this interrogatory as compound and lacking foundation.  The interrogatory assumes the truth of certain facts regarding hepatitis C and requires Defendant to affirm those facts to respond.  The interrogatory provides no foundation for those facts. Without waiving the objection, see Response to No. 5.

Respectfully Submitted,

JACKIE MILLER,

Defendant,

Lisa Madigan, Attorney General
of the State of Illinois,

Attorney for Defendant,

s/Joseph Rupcich

By:_____
    Joseph N. Rupcich
    Assistant Attorney General

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
(217) 782-1841
Of Counsel.

3

## **ATTESTATION**

Jackie Miller, being first duly sworn on oath, deposes and states that she is a Defendant in the above-captioned matter, that she has read the forgoing document, and the admissions made herein are true, correct and complete to the best of her knowledge and belief.

s/Jackie Miller

Jackie Miller

Subscribed and sworn to before me

this 28th day of October, 2011.

Notary Public

"BELINDA S ADELMAN
MY COMMISSION EXPIRES
MARCH 26, 2013

## CERTIFICATE OF SERVICE

Joseph Rupcich, Assistant Attorney General, herein certifies that he has served a copy of the foregoing Defendant Miller's Response to Plaintiff's Request for Interrogatories upon:

James Myles, A-15155
Pontiac Correctional Center
P. O. Box 99
Pontiac, IL 61764

Michael T. Kokal
Heyl, Royster, Voelker & Allen
Suite 575, PNC Bank Building
One North Old State Capitol Plaza
Springfield, IL 62705

by mailing a true copy thereof to the above addresses in an envelope duly addressed, bearing proper first class postage, and deposited in the United States mail at Springfield, Illinois on November 14, 2011.

s/Joseph Rupcich

_____

Joseph N. Rupcich
Assistant Attorney General

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-1841



An email back would be great.  Thank you for your time,
Dr. Shicker.

Jackie Miller, Chairperson
Administrative Review Board
Office of Inmate Issues
217-558-2200 x2030
Fax:  217-522-1957

**Miller, Jackie**
**From:**      Shicker, Louis
**Sent:**       Friday, June 04, 2010 11:31 AM
**To:**         Miller, Jackie
**Subject:**   RE: ARB medical grievance reviews

Offender Myles A15155 – Needs to be cleared cardiac wise before he can be considered for treatment. They are working on that now.

I hope this is helpful

*Louis Shicker MD*
*IDOC Agency Medical Director*
*Office: 312-814-3233*
*Mobile: 312-802-3714*
*Fax: 312-814-2186*

**From:** Miller, Jackie
**Sent:** Tuesday, June 01, 2010 10:24 AM
**To:** Shicker, Louis
**Subject:** RE: ARB medical grievance reviews

Dr. Shicker, did you get a chance to review Offender Myles A15155  or
? Thanks.

**From:** Shicker, Louis
**Sent:** Friday, May 14, 2010 9:10 AM
**To:** Miller, Jackie
**Subject:** RE: ARB medical grievance reviews

I'll get back to you about the other two.

*Louis Shicker MD*
*IDOC Agency Medical Director*
*Office#: 312-814-3233*
*Mobile: 312-802-3714*
*Fax: 312-814-2186*

**From:** Miller, Jackie
**Sent:** Thursday, May 13, 2010 1:52 PM

OCT-26-2011  11:10        DOC INMATE ISSUES

RECEIVED  10/26/2011 18:45
2175221957        P.04/04

**To:** Shicker, Louis
**Subject:** RE: ARB medical grievance reviews

No.  But to be more specific:

Offender Myles PON A15155 states that on 2/14/07, a blood sample
was taken and sent to an outside lab for analysis. He states that the
result of the test revealed that he had an ALT level of 51 and an ast level
of 52. He says these are "sensitive indicators of liver injury".  He says
another blood sample was taken on 7/30/08 which revealed Offender
positive for Hep C. He says the staff never told him he was positive until
July 23, 09.  He says that he needs Hep C treatment.

**From:** Shicker, Louis
**Sent:** Thursday, May 13, 2010 1:41 PM
**To:** Miller, Jackie
**Subject:** RE: ARB medical grievance reviews

Were any of the Hepatitis C offenders at other institutions when
they were found ineligible for treatment?

*Louis Shicker MD*
*IDOC Agency Medical Director*
*Office#: 312-814-3233*
*Mobile: 312-802-3714*
*Fax: 312-814-2186*

**From:** Miller, Jackie
**Sent:** Thursday, May 13, 2010 9:19 AM
**To:** Shicker, Louis; Shicker, Louis
**Subject:** ARB medical grievance reviews

Dr. Shicker, it was nice meeting you yesterday.  I have a
few questions and would appreciate your professional
review.

Myles, James A15155  PON   Grieves not receiving Hep
C treatment.

TOTAL P.04

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

JAMES MYLES (A-15155),　　　　　 )
　　　　　　　　　　　　　　　 )
　　　Plaintiff,　　　　　　　 )
　　　　　　　　　　　　　　　 )
　　　v.　　　　　　　　　　　 )　　No. 10-1250
　　　　　　　　　　　　　　　 )
SYLVIA MAHONE, et al.,　　　　 )
　　　　　　　　　　　　　　　 )
　　　Defendants.　　　　　　　 )

## DEFENDANT SHICKER'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS

NOW COMES the Defendant, LOUIS SHICKER, by and through his attorney, Lisa Madigan, and pursuant to Rules 33 and 34 of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 33 and 34), responds as follows to Plaintiff's First Set of Interrogatories and Request for Production of Documents.

1.　State the duties of Defendant Louis Schicker, Medical Administrator for the Illinois Department of Corrections. If those duties are set out in any job description or other document, produce the document.

