UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

JAMES MYLES,
    Plaintiff,

vs.                                        No. 10-1250-JES-JAG

SYLVIA MAHONE, et al.,
    Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

Now Comes the Plaintiff, JAMES MYLES, pro se, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and for his response submit the following Declaration in lieu of a n Affidavit, Brief, and Exhibits hereto attached.

WHEREFORE, Plaintiff Myles pray this Honorable Court enter judgment in his favor and deny the Defendant's summary judgment motion.

Date: January 19, 2012

*James Myles* (signature)
James Myles, pro se

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

JAMES MYLES,
    Plaintiff,

vs.                          No. 10-1250-JES-JAG

SYLVIA MAHONE, et al.,
    Defendants.

DECLARATION IN LIEU OF AFFIDAVIT IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

JAMES MYLES declares under penalty of perjury:

1. I am the Plaintiff in the above titled cause. I make this declaration, in lieu of an affidavit, in opposition to Defendant's motion for summary judgment on my claim against Defendant's Simpson, Pierce, Miller, Randle, and Schicker for violation of my rights as guaranteed by the United States Constitution under the Eighth Amendmnet for their deliberate indifference to my serious medical needs; whereas, the Defendant's named herein deliberately denied me treatment through their denial of my 'emergency' grievance and subsequent grievance process for a life threatening liver disease, Hepatitis C virus (HCV) that the prisons medical staff (Hereinafter, Codefendants') were completely aware for two and a half years of my liver abnormalty prior to my discovery of it and failed to inform me I was infectyed with the virus and was testing HCV positive for years while withholding the only federally approved medical treatment specifically engineered for the effective treatment of the HCV infection.

Ex. A

2. Approximately the first or secon week of July 2009 while being evaluated at a chronic clinic for hypertension I discovered I was infected with the hepatitis virus.

3. The regular physician was not present at the prison or unavailable for some reason and I was thus evaluated by a visiting physician, Dr. castrovillo, at the prison health care unit.

4. During the hypertension clinic Dr. Castrovillo had my medical file open in full view of me examining various laboratory reports.

5. I asked Dr. Castrovillo to explain to me what the figures (numbers) on my laboratory reports meant, and he did.

6. Dr. Castrovillo began with my current laboratory report, explaining what each number represented in medical terms in connection with the various blood screening I had , he turned the pages-in reverse-to determine what previous blood screening had revealed. After a few minutes Dr. Castrovillo asked me if anyone had ever spoke with me about hepatitis; "the medical Director or any Doctor here," meaning Pontiac health care unit. Dr. Castrovillo then told me it appears I have hepatitis and stated he would schedule me for labs, meaning more blood  tests, at the prison to determine if I had an HCV infection.

7. A blood sample was taken from me and sent to an off-site facility for analyzing for the presence of the HCV. The results were positive for Hepatitis C stating that my AST level was 58 H-high out of range of normal, and that my ALT level was 53 H-high out of range of normal.

8. Prior to being examine by Dr. castrovillo no other prison medical personnel ever informed me I had abnormal liver function or tested positive for HCV or any other hepatitis virus.

9. The same day of the blood draw was taken I contacted Dr. Mahone by letter requestiing a consultation with her to discuss what treatment options were

available to me for the infection of the hepatitis virus.

10. On 7/23/09 Dr. Mahone had me brought to the HCU and spoke with me briefly and stated she would have me vaccinated against Hepatitis A & B and stated there is no previous indications of hepatitis in my medical charts. I again requested to be treated for the HCV infection. Dr. Mahone only stated she would call me again.

11. On 11/10/09 Dr. Mahone spoke with me and told me I could not receive treatment because of my age. I was 63 at that time, she stated that current guidelines precluded treatment for me.

12. I told Dr. Mahone I have a current copy of the guidelines for treatment of prison inmates with HCV and that age was not a contraindication or determining factor in precluding treatment. I then told Dr. mahone I would send her a current copy of the guideline for HCV treatment of prison inmates if she'd like. Dr. Mahone told me I could leave.