**RESPONSE:**　As medical director I oversee delivery of healthcare services to the entirety of the Illinois Department of Corrections, which includes contract monitoring for the vendors and implementation of policies and procedures for delivery of healthcare.  I do not personally see patients. See Exhibit A attached hereto.

2.　State the procedure in effect between the years 2007 through to 2009 for diagnosing prison inmates at Pontiac Correctional Center with viral hepatitis.

**RESPONSE:**　See Exhibit B attached hereto.



DEFENDANT'S
EXHIBIT

H

3.    State whether or not the same procedure in effect in paragraph #2 above is the same procedure in effect between the years 2003 through to 2006.

**RESPONSE:**    It is not.

4.    If those procedures in paragraphs #2 and #3 above are set out in any policy, directive, or other document produce the document.

**RESPONSE:**    See Exhibits B and C.

5.    State the procedure in effect in paragraphs #2 and #3 above for informing, notifying, or apprising a patient/inmate of any adverse diagnosis that potentially require short or long term treatment, and if those procedure in paragraphs #2 and #3 above are set out in any policy, directive, or other document produce the document.

**RESPONSE:**    The treatment guidelines have consistently contained a recommendation of patient counseling and education.  Currently, inmates with a hepatitis C positive diagnosis are placed in the hepatitis C clinic, where they are assessed every six months.

6.    State the names, titles, and duties of all staff members at Pontiac Correctional Center Who are responsible for complying with paragraphs 2,3,4 and 5 above. If those duties are set forth in any job description, policy, directive, or other document, produce the document.

**RESPONSE:**    Defendant objects to this interrogatory as vague, as it is not limited to a particular time and the people in various positions have changed over time.  Without waiving the objection, generally, this duty would belong to the facility

Medical Director or staff physician.  I know that Dr. Tilden is the current facility Medical Director at Pontiac Correctional Center and that, prior to Dr. Tilden, both Dr. Mahone and Dr. Taller have held the position.

7.    State the procedure in effect between 2007 through 2010 in the IDOC for responding to and investigating inmate grievances. If the procedure for handling grievances based on inmate medical complaints is different from handling other kinds of grievances, state both procedures. If those procedures are set forth in any directive, manual, or other document, produce the document.

**RESPONSE:**    See Exhibit D attached hereto and 20 Ill. Admin. Code, Chapter I, Subchapter E, Part 504.

Respectfully Submitted,

LOUIS SHICKER,

Defendant,

Lisa Madigan, Attorney General
of the State of Illinois,

Attorney for Defendant,

s/Joseph Rupcich

By: _____

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
(217) 782-1841
Of Counsel.

Joseph N. Rupcich
Assistant Attorney General

## **CERTIFICATE OF SERVICE**

Joseph Rupcich, Assistant Attorney General, herein certifies that he has served a

copy of the foregoing Defendants' Response to Plaintiff's First Set of Interrogatories and

Request for Production of Documents upon:

> James Myles, A-15155
> Pontiac Correctional Center
> PO Box 99
> Pontiac, IL 61764

by mailing a true copy thereof to the above addresses in an envelope duly addressed,

bearing proper first class postage, and deposited in the United States mail at Springfield,

Illinois on June 16, 2011.

s/Joseph Rupcich

Joseph N. Rupcich
Assistant Attorney General

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-1841

## **ATTESTATION**

LOUIS SHICKER, being first duly sworn on oath, deposes and states that he is a Defendant in the above-captioned matter, that he has read the forgoing document, and the admissions made herein are true, correct and complete to the best of his knowledge and belief.

LOUIS SHICKER

s/Louis Shicker

Subscribed and sworn to before me

this ___16___ day of ___June___ , 2011.

s/Janis Berlin

Notary Public

OFFICIAL SEAL
JANIS BERLIN
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 6-12-2012



**Illinois Department of**
**CENTRAL MANAGEMENT SERVICES**

**POSITION DESCRIPTION**

| 1. POSITION TITLE | WORKING TITLE (IF ANY) | Bilingual Code | Position Title Option Code | 2. POSITION NUMBER | | | | |
|---|---|---|---|---|---|---|---|---|
| Existing Position | | | | | | | | |
| New/Revised Position **Senior Public Service Admin.** | **Medical Director** | | | **40070-29-02-700-00-01** | | | | |

| 3. AGENCY | 4. BUREAU/ DIVISION | 5 EXMT CODE | 6 WORK COUNTY | 7 AH AUTH. | 8 AUDIT | 9 OFFICE USE |
|---|---|---|---|---|---|---|
| Existing Position | | | | | | |
| New/Revised Position **Corrections** | **Support Services** | | | | R | |

| 10. SECTION | 11. UNIT | 12. TRANSACTION CODE | 13. EFFECTIVE DATE |
|---|---|---|---|
| Existing Position | | | |
| New/Revised Position **Health Services** | **Medical Director** | ☒ MA021  ESTABLISH<br>☐ MC022  EXEMPT CODE CHANGE<br>☐ MC024  POSITION NUMBER CHANGE | |

| 14. WORK LOCATION | 15. BARGAINING/TERM CODE | Rutan Exempt | |
|---|---|---|---|
| Existing Position | | | ☐ MC026  CLARIFY<br>☐ MC027  ADDITIONAL IDENTICAL CHANGE<br>☐ MC028  WORK COUNTY CHANGE<br>☐ MD021  ABOLISH |
| New/Revised Position | **EF-000** | | ☐ MC149  DOWNWARD REALLOCATION<br>☐ MC150  LATERAL REALLOCATION<br>☐ MC158  UPWARD REALLOCATION |

| % OF TIME | 16. COMPLETE, CURRENT AND ACCURATE STATEMENT OF POSITION ESSENTIAL FUNCTIONS |
|---|---|
| | Under administrative direction of the Deputy Director of Support Services (SPSA), serves as subject matter expert for the Department of Corrections (IDOC) and the Department of Juvenile Justice (DJJ) in the delivery of inmate health care; evaluates the care provided throughout the correctional system, including preventive and public health, mental health, primary and secondary medical care and occupational health and safety; develops and implements all health care administrative policies, procedures and Department directives; serves as expert consultant and resource person to agency and institution administrators on the delivery of inmate health care; supervises activities of the Office of Health Services which includes statewide Medical-Nursing Services, statewide Environmental Health Program and statewide Mental Health Services. |

1. Serves as subject matter expert for the Department of Corrections (IDOC) and the Department of Juvenile Justice (DJJ) in the delivery of inmate health care; evaluates the care provided throughout the correctional system, including preventive and public health, mental health, primary and secondary medical care and occupational health and safety; develops and implements all health care administrative policies, procedures and Department directives.