13. Within the following four months I continued writing Dr. Mahone letters for treatment. I wrote Wexford Health Sources on one occasion, and filed two 'emergency' grievances and wrote two seperate letters to Warden Pierce.

14. On three occasions I spoke with Dr. Mahone inside her office between 11/10/09 and 12/29/09 and requested treatment each time.

15. Dr. Mahone continued ordering the same lab tests that each time revealed that myAST and ALT levels were abnormal and in many cases getting worse.

16. On 12/29/09 Dr. Mahone had me come to the HCU and asked if I still wanted medical treatment for the HCV infection. I responded emphatically, yes, I want treatment.

17. Dr. mahone retrieved from inside her desk an 8½ by 11 sheet of paper and told me it was a Consent For Treatment form and told me I was required to sign it in the presence of a witness. She then had Nurse Ferrell witness me sign the document by signing her own signature in the blank that states; witness. The section that indicated what the "Consent For Treatment " was for, Dr. Mahone

filled in the words: Hepatitis C Treatment, and signed her last name to the document as the person performing the treatment. (See Attached Consent For treatment Form)

18. Prior to the date of signing the consent for treatment form I was never required by any medical personnel at the PCC health care unit to sign any documentation for blood tests, genotyping, viroload, fibrosure tests, nor biopsy. Nor was I required to sign for any of the aforestated tests following 12/29/09 for liver function tests of any sort.

19. At no time was I ever taken to the University of Illinois Medical Center for treatrment of any sort. Only my blood was transported there.

20. I was never removed from the prison in connection with my liver with the exception of being taken to Decatur Memorial Hospital for a liver biopsy after many requests and complaints for a liver biopsy to determine the degree of liver damage to my liver as a result of the HCV infection which revealed that I have chronic Hepatitis C with briding portal fibrosis.

21. Dr. Mahone, and any doctor coming in contact with me should have known as early as 2003 that my liver enzymes were testing at abnormal levels.

22. Each liver function test from 2003 through 2009 were listed as FLAGED by the offsite testing facility or OUT OF RANGE to draw immediate attention to any reviewing physician.

23. Discovery in this case revealed that charts in my medical records indicated that the Defendant's knew I had hepatitis as early as 2003 and failed to inform me I had a potential life threratening disease and denied me treatment for it.

24. Laboratory tests signed by Dr. Mahone indicates she knew as early as 2/14/07, 6/13/07 which was initialed by Dr. Mahone.

25. The information I had HCV infection had been in my medical charts and available to Dr. Mahone a full six years before she claimed no prior HCV indication in my medical files and prior to her admission in my grievance that there

had been and unintentional two and a half year delay in informing me I had tested positive for HCV. (See Medical Chart and Dr. Mahone's Response To My Grievance Filed September 7, 2009, Hereto Attached Marked as Ex. B1-7 & B8 Respectively).

26. On 9/29/09 I filed my grievance and listed it as an 'emergency' pursuant to Administrative Directive 04.01.114, G. 2(a) directed to the Chief Administrative Officer, Guy Pierce, of Pontiac Correctional Center.

27. In my 'emergency' grievance I clearly listed the facts leading to my accidental discovery that I am infected with the HCV that was concealed from me in my medical records and that I have been requesteing treatment for. I attached prior blood screenings for the past 2½ years (2007-2009) indicating I had been infected with the hepatitis virus based on liver enzymes registering in the abnormal range.

28. My 'emergency' grievance requested Warden Pierce to intervene and independantly investigate the allegation of my claim and order the Codefendants to provide medical treatment/explore the federal treatment options for me.

29. The decision by Warden Pierce was that my grievance was not an emergency. That decision was signed, Guy Pierce.

30. At no time during September 2009 through December 2009 was there a memorandim posted that Warden Pierce would not be acting in his capacity as CAO of Pontiac Prison.