2. Serves as expert consultant and resource person to agency and institution administrators on the delivery of inmate health care; strives to maintain or improve the health status of the inmate population while providing a safe working and living environment for both inmates and staff; remains up-to-date and researches data pertinent to lifestyle-related illnesses, including AIDS, TB, heart disease and diabetes; reviews and modifies Administrative Directives to ensure compliance with changing state and federal requirements as well as new recommendations for monitoring disease outcomes.

3. Through subordinate managers, monitors and reviews the activities of the Office of Health Services which includes statewide Medical-Nursing Services, statewide Environmental Health Program and statewide Mental Health Services; serves as full line supervisor; assigns and reviews work; provides guidance and training to assigned staff; counsels staff regarding work performance; reassigns staff to meet day-to-day operating needs; establishes annual goals and objectives; approves time off; adjusts first level grievances; effectively recommends and imposes discipline, up to and including discharge; prepares and signs performance evaluations; determines and recommends staffing needs.

| DIRECTOR OF CMS SIGNATURE | IMMEDIATE SUPERVISOR SIGNATURE | AGENCY HEAD SIGNATURE | DATE |
|---|---|---|---|
| | | | |

CMS-104 (Rev. 10/94) IL 401-0794

DEFENDANT'S EXHIBIT
A

: 00001

| 16. (CONTINUED) | |
|---|---|
| % OF TIME | 4. Formulates and implements fiscal control policies and procedures; establishes, directs and administers fiscal programs through constant review and revision of current procedures; formulates budget; independently negotiates with vendors to ensure the Departments control costs through competitive bidding for comprehensive health service contracts.<br><br>5. Performs other duties as requried or assigned which are reasonably within the scope of the duties enumerated above. |

17. POSITION TITLE AND NUMBER OF IMMEDIATE SUPERVISOR (Responsible for assigning and reviewing work, preparing, conducting and signing performance evaluations; effectively recommending and imposing disciplinary action and adjusting grievances for the incumbent of this position.)

| | WORKING TITLE (IF ANY) |
|---|---|
| Sr. Public Service Admin.   40070-29-02-000-00-01 | Deputy Director of Support Services |

18. CHECK THE APPROPRIATE BOX IF THIS POSITION IS A:

☒ SUPERVISOR     OR     ☐ LEAD WORKER

**NOTE:** Supervisory or lead worker responsibilities <u>must</u> be described in a detailed duty statement(s) with a time percentage(s) allotted.

If a box was checked above, list position title, position number, and number of subordinate incumbents or authorized funded headcount:

| Position Title | Position Number | No. of Incumbent or Funded Vacancies |
|---|---|---|
| Executive Secretary II | 14032-29-02-700-01-01 | 1 |
| Executive Secretary II | 14032-29-02-700-01-02 | 1 |
| Senior Public Service Administrator | 40070-29-02-700-10-01 | 1 |
| Senior Public Service Administrator | 40070-29-02-700-20-01 | 1 |
| Senior Public Service Administrator | 40070-29-02-700-30-01 | 1 |
| | | |
| | | |

19. SPECIALIZED KNOWLEDGES, SKILLS, ABILITIES, LICENSURE OR CERTIFICATION NECESSARY FOR THE SUCCESSFUL PERFORMANCE OF THE WORK OF THIS POSITION.  NOTE: SINCE THERE ARE NOW SEVERAL OPTIONS OF SKILLS AND ABILITIES AND LICENSURE OR CERTIFICATION IDENTIFIED ON STANDARDS, THE PHRASE "SAME AS SPECIFICATION" CAN NO LONGER BE USED.

; 00002

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

JAMES MYLES (A-15155),      )
                            )
        Plaintiff,          )
                            )
        v.                  )      No. 10-1250
                            )
SYLVIA MAHONE, et al.,      )
                            )
        Defendants.         )

**DEFENDANT LOUIS SHICKER'S ANSWERS TO
PLAINTIFF'S REQUEST FOR INTERROGATORIES**

NOW COMES Defendant, LOUIS SHICKER, by and through his counsel, Lisa Madigan, Attorney General for the State of Illinois, answering Plaintiff's Request for Interrogatories as follows:

1. Were you ever consulted with by any Pontiac Prison staff, at any time and in any form, regarding the Plaintiff's Hepatitis C virus (HCV).

ANSWER:    I do not recall any such consultation.  However, if I was contacted by Administrative Review Board regarding an inmate's hepatitis C, my general practice would have been to consult with Wexford's hepatitis C coordinator and/or the facility Medical Director for wherever the inmate was housed.

2. Were you ever consulted with by the Administrative Review Board (ARB), at any time and in any form, regarding the Plaintiff's HCV.

ANSWER:    Although I do not recall, based on the email correspondence, I was contacted by email by Jackie Miller.  See Ms. Miller's responses.

3. If your response to interrogatories #1 'and #2 is in the affirmative please state what your response to either of them were.

1



DEFENDANT'S
EXHIBIT

I

ANSWER:   See No. 2.

4. Did your office at any time receive from any Medical Director of the Pontiac Correctional Center (PCC) a treatment plan for the Plaintiff's HCV.