31. My grievance was sent to Sharon Simpson, the grievance officer, for handling. Inspite of the factual allegations, attached medical exhibits, and the health care unit Defendant's admission that the 2½ year delay was unintentioinal, and that I would-only-be monitored, Sharon Simpson found that my grievance was moot. The Codefendant's response never indicated they would provide treatment or consider treatment for my HCV infection.

32. I filed a subsequent 'emergency' grievance to Warden Pierce stating I still was not being provided treatment by the prisons health care unit for my

serious medical illness requesting that the Warden intervene and further investigate the allegations in my grievance. Warden Pierce again found my grievance to not be an emergency dispite of the life treatening nature of my claims therein. That would be the grievance of 12/3/09.

33. My second grievance was again heard by Sharon Simpson who also found that the allegation in my grievance were moot over my complaints that I was not being provided medical treatment for my serious medical needs.

34. My appeals were timely submmited to the Administrative Review Board who stated that problems with my heart were being looked into prior to any treatment. The grievance was also found to be moot on appeal and signed by Jackie Miller and Michael Randle, Director of Corrections.

35. During the times that I was going to the prisons medical office every three to four months I was going for the sole purpose of hypertension clinic for elevated blood presure and not for any purpose known to him in connection with his diagnosed Hepatitis C infection prior to July 2009.

36. Any tests that were performed prior to July 2009 indicating the presence of hepatitis or liver disease of any kind was not disclosed to me.

37. The Federal Board of Prisons Guidelines indicate that treatment for HCV should be available to me.

38. It was only after I filed my grievance that the Codefendant's began to acknowledge my serious medical condition that they knew of for six and a half, or more, years.

39. The grievance office failed to comply with their own Administrative requirement pursuant to Administrative Directive 04.01.114, G. 5(4) requiring an in person interview with me regarding a sufficiently serious grievance alledging life threatening facts.

40. At the time Jackie Miller and Michael randle denied my grievance I was not receiving treatment for my serious medical illness.

41. As of the date of my signing this declaration in lieu of an affidavit I continue not receiving treatment for my serious life threatening illiness. The extent of the Codefendant's involvement has been diagnosing the disease.

42. As CAO of Pontiac prison, Warden Pierce is accountable for the actions of his executive staff executed in his name, particularly those whom he alleges to have delegated his authority to.

43. Prior to July 2009 each time I had cause to go the the prisons health care uinit and, or have blood tests they were specifically, to my knowledge, for my chronic hypertension clinic.

44. Pursuant to the IDOC Central Management Service protocol antiviral treatment is shown to be indicated for treatment for my type of HCV INFECTION.

45. The facts of my claim exhibit a number of issues of material fact that are appropriate for a jury to decide.

Date: January 19, 2012

*James Myles*
James Myles, pro se

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

JAMES MYLES,
    Plaintiff,

vs.                              No. 10-1250-JES-JAG

SYLVIA MAHONE, et al.,
    Defendants.

BRIEF IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION

Statement of the case:

This is a § 1983 action filed by the Plaintiff, a prison inmate, housed at Pontiac Correctional Center (PCC) seeking damages and declaratory judgment based on the deliberate indifference to his serious medical needs. Defendants have filed a motion for summary judgment as to the deliberate indifference claims against Defendant's Simpson, Pierce, Miller, Randle, and Schicker arguing that their conduct did not violate the Plaintiff's rights under the Constitution.

Statement of facts:

The Plaintiff's Declaration in lieu of an Affidavit submitted in response to Defendant's motion states that, at the time of his filing his grievance and subsequent complaint that he had discovered that the PCC health care unit Medical Directors had been withholding pertinent medical facts from him that he had been diagnosed positive for Hepatitis C infection and that inspite of the seriousness

of the Hepatitis C virus (HCV) being a life threatening disease and the PCC medical staff not informing him of the disease coursing through his body, they were also denying the Plaintiff of medical treatment of any sort.