ANSWER:   Not to my knowledge.

5. Did you or your office receive a treatment plan for Plaintiff's HCV from Wexford health Sources, Inc.

ANSWER:   Not to my knowledge.

6. To your medical knowledge has the Plaintiff shown any contraindications of any sort to antiviral therapy treatment.

ANSWER:   No.

7. To your knowledge is there a systemic problem at PCC with notifying prison inmates of adverse medical diagnosis.

ANSWER:   No.

8. Is there a systemic problem at PCC with notifying prison inmates of adverse medical diagnosis as they relate to any form of Hepatitis.

ANSWER:   Not to my knowledge.

9. Is there any known document [Consent for Treatment] in any of the Plaintiff's medical records, signed by Dr. Mahone, a medical assistant (as witness) and, the Plaintiff.

ANSWER:   I am not Plaintiff's treating physician and have not reviewed Plaintiff's medical records; therefore, I do not know.

10. Identify any Medical Director, including Dr. Mahone, who has suggested that the Plaintiff receive antiviral therapy treatment for his *HCV*.

2

ANSWER:  I am not aware of any.

11. What general training do you have with the treatment of *HCV.*

ANSWER: I have training in internal medicine.   I was involved in formulating the current guidelines followed by IDOC, and have worked with the hepatology group at University of Illinois Chicago, who manage the provision of treatment to inmates who receive it. I have also treated about a dozen patients with Hepatitis C.

12. Based on your medical knowledge is it your opinion that chronic *HCV,* such as the type the Plaintiff has, is a serious disease.

ANSWER:  Defendant objects to this interrogatory as vague as to Plaintiff's definition of "serious."

13. In your medical opinion, based on your knowledge of *HCV,* can *HCV* also become a life-threatening illness.

ANSWER:   Yes.

14. Is *HCV* sufficiently serious enough to, if left untreated, cause organ damage or failure.

ANSWER:  Defendant objects to this interrogatory as compound and lacking foundation.  Without waiving the objection, Defendant agrees that hepatitis C can, in a minority of cases, approximately 20%, lead to cirrhosis 20 to 30 years after infection unless complicated by co-morbidity or alcoholism in which case there may be a shorter interval to the development of significant liver disease.  Antiviral treatment has a high failure incidence and many serious side effects. Defendant, therefore, does not agree that antiviral treatment

3

necessarily prevents the end stage results in the small percentage of cases in which they develop or and that a clinical decision needs to be made as to which individuals should undergo treatment.

15. Since the Plaintiff has been without antiviral therapy for his diagnosed *HCV* for at least 5 or more years to the current date, and based on the Plaintiff's medical records, he has developed further liver damage since the time he was diagnosed til now.

ANSWER:    I do not know.

16. Has the concealment from the Plaintiff that he has *HCV* place him at greater risk of developing further liver damage.

ANSWER:    Defendant objects to this interrogatory as argumentative, compound, and lacking foundation.  The interrogatory requires Defendant to affirm that Plaintiff's hepatitis C was concealed from him in order to answer the question.  There is no foundation for such a "fact."

17. What guidelines did the IDOC adhere to from 2005 through to 2009 for the clinical prevention and treatment of viral hepatitis.

ANSWER:    See Exhibit B to Defendant Shicker's Responses to Plaintiff's First Interrogatories and Requests to Produce.

18. At any time did-you offer the Plaintiff-antiviral treatment.

ANSWER:    No.

Respectfully submitted,

LOUIS SHICKER,

    Defendant,

Joseph N. Rupcich
Attorney for Defendant
Office of the Attorney General
500 South Second Street
Springfield, IL  62706
Telephone:  (217) 782-1841
Facsimile:  (217) 524-5091
jrupcich@atg.state.il.us

    Of Counsel.

Lisa Madigan, Attorney General
of the State of Illinois,

    Attorney for Defendant.

By: _____ s/Joseph Rupcich _____
    Joseph N. Rupcich, #6283899
    Assistant Attorney General

5

NOV-21-2011  12:16          AREA EAST PAROLE                                            P.02/02

## ATTESTATION

Louis Shicker, being first duly sworn on oath, deposes and states that he is a Defendant in the above-captioned matter, that he has read the forgoing document, and the admissions made herein are true, correct and complete to the best of his knowledge and belief.

s/Louis Shicker

_____
Louis Shicker

Subscribed and sworn to before me

this ___21___ day of __November__ 2011.

s/Sara Sullivan
_____
Notary Public

OFFICIAL SEAL
SARA SULLIVAN
Notary Public - State of Illinois
My Commission Expires May 29, 2012

TOTAL P.02

## CERTIFICATE OF SERVICE

Joseph N. Rupcich, Assistant Attorney General, herein certifies that he has served a copy of the foregoing Defendant Louis Shicker's Answers to Plaintiff's Request for Interrogatories upon:

> James Myles A-15155
> Pontiac Correctional Center
> PO Box 99
> Pontiac, Illinois 61764
>
> Michael T. Kokal
> Heyl, Royster, Voelker & Allen
> Suite 575, PNC Bank Building
> One North Old State Capitol Plaza
> Springfield, IL 62705

by mailing a true copy thereof at the address referred to above in an envelope duly addressed bearing proper first class postage and deposited in the United States mail at Springfield, Illinois on November 23, 2011.

> s/Joseph Rupcich
>
> _____
> Joseph N. Rupcich
> Assistant Attorney General

6



**Wexford Health**
S O U R C E S   I N C O R P O R A T E D

# MEMO

**TO:** Wexford Illinois Medical Providers          **FROM:** Dr. Art Funk, Dr. Dennis Larson

**CC:** Dr. Emil Dameff, Dr. Tom Lehman          **PHONE:** 773-255-5154 618-520-1902

Dr. Dina Paul, Dr. Tracy Becker

**DATE:** June 4, 2009          **FAX:**

**SUBJECT:** Hepatitis Evaluation Dr. Dina Paul, Hepatitis C Coordinator

Office: 412-937-8590 Ext. 221 Cell: 412-913-1134 Fax: 412-937-9151

**Purpose:** To provide a consistent approach to the evaluation of the patient with hepatitis and to assist the on-site medical providers through the Hepatitis C Guideline and its application.