The Plaintiff declaration state that the discovery of the medical information in his medical file came only after he inquired about the numerical value of the laboratory report before him during an unrelated visit to the prisons hospital for high blood pressure during an examination by a visiting medical physician. Plaintiff's declaration go on to state that the visiting physician stated to him that it appeared by the laboratory reports that he has hepatitis and that the visiting physician ordered that Plaintiff's blood be drawn to be further analyzed by an offsite laboratory to verify what current and past laboratory reports had been indicating.

Plaintiff's declarion reveal that subsequent to the hospital visit with the visiting physician he requested to examine his medical records, whereupon he discovered that during all his previous hypertension clinics where blood draws were required before each clinic that each previous hypertension clinic-occuring every four months-indicated that Plaintiff tested positive for HCV and that at that time the PCC health care unit were aware of the adverse diagnosis for no less than two and a half years prior to his discovery that he was HCV positive.

The Plaintiff's declaration state that he filed his grievance on September 7, 2009 following repeated requests to the Defendant's of the PCC health care unit detailing the discovery of him being HCV positive and requesting some form of medical treatment for his serious medical illness of hepatitis. Plaintiff's grievance indicated that the medical staff at PCC knowingly placed him at greater risk of further damage to his liver by deliberately concealing from him he had HCV infection. Plaintiff detailed prior blood tests results that indicated from February 2007 through to the time of the filing of his grievance that every four months his blood test revealed that there was a problem with his liver function.

Plaintiff's declaration go on to state that after attempting to get medical treatment from the codefendant's that he then filed a grievance pursuant to Illinois Department of Corrections Administrative Directive 04.01.114, G. 2 (a) directed to the prisons Chief Administrative Officer, Defendant Pierce, as an 'Emergency' grievance due to the nature of his illness of being HCV positive for a deadly liver disease, and the length of time he had the disease-for which length of time the codefendant's withheld the medical information from him.

Moreover, the Plaintiff's declaration requested Defendant Pierce to treat his grievance as the emergency it was and and expidite its investigation to have medical treatment for the liver disease that could quite easily, and at any point in time, destroy any number of organ functions and/or lead to liver cancer.

The Plaintiff state in his declaration that the name of the person appearing on his emergency grievance as being the name enforcing the denial of his grievance was the name, Guy Pierce. That despite all the facts of his grievance and attached medical record exhibits Defendant Pierce found his grievance not to be an emergency, denying it as such, and sending the grievance through the usual grievance process knowing that that process could take from two to six months to resolve.

Plaintiff's declaration state that Defendant Simpson reviewed his grievance after codefendant Mahone stated that the two and a half year delay in informing the Plaintiff he had been infected with the Hepatitis C virus was unintentional. Defendant Simpson found that the issue of the Plaintiff not being provided medical treatment of any sort for the two and a half years for his serious medical illness was moot and forwarded Plaintiff's grievance to the Chief Administrative Officer, known to be Defendant Pierce, for his signature for his concurrence with the findings of Defendant Simpson, and that the name appearing on the Plaintiff's grievance in concurrence with Defendant Simpson's finding was the name, Guy Pierce.

Plaintiff's declaration go on to state that he submitted his grievance for appeal. That his appeal was reviewed by Chairperson, Defendant, Miller, who made

her decision to deny Plaintiff's grievance based on Plaintiff's grievance, medical exhibits, and the codefendants response to his grievance without reviewing Plaintiff personally or in-camera. Plaintiff's appeal denial contained the signature of Defendant Miller, and in cursive, the name of Michael Randle concurring with the findings of Defendant Miller.

The Defendant's each had a responsibility to properlty review Plaintiff's grievance in accordance to IDOC Administrative Directives, investigate Plaintiff's allegations in an unbiased manner, and render a fair decision that would result in the medical treatment of the Plaintiff.

The Defendant's filed their motion for summary judgment, and in support of that motion submitted a single affidavit from Defendant Pierce and as to the remaining Defendant's have failed to submit a verified or sworn document in the form of an affidavit in support of their motion.