- Patients with abnormal liver enzyme levels of unknown etiology, on hemodialysis, or otherwise as clinically indicated should be screened for hepatitis by obtaining:

  o HAV IgG, HBsAg, HBcAb, HBsAb, HCV antibody

- Patients who are positive for HCV antibody or HBsAg should have the following laboratory evaluation:

  o CMP, PT/INR, CBC, HIV Antibody

- When the above laboratory studies are complete, the patient should have an initial evaluation by the provider utilizing the **Initial Hepatitis Worksheet** (see attached).

- After completion the initial provider evaluation, the site medical provider will schedule a collegial discussion of each patient with Dr. Dina Paul, Hepatitis C Coordinator.

- Dr. Paul will assist the site medical provider in all aspects of hepatitis management once the collegial discussion has occurred.

- Fax copy of Initial Hepatitis Worksheet to: **412-937-9151** ATTN: Dr. Paul

This communication is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender. Thank you.

425 HOLIDAY DRIVE | FOSTER PLAZA TWO | PITTSBURGH, PA 15220 | P: 412-937-8590 | F: 412-937-8599 | WWW.WEXFORDHEALTH.COM

**DEFENDANT'S EXHIBIT**
: 00015
tabbies
J

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

JAMES MYLES (A-15155),           )
                                 )
        Plaintiff,               )
                                 )
        v.                       )      No. 10-1250
                                 )
SYLVIA MAHONE, et al.,           )
                                 )
        Defendants.              )

## DEFENDANT RANDLE'S RESPONSE TO
## PLAINTIFF'S REQUEST FOR INTERROGATORIES

NOW COMES the Defendant, Michael Randle, by and through his attorney, Lisa

Madigan, and pursuant to Rules 33 of the Federal Rules of Civil Procedure (Fed. R. Civ.

P. 33), responds as follows to Plaintiff's Request for Interrogatories.

1.      Did you personally review the Plaintriff's grievance of September 7, 2009

alledging [sic] that he was not told he had been diagnosed with the Hepatitis C virus

(HCV) and the failure of the Pontiac Correctional Facility to treat his medical condition.

**RESPONSE:**      No.

2.      With regard to the grievance at Interrogatory #1, did you seek the opinion of

the Agency Medical Administrator.

**RESPONSE:**      As I did not personally review the grievance, I did not seek the opinion

of the Agency Medical Administrator.

3.      If the Agency Medical Administrator finds that an inmate should be given

treatment, specifically, the plaintiff, would that decision warrant the denial of an

inmates grievance.

**RESPONSE:**      Defendant objects to this interrogatory as a vague hypothetical that

is lacking in foundation.

**DEFENDANT'S
EXHIBIT**

tabbies

K

4.     Subsequent to the admission of Dr. Sylvia Mahone in the plaintiff's 09/07/09 grievance for the failure to inform plaintiff-for more than 2 ½ years - that he had HCV, as recorded by prison staff members in the aforestated grievance was it proper to deny the plaintiff's grievance.

**RESPONSE:**     I was not personally involved in the process of reviewing the grievance in question and, thus, do not know if its denial was proper.

5.     In regard to Interrogatory #4 was it proper for any ARB personnel to have denied the plaintiff's grievance in light of the facts admitted to by Dr. Mahone.

**RESPONSE:**     I was not personally involved in the process of reviewing the grievance in question and, thus, do not know if its denial was proper.

6.     Was Dr. Mahone consulted regarding the plaintiff 's 09/07/09 grievance.

**RESPONSE:**     I do not know.

7.     Was any other medical personnel consulted regarding plaintiff's 09/07/09 grievance.

**RESPONSE:**     I do not know.

Respectfully Submitted,

MICHAEL RANDLE,

Defendant,

Lisa Madigan, Attorney General
of the State of Illinois,

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, IL 62706
(217) 782-1841

Attorney for Defendant,
s/Joseph Rupcich
By: _
Joseph N. Rupcich
Assistant Attorney Genera.

2

## **DECLARATION**

I, MICHAEL P. RANDLE, declare under the penalty of perjury, pursuant to 28
United States Code Section 1746, that the foregoing answers are true and correct.

s/Michael Randle

_10/28/11_
_____
Date

_____
Michael P. Randle

## CERTIFICATE OF SERVICE

Joseph Rupcich, Assistant Attorney General, herein certifies that he has served a copy of the foregoing Defendant Randle's Response to Plaintiff's Request for Interrogatories upon:

James Myles, A-15155
Pontiac Correctional Center
P. O. Box 99
Pontiac, IL 61764

Michael T. Kokal
Heyl, Royster, Voelker & Allen
Suite 575, PNC Bank Building
One North Old State Capitol Plaza
Springfield, IL 62705

by mailing a true copy thereof to the above addresses in an envelope duly addressed, bearing proper first class postage, and deposited in the United States mail at Springfield, Illinois on October 31, 2011.

s/Joseph Rupcich

Joseph N. Rupcich
Assistant Attorney General

Joseph N. Rupcich, #6283899
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
(217) 782-1841

Second Grievance

ILLINOIS DEPARTMENT OF CORRECTIONS

**COMMITTED PERSON'S GRIEVANCE**

051024

| Date: 12-3-09 | Committed Person: (Please Print) James Myles | ID#: A-15155 |
|---|---|---|
| Present Facility: Pontiac C.C. | Facility where grievance issue occurred: Pontiac C.C. | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] Disability
- [ ] Other (specify): _____

- [ ] Disciplinary Report: _____ / _____ / _____
  Date of Report    Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** This grievance is based upon the Unethical, Erranious, and Indifferent decision of the Medical Direct Dr. Sylvia Mahone, of the Pontiac Medical Dept. et Pontiac Correctional Facility. On 11-10-09, I was called to the hospital for a Medical Director's Clinic, in reference to a determination by the medical director as to whether or not to treat me for a deadly medical condition to which I have been found to have tested positive for. This condition being Hepatitis C, which is known as a "silent killer". It wasn't until after 2½ yrs. that the Med. Dept.