7. Whether the codefendant's responsed to Plaintiff's complaint only after his inadvertant discovery of his serious medical condition and grievance of July 2009 when the codefendant's claim to have known two and a half years of Plaintiff's serious medical illness prior to his grievance, whereas discovery revealed the codefendant's had knowledge as early as 2003 of his liver disease without telling him about it. (Ex. A, Myles' declaration at ¶ 25). Disputing #10.

8. Whether Defendant Simpson failed to comply with the requirement outlined in the IDOC Administrative Directive requiring a face to face meeting with the Plaintiff regarding a sufficiently serious grievance/complaint alledging life threatening facts. Group Ex. C, G. 5(4). Disputing Defendant's motion at #11. (Plaintiff's declaration at ¶ 39 ).

9. Whether Plaintiff's needs are being met, in that antiviral treatment for his serious medical illness of chronic Hepatitis C is being provided to him. Disputing Defendant's motion at #20. (Plaintiff's declaration at ¶ 41).

10. Whether the office of the Director of Corrections decision, although rendered by an alleged designee, is accountable for the denial of Plaintiff's grievance seeking medical treatment for his serious illness of Hepatitis rising to the level of deliberate indifference. (Ex. D, 04.01.115 F. 1. & G. 5).

11. Whether the Plaintiff's grievance complaining of having untreated HCV is sufficiently serious as to be considered an emergency. Disputing Defendants motion at 22 & 23. (Ex. E. Defendant Schicker's answer to Plaintiff's interrogatories at ¶6 & 13). (Ex. F. Defendant Miller's response to Plaintiff's interrogatories at ¶2, ¶5, ¶6 and ¶7), (Ex. A, Myles' Declaration at ¶17, ¶20, ¶22, and ¶23).

ARGUMENT

THE PLAINTIFF'S COMPLAINT CONTAIN GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE SUMMARY JUDGMENT FOR THE DEFENDANT'S ON THE PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIM FOR THE DENIAL OF MEDICAL TREATMENT THROUGH THE DENIAL OF HIS GRIEVANCE ALLEDGING HE WAS INFECTED WITH A LIFE THREATENING DISEASE KNOWN AS HEPATITIS C FOR BETWEEN TWO AND A HALF TO SIX AND A HALF YEARS WITHOUT HIM KNOWING OF IT AND NOT GETTING TREATMENT FOR.

Summary judgment is to be granted only if the record before the court shows "that there is a genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), federal Rule of Civil Procedure. A "material" fact is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Declaration of the Plaintiff and the affidavit of the Defendant are contradictory regarding the deliberate indifference to the PLaintiff for his serious medical illness of chronic Hepatitis C infection for as early as the spring of 2003. That through his filing a grievance the Plaintiff requested the Defendant's to intervene and order the codefendant's to cease being deliberately indifferent to Plaintiff's serious medical disease and take the necessary steps to provide the Plaintiff with the only Federally approved treatment-at that time-for his Hepatitis C virus.

The allegations in Plaintiff's declaration indicate that he only discovered by chance that he was infected with hepatitis through an unrelated hospital visit and through his inquiry of his medical records, laid open before him containing his laboratory reports flaging that his liver enzymes were soaring in

the abnormal range, that he was infected with a serious chronic illness capable of taking his life. Plaintiff was subsequently permitted to see his medical records going back two and a half years from the summer of 2009 and determined that the codefendant's in this cause was aware, through documentation of laboratory reports, blood tests and doctors notes, that they were aware that the Plaintiff had been infected with HCV for at least 2½ years. Later, through discovery, the Plaintiff was able to determine that the codefendant's of the prisons health care unit had this knowledge of his serious illness and did not reveal to him that his liver was functioning abnormally, and that they knew this for as far back as the spring of 2009 and even then failed to inform him of that diagnosis. The Plaintiff requested treatment upon the discovery that he was infected with HCV in 2009 and has repeatedly requested treatment unsuccessfully for the debilitating disease, chronic Hepatitis C.