**Relief Requested:** HCV RNA Test, and a genotype test, and a liver biopsy, followed by proper Treatment

- [x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

s/James Myles _____ A-15155 12.8.09
Committed Person's Signature    ID#    Date

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

| Date Received: _____ | [ ] Send directly to Grievance Officer | [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |
|---|---|---|

**Response:** _____

_____

_____

| Print Counselor's Name | Counselor's Signature | Date of Response |
|---|---|---|

---

**EMERGENCY REVIEW**

| Date Received: DEC 11 2009 | Is this determined to be of an emergency nature? | [ ] Yes: expedite emergency grievance [x] No: an emergency is not substantiated. Committed person should submit this grievance in the normal manner. |
|---|---|---|

Pontiac Corr. Ctr.
Grievance   s/Guy Pierce

Chief Administrative Officer's Signature    12.8.09    Date

Distribution: Master File; Committed Person          Page 1          DOC 0046 (Eff. 10/2001) (Replaces DC 3127)

Printed on Recycled Paper

**DEFENDANT'S EXHIBIT**
L

informed me that I had Tested positive for Hepatitis C, (see original grievance) _____ . It was on July 23, 2009 when I was formally informed by Dr. Sylvia Mahone. On 11-10-09 during another medical director's clinic Dr. Mahone asked me my age, and I replied that I am 63 yrs old. Dr. Mahone then told me that she had reviewed the updated medical guidelines, and that those guidelines recommend "No Treatment" for persons 60 yrs old, due to the adverse effects of the medication used. Therefore, I have been granted no treatment for this disease. However, the guidelines that the recommendation of no treatment were quoted from were "Not" the updated medical guidelines, the guidelines were from 2003, and a new revised updated guideline was released in 2005, and this guideline had eliminated the recommendation of "No Treatment" for persons 60 yr old. Since the medical director's clinic, I myself have had the opportunity to review the "New" updated medical guidelines for the Prevention and Treatment of Hepatitis C and Cirrhe Federal Bureau of Prisons Clinical Practice Guidelines, dated June 2009, which were updated Jan. 22, 2009. In 1999 the I.D.O.C. adopted the Federal Bureau of Prisons Guidelines for the Treatment of Hepatitis C, and there is absolutely nothing at all stated in those guidelines recommending "No Treatment" for persons 60 yrs old due to adverse effects of medication. (See Exhibit 12 page 28 of the updated guideline.

I had also written a letter to Dr. Mahone, Medical Director of Pontiac Med. Dept. (See Exhibit 13) that she might see the error in her decision, having quoted from the 2003 guidelines, and also sent to her a copy of page 28 of the new updated guidelines that she might see that there is "No" age restriction in reference to the Treatment of Hepatitis C in the new guidelines. I have not as of yet received any kind of a response from Dr. Mahone in reference to these findings. I have ALT (Alanine Aminotransferase) levels as high as 63 (10-50 normal) and AST (Aspartate Transaminase) as high as 83 (10-40 normal) an elevated ALT indicates

Exhibit 15
1:10-cv-01250-JBM-BGC #22-2 Page 9 of 18

ILLINOIS DEPARTMENT OF CORRECTIONS

## RESPONSE TO COMMITTED PERSON'S GRIEVANCE

| Grievance Officer's Report | |
|---|---|

Date Received: December 11, 2009       Date of Review: January 1, 2010       Grievance # (optional): 051024

Committed Person: Myles, James _____       ID#: A15155

Nature of Grievance: Medical Treatment

**Facts Reviewed:** Offender grieves medical treatment by facility HCU.

The Medical Director's response, dated 12/30/09, the grievance dated 12/03/09 was read and the applicable medical record was reviewed.

Offender Myles was seen at the HCU on 12/29/09. He will be evaluated for Hepatitis C treatment. He has agreed to the proposed evaluation.

Medical concerns are to be directed to the cell house CMT who will evaluate the offender or refer if appropriate. Alternatively, the offender may send a yellow "Medical Request" slip to the healthcare unit administration requesting medical services.

**Recommendation:** Based upon a total review of all available information, it is the recommendation of this Grievance Officer that the offender's grievance be MOOT based on the response of facility Medical Director to the issue. Any other judgement upon this matter that when returned for cause would have no practical effect upon the existing controversy.

s/S. Simpson

S. Simpson
Print Grievance Officer's Name       Grievance Officer's Signature
(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

| Chief Administrative Officer's Response | |
|---|---|

Date Received: _____   ☑ I concur   ☐ I do not concur   ☐ Remand

Comments:

s/Guy Pierce

Chief Administrative Officer's Signature                        1-5-10
                                                                 Date

| Committed Person's Appeal To The Director | |
|---|---|

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

s/James Myles

Committed Person's Signature       A-15155       1-17-10
                                   ID#           Date

Distribution: Master File, Committed Person       Page 1       DOC 0047 (Eff. 10/2001)
                                                                (Replaces DC 5657)

3

Exhibit 15
Page 1 of 3

12-3-09

Warden Pierce
Pontiac C. C.

Sir,

I sent to you an emergency grievance on Sept. 7, 2007, that has not yet been acted on, which delt with an ongoing injury, which is occuring to my liver. That the health care unit has neglected for 2½ years, while concealing the same from me.