On September 7, 2009 Plaintiff filed an 'emergency' grievance pursuant to Illinois Department of Corrections Administrative Directive to the Chief Administrative Officer, Defendant Pierce, which allows a grievants issues, if life threatening, to be reviewed without delay. The Chief Administrative Officer found that Plaintiff's grievance was not an emergency and denied its review. The Plaintiff's grievance was subsequently reviewed through the usual grievance channels by a designee of the Chief administrative Officer, Defendant Simpson, who found the grievance moot and denied it in the face of an admission by a codefendant, Mahone, that the delay of 2½ years was 'unintentional' and stated that Plaintiff's condition would be followed at that point. The Chief Administrative Officer concurred with the decision of his designee and concluded the grievance process at the institutional level.

The Plaintiff subsequently appealed the decision of Defendant's Pierce and Simpson to the Administrative Review Board. The substance of Plaintiff's allegations were there found to be moot by Defendant's Miller and Randle who

concurred with the findings of Defendant Miller. During the course of these events the Plaintiff also wrote letters to the Chief Administrative Officer, Defendant Pierce, and filed a second 'emergency' grievance. Both letters were not responded to by defendant Pierce, and the second grievance was also denied as being an emergency-inspite of Hepatitis C being a life threatening disease- and Plaintiff's second grievance was denied by each of the aforestated administrative officials governing the grievance procedure. There is clearly a genuine issue of material fact that can easily be decided by a jury.

Case law support the factual dispute as being material. Under the governiing law, the Supreme Court has ruled that the Eighth Amendment is violated by "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291 (1976). Such indifference may be demonstrated by repeated examples of negligent acts which disclose a pattern of conduct ... or by showing systemic or gross deficiencies in staffing, facilities, equipment or procedures. Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980); Wellman v. Faulkner, 715 F.2d 269, 271 (7th Cir. 1983).

The deliberate indifference claim contains both objective and subjective elements. Guitierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997). "in the medical care context, the objective element requires that the inmates medical need be sufficiently serious." Guitierrez, 111 F.3d at 1369. The subjective element requires that the prison official acted with a sufficiently culpable state of mind. The standard for deliberate indifference is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. Haley v. Gross, 86 F.3d 630, 641 (7th Cir. 1996). "[A] prisoner claiming deliberate indifference need not prove that the prison officials intended, hoped for, or desired the harm that transpired." Haley, 86 F.3d at 641. It is enough to show that the Defendant's actually knew of a substantial risk of harm to the Plaintiff and acted or failed to act in disregard of that risk.

A fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. <u>Farmer v. Brennan</u>, 511 U.S. 825, 836-837, 114 S.Ct. 1970, 1977 (1994). The mere fact that Plaintiff's illness could easily lead to organ failure and even death if not treated in a timely manner indicates that the complained of medical illness in Plaintiff's grievance was sufficiently serious and that the Defendant's acted with a culpable state of mind; thus, satisfying both the objective and subjective elements of deliberate indifference. For deliberate indifference to rise to the level of criminal recklessness the Defendant's must have known that the Plaintiff "was at serious risk of being harmed and decided not to do anything to do anything to prevent that harm from occuring even though he/she could easily have don so." <u>Armstrong v. Squandrito</u>, 152 F.3d 564, 577 (7th Cir. 1998)(citing <u>Farmer v. Brennen</u>, 511 U.S. 825, 836-837, 114 S.Ct. 1970 (1994).