I am also sending another emergency grievance on 12-3-09, which deals with an ongoing denial of medical treatment concerning the above mentioned grievance.

I would appreciate if you would direct the appropriate Institutional personal to address the nature of my grievances, so that I may exhaust my Institutional remedies.

Respitfully,
s/James Myles

JS-805



DEFENDANT'S
EXHIBIT

M

Exhibit C
Page 1 of 2

3-21-10

Warden Pierei
Pontiac C.C.

Sir,

I write this letter to you in hope
that you will assist me in getting the
health care that I need. I filed an
emergency grievance with your office
on 9-7-09, regarding treatment for a
condition that I am experiencing. That
grievance is now pending in Springfield,
and depending upon the results of said
grievance it may be processed further,
seeking other action.

I write to you because I was
given an evaluation for the treatment
that I seek approximately 2½ months
ago in the form of a blood test. This
blood test is to evaluate my condition
to see if treatment is warranted.
However, sense then I have sent two
letters to the new health care director
Dr. Taller, to see what the results of
this evaluation is and whether or not
I will receive this treatment. as my



EXHIBIT
3
J. Myles
5-3-11

correspondence has gone unanswered. I have even ordered a copy of my medical records on 2-7-10, that I might see what the results of my blood test were, and whether or not if treatment would be approved for me in the form of interferion treatments, and that request has also gone unanswered.

It is my hope that you will contact the health care unit F.D. Tallie, and inform them that I am seeking to know the results of the blood test I was given on 1-11-10, and whether or not if my condition warrants treatment with interferon for N CV.

Thank you in advance for your help in this matter.

Respectfully,
s/James Myles

JS-85



**Illinois**
Department of
**Corrections**

**PAT QUINN**
Governor

**Roger E. Walker Jr.**
Director

## HEPATITIS C GUIDELINE
### April 2009

### Purpose

The purpose of this guideline is to provide basic requirements in the treatment of Hepatitis C infection. It is not meant to cover every contingency of clinical care that may occur. Because this guideline can not cover every contingency of treatment, clinical judgment is required of physicians treating patients. For this reason, all physicians treating patients must be knowledgeable and trained in managing patients with hepatitis C. This is to be evidenced in privilege sheets.

Patients being treated with anti-viral medication for Hepatitis C may be managed by remote providers. However, the primary care of the chronic liver disease (cirrhosis, esophageal varices, ascites, encephalopathy, etc.) must continue to be managed by the primary care provider at the facility if patients are not being followed by telemedicine physicians. For this reason, persons with hepatitis C are continuously managed at intervals appropriate for their disease status and any off-site telemedicine management with anti-viral medication must be integrated into this schedule.

### References:

1. Diagnosis, Management, and Treatment of Hepatitis C: AASLD Practice Guideline, Hepatology April 2004, pages 1147-71
2. Chronic Hepatitis C: Current Disease Management, NIDDKD/NIH, November 2006 at http://digestive.niddk.nih.gov/ddiseases/pubs/chronichepc/index.htm
3. U.S. Preventive Services Task Force (USPSTF) Screening for Hepatitis C Virus Infection  http://www.ahrq.gov/clinic/uspstf/uspshepc.htm

### General Principles

The principles in treating hepatitis C in the Illinois Department of Corrections include:

- Inmates with elevated ALT or AST or those with clinical indications are to be screened for hepatitis C.

**DEFENDANT'S EXHIBIT**

_____ N _____

tabbies

; 00009

- Treatment decisions with anti-viral medication do not necessarily require elevation of liver enzyme elevation. Treatment decisions with anti-viral medication should include consideration of parole date. Treatment should generally not be initiated if the patient is expected to be discharged while treatment is ongoing or will not be able to be followed up by the treating physician for a three month period after completion of therapy. Estimation of treatment completion relative to parole date is individualized. But, in general, this means **from the time treatment is expected to start** a patient should be expected to continue incarceration for 15 months for persons with genotype 1 and 9 months for persons with genotype 2 or 3.
- Treatment of hepatitis C must be provided by a physician who has competency in managing hepatitis C infected individuals. Typically, this is evidenced by formal training and experience in managing hepatitis C patients. This evidence of competency is to be provided in privileging information.
- All patients with co-infection with HIV and Hepatitis C are to be managed or co-managed by an expert in co-infection.

Screening for Hepatitis C

Patients are to be screened under the following conditions:
- Abnormal liver enzyme level of unknown etiology
- On hemodialysis
- Otherwise as clinically indicated

Enrollment in Clinic

Anyone positive for Hepatitis C should be enrolled in the clinic. They are to be continuously monitored regardless whether they are on treatment or not. Patients being considered for treatment with anti-viral medication can be referred for telemedicine management by a Hep C consultant once the initial evaluation demonstrates no contraindications and an appropriate degree of fibrosis. Those patients referred for telemedicine treatment are to be managed consistently under that program until discharge from telemedicine management. On-site physicians are to follow along with telemedicine management and assist in any necessary interventions as requested.

Vaccination

All patients infected with hepatitis C shall be offered hepatitis A and B vaccination unless they are already vaccinated or previously infected and provided no contraindications exist. Pneumococcal and influenza vaccines should be offered as clinically indicated.

Initial evaluation

- All patients identified as Hepatitis C positive shall have counseling to include:
  - Preventive education provided which shall include how the disease is transmitted as well as risk factors for progression of disease.

- o Avoidance of risk factors for transmitting the disease to others
- o Importance of avoidance of alcohol
- o Risks and benefits of antiviral therapy in treating this disease for patients who are potential treatment candidates.
- All patients shall be referred to the facility physician and have a focused history and physical examination emphasizing evaluation for sequelae of chronic liver disease.