Moreover, the Defendant's knew of and disregarded an excessive risk to Plaintiff's health. Defendant's Pierce, Simpson, Miller, and Randle each were aware of the facts giving rise to Plaintiff being denied the knowledge of him being HCV positive. The Defendant's personal involvement is indicated where (1) each Defendant participated directly in the alleged Constitutional violation of being deliberately indifference to Plaintiff's serious medical needs by not properly reviewing his emergency grievance; (2) each Defendant after being informed through Plaintiff's grievance failed to remedy the wrong; (3) the Defendant's had in place a policy that an alleged unknown designee in place of the Chief Administrative Officer and Director of Corrections who could moot the Plaintiff's grievance even though there existed available to them, some evidence and an admission that the Plaintiff's constitutional rights were being violated; (4) Defendant's Pierce and Randle were grossly negligently in supervising subordinates who committed and or supported the commision of wrongful acts; and (5) the Defendant's exhibited deliberate indifference to the rights of Plaintiff by failing to act on information indicating that unconstitutional acts were

occurring. Although an official cannot be personally liable under a theory of respondeat superior, Gentery v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995) "he can, however be held liable if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowl;'edge and consent." Id. "That is he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. Some casual connection or affirmative link between the action complained about and the officials sued is necessary. Wolf-lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983). Thus, the office of the Chief Administrative Officer, Defendant Pierce, and the Office of the Director of the Illinois Department of Corrections, Defendant Randle, are as responsible as though they made the decisions themselves; even more-so where their names appear on Plaintiff's grievances and appeals authoriziing those decisions where no designee couould do so in the designee's own name. Pursuant to **Title 20**-of Corrections, Criminal Justice, and Law Enforcement, **Chapter** I-Department of Corrections, **Subchapter**-E. Operations, **Part 504**-Discipline and Grievances, **Subpart** F-Grievance Procedures for Offenders (20 Ill. Adm. Code 504.805(b) Responsibilities) state: No other individual may routinely perform duties whenever a Section in this Sunpart specifically states the Director or Chief Administrative Officer shall personally perform the duties. However, the Director or Chief Administrative Officer may designate another person or persons to perform the duties during periods of his or her temporary absence or in an emergency.

The Seventh Circuit found that "if the [state prison Director] denied an appeal submitted by [an inmate plaintiff], this would be sufficient to establish personal envolvement" for § 1983 purposes. Pride v. Peters, No. 94-2025, 1995 WL 746190 at *1 (7th Cir. Dec. 15, 1995)(unpublished order). However, in a published case, the Seventh Circuit held that the Director of the state prisons had enough personal involvement because he "approved an unjustified disciplinary ticket issued by [subordinates]," Black v. Lane, 22 F.3d 1395, 1401 (7th Cir. 1994). The Director of the Department of Corrections was "presumed to have knowledge of ... the

unlawful practices at [the prison]." Id. (citing Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985).

The Defendant's also claim they are entitled to qualified immunity, qualified immunity should be granted only when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 475 U.S. 800, 818, 102 S.Ct. 2727 (1982). Public officials are held to an objective reasonableness standard and presumed to be aware of the laws governing their conduct. Crawford-El v. Brittn, 523 U.S. 574, 590-91 (1998). The Court should apply an objective standard in assessing whether prison authorities should have known that failing to consider the codefendant's admission that they allowed 2½ or more years to go by without informing the Plaintiff he had a life threatening disease, was failing to treat his chronic Hepatitis C in any form, and that Plaintiff was told of the disease only after he asked a visiting doctor what the numerical evaluations meant with regard to blood tests perviously taken for years violated his constitutional rights. Saucier v. Katz, 533 U.S. 194, 201-05 (2004). The objective standard asks "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Suacier, Id. The Defendant's are not entitled to qualified immunity when they had an admission by the codefendant's that they allowed an inordinate amount of time to elapse without telling the Plaintiff of his illness that could cause organ failure, liver cancer, and even death, refusing to treat the Plaintiff during the entire time and refused to give Plaintiff medical treatment once he became aware of his condition and requested treatment because deliberate indifference was clearly established as a violation of the Plaintiff's constitutional rights. A reasonable person would have known, as a prison official, that such action violated the 8th Amendment and should have taken reasonable steps in treating Plaintiff's grievance as an 'emergency' and ensured that Plpaintiff's rights were not allowed to continue to be violated.