- Initial lab testing to include (at a minimum-more if clinically indicated):

Initial Testing  On-site physician

- o HCV RNA quantitative test and genotype
- o Chemistry 22 (to include ALT/AST, bilirubin, alkaline phosphatase, albumin,
- o Prothrombin Time
- o CBC with diff and platelets
- o BUN/Cr
- o HIV antibody
- o Hep A IgG, HBsAg, HBcAb IgG, HBsAb
- o FibroSpect (through UIC lab)
- o Mental health evaluation by psychiatrist or a licensed psychologist to evaluate for depression and any other mental illness that may contra-indicate hepatitis C treatment.

At this point in the evaluation, if a patient has grade 2 or greater on the FibroSpect test, has no contra-indications to treatment, understands the risks and benefits and will be incarcerated long enough to warrant treatment, he/she can be referred to the Hepatitis Consultant for consideration for a biopsy and treatment.

Initial Testing  Hepatitis C consultant or trained physician

- Liver Biopsy shall be performed on those individuals with non-genotype 2 or 3 with FibroSpect results indicating fibrosis levels 2 or greater.  Need for liver biopsy shall be determined by the treating Hep C consultant determined after referral

- If a patient is a treatment candidate the following tests or evaluations shall be performed
  - o All patients shall have diagnostic evaluations as warranted to exclude other potential causes of liver disease such as hemochromatosis, Wilson's disease or autoimmune hepatitis.  This may require additional blood testing as indicated.
  - o ANA, TSH, Fasting Lipids
  - o All patients evaluated for treatment must have an optometrist or ophthalmologist evaluation for retinopathy

     o  All patients evaluated for treatment who are above 50 years of age shall have a cardiac stress test prior to final determination of treatment

## Interval Laboratory and Other Testing

As a general rule interval follow up laboratory tests are performed one week before the clinic.

- After initial lab tests, all patients undergoing treatment shall have a viral load done at weeks 4, 12, 24 and 48 weeks of treatment.
- CBC and complete metabolic panel (Chem 22) are to be done at week 1, 2, 4, and monthly thereafter while on treatment
- For genotype 1 patients, TSH and lipid panel tests month 3, 6, 9 and 12
- For genotype 2 and 3 patients TSH and lipid panels tests month 3 and 6
- For persons with hepatitis C but not under treatment, laboratory tests are ordered as clinically indicated
- For persons on antiviral treatment, depression screening is performed before every clinical visit by the nurse presenting the patient or a mental health professional. Any positive responses or any indication to the nurse that the patient is depressed is to be reported immediately to the treating physician and mental health professional.
- Nurse screening questions are:
  - Over the past 2 weeks, have you felt down, depressed, or hopeless?
  - Over the past 2 weeks, have you felt little interest or pleasure in doing things?

## Time intervals for clinic appointments

The time intervals for appointments will depend on the clinical status of the patient and whether the patient is in treatment or not.

### TIME INTERVALS OF HEPATITIS C CLINICS

| Intervention | Time Interval |
|---|---|
| Initial evaluation-includes history and physical and HCV RNA quantitative test and genotype | Within a month after the patient is identified as hepatitis C + or within a month of arrival at the parent institution |
| Follow up to initial evaluation and additional lab testing | Within one month subsequent to initial evaluation |
| In treatment with antiviral medication | 1st visit;1,2, and 5 weeks post initiation; then monthly from week 5 until completion of therapy and sooner if clinically indicated |
| Not candidate for treatment by virtue of low level of fibrosis on FibroSpect | Every 6 month follow up and every 2 year testing with FibroSpect unless other complication of hepatitis or metabolic syndrome is present or other |

| | |
|---|---|
| | contraindications to treatment exist. |
| Not candidate for treatment by virtue of low level of fibrosis on liver biopsy | Every 6 months follow up with biopsy every 3-5 years unless other complication of hepatitis is present. |
| Not candidate for treatment  because of contraindication to treatment or refusal of treatment | Every 6 months follow up unless complication of liver disease is present in which case 3 month interval is indicated |
| Follow up after completion of treatment | Monthly for 3 months then every 6 months or every 3 months if complication of liver disease occurs. |
| All patients | Shorter intervals are indicated if any clinical indication arises (e.g. a new complication of cirrhosis) |

## Complications of cirrhosis

- All patients with cirrhosis should be screened for esophageal varices with follow up as indicated
- Patients with varices should be on a beta blocker unless contraindicated
- Patients with cirrhosis should be followed every 3 months at a minimum and assessed and treated for complications of their cirrhosis.
- Liver ultrasound and alpha-fetoprotein every 6 months as surveillance for hepatocellular carcinoma

## Treatment with Ribavirin and Pegylated interferon

- Patients beginning work up for treatment should not have their appointments unduly delayed and should be seen monthly (during their work up) until a treatment decision is made.
- In general, Genotypes 2 & 3 will not require a biopsy for treatment.  Treatment decisions are to be on clinical grounds
- In general, Genotypes other than 2 or 3 require a biopsy prior to treatment and Stage II fibrosis is the threshold above which treatment is provided.
- FibroSpect can be used to identify those without significant fibrosis.  For FibroSpect test results of 2 and above, biopsy should be obtained to confirm stage 2 fibrosis. FibroSpect results 0-1 should be considered to be without significant fibrosis and can be re-scheduled for repeat liver enzymes on a 6 month basis and a repeat FibroSpect on an every two-year basis.
- Treatment is initiated with patient consent after the patient is evaluated for contraindications to treatment and after clinical thresholds for treatment are reached.  Patients are to be counseled on the risks and benefits of treatment prior to consideration of treatment.
- Patients are to be followed at intervals listed above

Stopping treatment

- As a general rule, treatment is discontinued in the absence of at least a 2-log reduction at 12 weeks; or detectable HCV RNA at 24 weeks, or an earlier stop treatment may be decided based on patient response.
- Length of treatment is related to genotype and response to treatment. Decisions on length of treatment and stopping treatment are made by the Hepatitis C treating physician as clinically indicated.